

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## (Greensboro Division)

| | |
|---|---|
| **STEPHEN MOORE,** | |
| Plaintiff, | Case No.: 1:26CV591 |
| vs. | |
| **DEERE & COMPANY; and JOHN DEERE KERNERSVILLE LLC,** | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | |

## PRELIMINARY STATEMENT

1. This is an action for legal and equitable relief brought by Plaintiff Stephen Moore against his former employers, Deere & Company and John Deere Kernersville LLC (referred collectively throughout this Complaint as "Defendant"). Plaintiff seeks redress for intentional religious discrimination, severe workplace retaliation, and protected medical leave interference via fraudulent personnel record manipulation. Plaintiff Stephen Moore also brings this action under North Carolina common law for false imprisonment (Claim V), wrongful discharge in violation of public policy

1

(Claim VI), intentional infliction of emotional distress (Claim VII), and Common Law Abuse of Process (Claim VIII).

2. Defendant enforced a workplace apparel policy against Plaintiff's religious attire while routinely permitting identical secular items on the production floor. Following Plaintiff's internal discrimination complaints, Defendant executed a hostile gate lockout by deactivating Plaintiff's security credentials immediately upon his return from protected medical leave. Defendant further altered electronic personnel records to reset Plaintiff's hire date in an effort to retroactively strip his FMLA eligibility and terminate his prior elected benefits, confined him in a room against his will, and used a court filing granted based on the termination as the temporal justification to execute a retaliatory discharge.

3. Defendant finalized and executed Plaintiff's termination at 12:44 PM on April 29, 2025, twenty (20) minutes before the state court administrative mechanism it cited as the mandate for discharge was filed at 1:04 PM. This filing was granted at 3:15 PM on April 29, 2025 based on the termination. Defendant later falsely claimed that this subsequent court order justified an adversarial disciplinary meeting held five (5) days prior on April

2

24, 2025. In executing this exact timeline, Defendant submitted contradictory statements under oath to administrative regulatory bodies.

## **JURISDICTION AND VENUE**

4. This Court has subject-matter jurisdiction over the federal statutory claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3) (Title VII), 29 U.S.C. § 2617 (Family and Medical Leave Act), and 29 U.S.C. §§ 1132, 1140 (Employee Retirement Income Security Act).

5. This Court has supplemental jurisdiction over the North Carolina state statutory and common law claims pursuant to 28 U.S.C. § 1367, as the state claims are so related to the federal claims that they form part of the same case or controversy.

6. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events giving rise to the claims occurred at the John Deere Kernersville LLC manufacturing facility located within this judicial district, and Defendant corporate entity conducts substantial business operations within this district.

3

## Evidentiary and Exhibit Conventions

7.     For the avoidance of doubt, certain core documentary, administrative, and photographic assets referenced throughout this Complaint are explicitly annexed hereto as physical attachments and are uniformly labeled with the prefix "Attached hereto as Exhibit" followed by the corresponding letter or number. All other external investigative files, digital metadata, clinical files, and evidentiary metrics referenced herein shall be formally produced and disclosed in their entirety during the subsequent civil discovery phase of this litigation pursuant to Federal Rule of Civil Procedure 26.

## PARTIES

8.     Plaintiff Stephen Moore is a natural person and a citizen of the United States. He resides in Randolph County, North Carolina. At all times relevant, Plaintiff was an "employee" as defined by federal and state employment statutes.

9.     Defendant Deere & Company is a multi-national corporation headquartered in Moline, Illinois. Defendant owns and operates a regional manufacturing campus and wholly owned facility under the trade name John

4

Deere Kernersville LLC, located at 1000 John Deere Road, Kernersville, NC 27284. At all times relevant, Defendant acted as an employer within the meaning of Title VII, the FMLA, ERISA, and applicable state common law.

10.     At all times relevant, Defendant Deere & Company and Defendant John Deere Kernersville LLC operated as a highly unified, single integrated employer under controlling federal standards. As explicitly noted in the official Equal Employment Opportunity Commission (EEOC) Determination and Notice of Right to Sue, the federal agency issued administrative notification concurrently to both the global corporate headquarters in Moline, Illinois, and local defense counsel in North Carolina (Attached hereto as Exhibit A-1, p. 2). This shared administrative handling confirms that the entities share common ownership, centralized control of labor relations, integrated human resource platforms, and a unified corporate legal framework.

11.     For structural clarity throughout this Complaint, Defendants are referred to collectively in the singular as "Defendant." Because of their highly unified operations, any reference to the corporate policies, system databases, or management actions executed by personnel at the local

5

Kernersville facility constitutes the direct corporate actions, shared knowledge, and joint legal liabilities of both named corporate entities.

## **ADMINISTRATIVE PREREQUISITES**

12.     Plaintiff has fully exhausted his administrative remedies prior to filing this action. On August 12, 2024, immediately following the targeted enforcement of Defendant's corporate jewelry policy, Plaintiff initiated formal exhaustion by submitting an electronic administrative inquiry to the Equal Employment Opportunity Commission ("EEOC") Greensboro Local Office.

13.     On October 3, 2024, immediately following a manager-initiated security credential deactivation and facility lockout, Plaintiff traveled to the EEOC Greensboro Local Office and formally filed an in-person, physically signed supplemental administrative disclosure to encompass these subsequent retaliatory actions. This physical filing generated an official Form 5A Charge of Discrimination under Charge No. 435-2024-01634, which was subsequently processed through the electronic portal system and logged on October 7, 2024 (Attached hereto as Exhibit A-2).

6

14.     On February 6, 2025, the EEOC Greensboro Local Office formally processed and acknowledged Charge No. 435-2024-01634, placing Defendant on administrative notice of the active federal investigation.

15.     On March 5, 2025, the EEOC formally issued an administrative Request for a Position Statement to Defendant, officially establishing April 8, 2025, at 4:00 PM, as the absolute final submission deadline for Defendant to log its defensive case.

16.     On April 29, 2025, at 12:44 PM, exactly twenty-one (21) days after the final EEOC Position Statement Submission Deadline concluded, Defendant's local management terminated Plaintiff's employment. Defendant cited a localized, management-initiated state court domestic petition as the post-hoc pretextual operational justification for the discharge, concealing the direct retaliatory nature of the termination.

17.     The EEOC subsequently issued a Determination and Notice of Right to Sue solely for the initial Charge (No. 435-2024-01634) on April 27, 2026 (Attached hereto as Exhibit A-1).

18.     Plaintiff's claims regarding his subsequent April 29, 2025 termination are fully ripe for judicial review before this Court because they are "reasonably related" to his initial, timely filed EEOC charge. Under

7

controlling Fourth Circuit precedent, a plaintiff may raise a Title VII retaliation claim for the first time in federal court without exhausting administrative remedies on that specific claim if the retaliation occurred in response to, and during the pendency of, an initial exhausted charge.

19. Following his termination, Plaintiff proactively initiated a second administrative inquiry on July 10, 2025, regarding the discharge, which the EEOC formally acknowledged as Charge No. 435-2025-01587 on August 11, 2025. Plaintiff filed this Civil Complaint within ninety (90) days of receiving the April 27, 2026, Notice of Right to Sue for Charge No. 435-2024-01634.

## **EXHIBITS**

20. Attached hereto and incorporated by reference are the following exhibits referenced herein:

   a) **Exhibit A-1**: EEOC Notice of Right to Sue Letter issued on April 27, 2026, for Charge No. 435-2024-01634.

   b) **Exhibit A-2**: Signed EEOC Form 5A Charge of Discrimination document under Charge No. 435-2024-01634.

8

c) **Exhibit A**-6: Form 5: Charge of Discrimination for Charge No. 435-2024-01634

d) **Exhibit D-1**: John Deere Corporate Jewelry Policy Manual, designated as Doc. No. JDKP-335.

e) **Exhibit D**-2: 01/01/2025 Hire Date Alteration Submitted to EEOC by Defendant as Evidence for Benefits Removal

f) **Exhibit F-1**: Contemporaneous Photographic Evidence of secular apparel worn on the production floor.

g) **Exhibit F-2**: Visual comparisons of Plaintiff's actual religious bracelets next to a standard wristwatch.

h) **Exhibit F-3**: Physical and visual evidence regarding the bulky green welding sleeves.

i) **Exhibit R-1**: Plaintiff's 2023 Non-Exempt Annual Review showing "Highly Successful."

j) **Exhibit W-2**: State insurance EDI Form 19 regulatory filing dated October 25, 2024 ("*ASKED TO REMOVE*" & "*KOHN DEERE KERERSVILLE*").

k) **Exhibit W-3**: North Carolina Industrial Commission Form 61 Denial document ("*KOHN DEERE KERERSVILLE*").

l) **Exhibit W-4**: North Carolina Industrial Commission Order Assessing Sanction dated September 18, 2025.

m) **Exhibit Z**: Handwritten thank-you note from Manager Lindsey Cota showing appreciation.

## STATEMENT OF FACTS

### I. Religious Practice and The Safety Pretext

21. Plaintiff is an adherent of the Chakra and Nazar spiritual traditions. His sincerely held religious beliefs require the continuous wearing of uncovered, compact, skin-contact religious wrist apparel, specifically consisting of smooth Evil Eye, Tiger-Eye, and Jade spiritual beads, on both his right wrist and left wrist as tools for active spiritual deflection, energetic flow, and personal well-being.

22. The sudden shift in Plaintiff's employment environment stands in stark contrast to the exceptional professional baseline established by management immediately prior to the apparel dispute. Specifically, on November 2, 2023, Plaintiff's supervisor, William Bridges, formally executed

10

Plaintiff's 2023 Non-Exempt Annual Review, awarding him an overall performance rating of *"Highly Successful"* attached hereto as Exhibit R-1.

23. In that official performance evaluation, management explicitly documented that Plaintiff maintained *"zero attendance points with no active coaching or counseling actions,"* successfully submitted an accepted Kaizen efficiency project, served as a reliable back-up lead technician, and was *"always ready everyday [sic] to perform his best."* The evaluation concluded by noting that Plaintiff was a *"great teammate"* and that management *"look[ed] forward to working with him as we move into the new year."*

24. Prior to the sudden shift in Plaintiff's employment environment, he strived to never miss a day of work and made every effort to arrive at least 30 minutes early.

25. Following this stellar performance evaluation, Plaintiff's upward career trajectory continued into the 2024 calendar year. On May 21, 2024, Manager Lindsey Cota explicitly validated Plaintiff's ongoing performance and alignment for upward mobility, stating in writing that his career outreach was *"never a bother,"* and confirming that General Manager Steven Brewer was actively tracking Plaintiff for advanced project assignments.

11

26. This corporate career track was formalized on June 10, 2024, when Ms. Cota officially scheduled and authorized a final logistics "job shadow" session alongside PDP Buyer Kristian Eller. This documented path toward corporate advancement highlights that Plaintiff maintained an unblemished operational record prior to his disclosures.

27. Following the completion of the shadowing sessions, Ms. Cota maintained manager-initiated professional outreach. On July 8, 2024, Ms. Cota sent an electronic transmission to Plaintiff stating she *"had looked for you a couple times,"* invited him to an individual *"1:1"* development meeting to discuss his college degree, and encouraged him to *"review"* and *"let me know if you have any questions"* regarding open corporate NTA positions on her immediate team.

28. Defendant's application of its workplace safety guidelines varies based on the secular or religious nature of the wrist apparel worn by employees. Under Equal Employment Opportunity Commission Charge No. 435-2024-01634, Defendant's certified Position Statement formally documented that its underlying facility safety guideline *"does allow for the wearing of a wristwatch, so long as the watch is snug to the wrist."* Plaintiff wore religious chakra bracelets that maintained a compact, snug physical

12

profile identical to a standard wristwatch. The bracelets posed no greater operational or mechanical hazard than the secular wristwatches explicitly permitted on the production floor by Defendant's guidelines.

29. Defendant's directive requiring Plaintiff to cover the apparel with a sleeve prevents Plaintiff from adhering to his spiritual practices. Because Plaintiff's beliefs require the religious apparel to remain completely unobstructed to maintain active spiritual deflection and energetic flow, an opaque sleeve neutralizes the items' utility. Specifically, any physical barrier, regardless of its transparency, neutralizes the items' utility by blocking the Nazar's ('Evil Eye') line of sight, while simultaneously rendering the Tiger-Eye and Jade beads spiritually inert.

30. The physical characteristics of the permitted secular wristwatches present identical or greater operational risk profiles than Plaintiff's religious apparel. A standard secular wristwatch permitted by Defendant features a protruding metallic casing, an external crown, a physical winding stem, and mechanical buckle assemblies that present an inherent operational risk of catching on manufacturing equipment. In contrast, Plaintiff's religious Evil Eye, Tiger-Eye, and Jade bracelets utilize elasticized tension to maintain a low-profile, skin-contact fit that features a

13

physical and geometric profile substantially similar to, or smaller than, a standard wristwatch assembly (Attached hereto as Exhibit F-2).

31.     Although Defendant permitted these protruding secular components on the production floor while banning low-profile religious beads, Defendant refused to allow or engage in the mandatory interactive process regarding low-profile structural reinforcement methods, such as 1/32" 7x7 industrial stainless steel aircraft cable manufactured in accordance with ASTM A492-95 (2019) standards, despite its minimal mechanical hazard profile, while permitting secular wristwatches that presented far greater mechanical hazards.

32.     Furthermore, to completely eliminate any risk of mechanical entanglement, Plaintiff's low-profile religious apparel could be fitted with an engineered, load-rated breakaway safety clasp. This ensures that in the highly unlikely event of mechanical contact, the bracelet would immediately break away harmlessly from the wrist, presenting a vastly superior safety and hazard profile to the unmitigated, high-tensile wristwatch assemblies permitted by Defendant.

33.     Defendant claimed to administrative bodies that *"They also offered multiple alternatives, including having Mr. Moore wear the bracelets*

14

*on his ankle or another part of his body or secure the bracelets to his wrists and forearms through some form of covering such as welding sleeves, wrist bands, or long sleeved shirts over top, all of which they offered to him at no expense.* "All of these options result in one option—covering.

34.     First, it is a functional and spiritual impossibility for Plaintiff to wear these specific, skin-contact religious wrist items on alternate anatomical placements while maintaining their necessary theological purpose. Because the religious bracelets are custom-sized to the specific circumference of Plaintiff's wrists, it is physically impossible to secure them to "*another part of his body.*" The human body features no other viable anatomical placement to secure compact wrist items. All of Defendant's "*multiple alternatives*" they claimed to offer as an array of distinct options required the identical operational result, which is the total physical concealment of Plaintiff's religious apparel.

35.     The "*welding sleeves*" referenced by Defendant constitute standard personal protective equipment (PPE) that Defendant is already required to purchase and provide universally to facility welders.

36.     The instructions to conceal the bracelets by wearing welding sleeves, long sleeves, or wrist bands achieved the identical, singular result

15

of physical concealment. Furthermore, the only protective equipment mentioned that Defendant would provide was welding sleeves—items Defendant already provides universally to facility welders as standard personal protective equipment (PPE). Offering an employee a pre-existing, universally accessible workplace safety tool and characterizing it as a unique, personalized religious accommodation is highly misleading. By presenting a singular concealment mandate as an array of distinct options, Defendant fabricated its compliance record to administrative authorities.

37. Defendant asserted to administrative regulatory bodies that its enforcement action against Plaintiff's religious attire was mandated by strict operational adherence to its corporate "Jewelry Policy" Doc. No. JDKP-335 (Attached hereto as Exhibit D-1). However, while Defendant prohibited Plaintiff's snug, compact religious wrist apparel, it permitted secular employees to perform active physical work on the production floor while wearing jewelry items that departed from that policy.

38. Specifically, page 1 of Defendant's corporate policy manual, Doc. No. JDKP-335 contains explicit exceptions that completely undermine its stated safety purpose by stating that the rules *"do not apply to people who*

*are not engaged in physical work,"* such as office employees or safety auditors.

39.     Under this corporate exception, Defendant routinely permitted supervisors and office personnel to walk freely through high-hazard production areas alongside active machinery while wearing loose, unmitigated jewelry items.

40.     Furthermore, Doc. No. JDKP-335 leaves enforcement entirely up to subjective opinion, stating that items shall not be *worn "as determined by their Supervisor or the Safety Specialist,"* thereby granting local managers unchecked authority to target Plaintiff's religious items while ignoring secular items.

41.     Furthermore, while Defendant prohibited Plaintiff's snug, compact religious wrist apparel, it permitted secular employees to perform active physical work on the production floor while wearing jewelry items that departed from that policy. Defendant's sudden, targeted enforcement of the "Jewelry Policy" against Plaintiff started after he disclosed their religious nature.

42.     Specifically, on the production floor, Defendant continuously permitted employees to wear secular, large, metallic rings while actively

17

operating heavy machinery and climbing onto logistics equipment, in direct violation of JDKP-335's explicit mandate that employees performing physical work *"shall not perform work assignments while wearing rings."*

43. This differential enforcement of corporate policy Doc. No. JDKP-335 is documented by contemporaneous photographic evidence (Attached hereto as Exhibit F-1). Specifically, Exhibit F-1 documents an active heavy equipment operator inside a machinery cab wearing a ring on his left hand (Image 11) while performing physical operational tasks. Additionally, Exhibit F-1 documents an active floor employee wearing a ring on his left hand (Image 9) while standing adjacent to operational machinery during active shift hours.

44. By permitting visible, secular ring and wristwatch policy departures to continue unhindered on the production floor while simultaneously threatening Plaintiff with immediate discharge for a compact religious wrist item, Defendant enforced its safety metrics selectively based on religious status. This differential treatment demonstrates that Defendant applied its corporate safety standards inconsistently to prohibit religious attire while tolerating equivalent secular jewelry.

18

45.     This extensive, coordinated, and differential enforcement of corporate apparel metrics by local management is explicitly documented by contemporaneous photographic evidence. Specifically, Exhibit F-1 contains twelve (12) distinct, numbered visual entries capturing the facility's active operational reality.

46.     Each of these permitted secular wrist items shares an identical or more pronounced physical and geometric profile compared to Plaintiff's compact spiritual bracelets.

47.     To demonstrate the selective nature of local management's enforcement metrics, in Exhibit F-1 Plaintiff indexes the secular wrist apparel permitted across the facility's highest-hazard industrial roles alongside the compact religious items that were subjected to a selective, mandatory concealment-or-termination ultimatum:

a. **Plaintiff (Logistics Specialist):** Wore compact, low-profile religious Chakra/Nazar wrist apparel for material handling. Result: Subjected to hostile facility lockout and a mandatory concealment-or-termination ultimatum.

**b. Image 1 (Welder):** Wore secular smartwatch/tracker in an extreme industrial hazard zone with high-heat welding arcs and sparks. Result: Permitted to operate bare-wristed and unhindered.

**c. Image 2 (Facilities Worker):** Wore industrial secular wristwatch around plant-wide infrastructure and heavy equipment. Result: Permitted to operate bare-wristed and unhindered.

**d. Image 3 (Maintenance Technician):** Wore secular timepiece/watch during high-risk mechanical troubleshooting and internal machinery repairs. Result: Permitted to operate bare-wristed and unhindered.

**e. Image 4 (Welder):** Wore a secular smartwatch in a high-heat manual fabrication environment near active sparks and heavy tooling. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

**f. Image 5 (Paint Dept. Lead Tech):** Wore a digital sports watch in a chemical exposure area with specialized painting infrastructure and technical oversight. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

**g. Image 6 (Maintenance Technician):** Wore a secular wrist tracker while handling active industrial machinery, plant mechanics, and

20

physical tooling. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

**h. Image 7 (Plant Personnel):** Wore secular wrist apparel during plant floor operations oversight and active supervisory transit. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

**i. Image 8 (Welder):** Wore a secular timepiece during manual structural welding with open heat-generation and heavy hand-tool operations. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

**j. Image 9 (Welder - Cross-Deployed to Logistics):** Wore a thick-banded secular watch and a large ring. This worker was cross-deployed directly into Plaintiff's immediate workflow department. Management enforcement action: None. Permitted to work bare-wristed in the exact same department.

**k. Image 10 (Maintenance Personnel):** Wore a smartwatch/fitness tracker around complex machinery, diagnostic testing, and physical plant maintenance. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

21

**l. Image 11 (Maintenance Personnel):** Wore a thick-strap digital watch and a large ring during heavy machinery calibration and physical repair tasks in active lines. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

**m. Image 12 (Lead Tech Welder):** Wore a secular smartwatch/tracker while providing technical line leadership, active structural welding, and fabrication management. Management enforcement action: None. Permitted to operate bare-wristed and unhindered.

48. As detailed above, Defendant routinely permitted bare, unhindered secular wrist items to be worn by Welders, Maintenance Technicians, and Lead Techs operating in the facility's highest-risk, high-heat, and heaviest machinery hazard zones.

49. Conversely, Plaintiff, a Logistics technician operating in a lower physical hazard environment, was issued an immediate concealment-or-termination ultimatum for an identical or lower-profile religious wrist item.

50. Specifically, Exhibit F-1 (image 9) documents that a secular worker cross-deployed from the Welding department into Plaintiff's exact

22

Logistics department was permitted to operate bare-wristed without corporate interference.

51. Defendant tolerated these physical risk profiles for secular items in high-hazard roles while prohibiting Plaintiff's compact spiritual bracelets in a lower-hazard role.

52. On August 12, 2024, local management targeted Plaintiff's religious chakra bracelets for enforcement under the corporate "Jewelry Policy." Although Plaintiff had worn these compact, snug-fitting religious items openly for over a full year with zero operational or safety incidents, Human Resources Representative Mike Fogleman ordered the complete removal of his religious apparel.

53. On August 12, 2024, following this discriminatory directive and refusal to accommodate, Plaintiff sought formal administrative relief by initiating his filing with the EEOC.

54. Defendant's subsequent administrative statements regarding this directive stand in direct, irreconcilable contrast to its certified state regulatory filings. On Page 2 of Defendant's certified 435-2024-01634 EEOC Position Statement, Defendant asserted: "*JDK denies that at any point did*

23

*Mr. Fogleman instruct Mr. Moore that he was required to remove the bracelets."*

55. However, on October 25, 2024, Defendant's authorized agent submitted an official state insurance EDI Form 19 regulatory filing documenting the "Cause and Nature of Injury" as follows: *"WAS ASKED TO REMOVE THEN COVER UP BRACELETS DUE TO JEWELRY POLICY. EMPLOYEE LEFT AND TOOK FMLA UNTIL 10/3/2024"* (Attached hereto as Exhibit W-2, Box #12).

56. This state administrative filing documents that local management instructed Plaintiff to remove his religious apparel, directly contradicting Defendant's subsequent denials submitted to the EEOC.

57. On August 13, 2024, at approximately 9:50 AM, Plaintiff provided Defendant with written notice of a request for religious accommodation by transmitting a formal memorandum titled *"The Burden of Belief"* via electronic mail directly to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer (Comegys). This document detailed the religious foundation of Plaintiff's chakra beliefs, cited applicable Title VII and Department of Labor legal standards regarding religious accommodation and undue hardship, and formally advised Management that

24

the forced removal of his religious apparel conflicted with his faith and caused severe psychological distress.

58. On that same calendar day, August 13, 2024, at approximately 11:27 AM, Plaintiff transmitted a companion formal email disclosure titled *"The Hypothetical Dilemma"* directly to General Manager Steven Brewer. This document alerted the facility's highest operational executive that local Human Resources representatives were utilizing safety policies to prohibit religious apparel and formally advised management of Plaintiff's active enforcement and initiation of administrative relief with the EEOC due to the denial of a religious accommodation.

59. On August 14, 2024, local management conducted an unannounced administrative meeting targeting Plaintiff. Specifically, Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley summoned Plaintiff to the facility on his scheduled day off and issued an ultimatum demanding the absolute concealment of his religious wrist apparel.

60. During this interaction, Plaintiff requested reasonable accommodation to continue wearing his compact chakra bracelets as

25

normal, noting that he had performed his assembly duties openly for over a year without a single operational or safety incident.

61.     Defendant denied Plaintiff's request and instead proposed that Plaintiff wear bulky, loose-fitting green *"welding sleeves"* over his wrists and forearms. Because these oversized sleeves (Attached hereto as Exhibit F-3) were a physically higher safety risk for his logistics warehouse role, and because unavoidably covering the items directly violated his religious tenets, Plaintiff declined the non-viable proposal.

62.     Because Plaintiff's sincerely held spiritual beliefs require that the Nazar (Evil Eye) talisman remain completely unobstructed to execute active deflection of negative energy, mandating a covering prevents the religious practice entirely rather than modifying it.

63.     While management mandated immediate compliance with the covering directive on August 14, 2024, management declined to discuss localized workflows. Faced with an immediate directive to suppress his religious practice while experiencing acute mental distress, Plaintiff suffered an immediate panic attack and was compelled by a medical emergency to exit the hostile meeting space to manage his worsening psychiatric symptoms.

26

64. Consequently, Plaintiff's departure from the room was a physical physiological response to the directive.

65. On August 15, 2024 at approximately 3:16 PM, Human Resources Manager Brian Mosbaugh sent Plaintiff an email on his day off requesting a meeting to be held fourteen (14) minutes later at 3:30 PM.

66. On August 16, 2024, Plaintiff logged a comprehensive internal discrimination report into Defendant's internal corporate compliance system under EthicsPoint Report Key 973570938501, advising corporate oversight that local management was forcing the removal of his religious attire. Subsequently, on August 18, 2024, at approximately 7:23 PM, Plaintiff added an official Follow-Up disclosure to the portal explicitly rejecting Defendant's alternative covering directives, documenting that *"The meeting I had with the HR manager [Mosbaugh] only made the issue worse when I was given the options to remove my religious apparel or cover it up."*

67. On August 16, 2024 at approximately 3:11 PM, Defendant's "posted by Organization" response informed Plaintiff to provide his Report Key and password to Ethics & Compliance Process Manager Russell Nieman if he had any additional information regarding the incident.

27

68. On August 17, 2024, Plaintiff formally reported Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley to internal corporate compliance channels for policy enforcement and differential treatment under EthicsPoint Report Key 327000348401. This formal submission alerted corporate compliance to the ongoing hostility and disparate enforcement practices taking place at the facility.

69. The emotional distress and psychological trauma resulting from the August 14, 2024 ultimatum triggered an acute mental health crisis, necessitating an emergency clinical evaluation on August 19, 2024, and forcing Plaintiff onto protected FMLA medical leave before any alternative accommodation was reached.

70. On August 17, 2024, at approximately 11:02 AM, Plaintiff provided formal written notice of the ongoing religious apparel dispute via an electronic mail transmission directed to Manager Tami McNeer (Comegys). In this disclosure, Plaintiff reported that local management had actively pressured him into removing his religious items against his will, stating: *"I can only describe it as a Muslim being forced to eat pork,"* and explicitly advised management that Defendant's covering directive seemed questionable, noting it was not an accommodation.

28

71.     This August 17, 2024 email correspondence further provided Defendant with contemporary written notice of a separate Title VII violation at the facility. Specifically, Plaintiff documented that local management forced him to participate in a sectarian group prayer during a mandatory company standdown meeting earlier that year regarding an incident where a tractor-trailer backed into a man, pinning him between a loading dock and the back of the tractor-trailer. Plaintiff reported that when he raised civil rights concerns regarding the forced prayer, Human Resources Manager Brian Mosbaugh dismissed both the forced prayer and the apparel restriction as mere *"minor incidents."*

72.     In the same transmission to Manager Tami McNeer (Comegys), Plaintiff documented the immediate psychological impact of the local management group's enforcement actions, writing that he was *"too emotionally distraught to describe everything perfectly"* and had been *"pressured into removing"* his religious items.

73.     Plaintiff further put Defendant's Manager Tami McNeer (Comegys) on notice that management was actively spreading details of his confidential accommodation meetings across the workplace, documenting:

*"I could tell that several people in the office had been gossiping about the incident. People were staring and acting funny."*

74.     On Monday, August 19, 2024, at 11:30 AM, Manager Tami McNeer (Comegys) acknowledged the severity of the reports via electronic mail, confirming that Plaintiff's concerns were routed to active internal investigation channels and directing him to utilize the corporate EthicsPoint hotline database for secure tracking. At approximately 11:52 AM that same day, Plaintiff transmitted a written follow-up note to Ms. McNeer (Comegys) informing her that *"I do not feel comfortable"* discussing the issue with Human Resources Manager Brian Mosbaugh. Plaintiff also confirmed that he had successfully logged the active discrimination violations into the global EthicsPoint database.

75.     Following the initial internal disclosures, on August 19, 2024, Plaintiff underwent an emergency clinical evaluation at the Guilford County Behavioral Health Center. This evaluation formally codified the clinical diagnoses of an acute Panic Attack and Generalized Anxiety Disorder stemming from the workplace hostility.

76.     On August 19, 2024, at approximately 11:50 AM, Plaintiff placed local management on written notice of his psychological and

30

physiological responses to the apparel dispute via an email transmitted directly to Manager Lindsey Cota. Plaintiff documented that during his clinical evaluation, his blood pressure rose from a baseline of 120/80 to an acute hypertensive state of 150/80 when asked by medical staff to recount the workplace events. Plaintiff further advised management that his medical providers prescribed targeted, clinical therapeutic medications to treat the acute anxiety resulting from the facility dispute.

77.     On August 19, 2024, Plaintiff updated his active internal compliance record under EthicsPoint Report Key 327000348401 to place Defendant on formal notice of his emergency medical status. As documented across these compliance logs and corresponding clinical records, the physiological and psychological impact of local management's enforcement actions resulted in acute medical distress. Specifically, Plaintiff noted that his baseline blood pressure elevated to a hypertensive metric the moment he was asked to recount the workplace apparel incident, that clinical diagnoses of acute Panic Attacks and Generalized Anxiety Disorder were formally codified as stemming directly from the workplace hostility, and that targeted, clinical therapeutic medications were prescribed to manage these severe physiological symptoms, proving that the proposed covering directive directly

31

interfered with Plaintiff's health and operational ability to remain on the production floor.

78. On August 21, 2024, formal written medical directives from Dr. Julie Nguyen on Cone Health Outpatient Behavioral Health letterhead were transmitted to Human Resources Representative Veronica McNeill, which Ms. McNeill formally acknowledged as received on August 22, 2024.

79. This documentation placed Defendant on explicit notice that Plaintiff required an immediate, total work excuse to enter a four-week virtual Mental Health Intensive Outpatient Program (MH-IOP) stretching through an anticipated return date of September 23, 2024, thereby establishing a baseline medical timeline that Defendant's subsequent retaliatory gate lockout was calculated to disrupt.

80. On August 22, 2024, Supervisor Jessie White forwarded Plaintiff's medical note and FMLA filing notice to Human Resources Manager Brian Mosbaugh, Supervisor William Bridges, and Human Resources Representative Veronica McNeill.

81. Plaintiff was placed on approved medical leave under the Family and Medical Leave Act (FMLA).

32

82. As detailed in his master attendance records and certified medical notes, Plaintiff was admitted into and completed a daily multi-week group treatment regimen within the Cone Health Behavioral Health Partial Hospitalization and Intensive Outpatient Programs from August 20 through September 12, 2024, under the care of Dr. Julie Nguyen, Case Manager Rita Clark, and Counselor Cory Bates.

83. Following completion of this daily program, Plaintiff transitioned into a structured, monthly outpatient therapy framework under the clinical care of Jessica R. Schlosberg, LCSW, maintaining consistent treatment stretching through the time of this filing of this civil complaint.

84. Throughout this approved medical leave, Plaintiff maintained weekly communication with management regarding his medical status, verifying his regular check-ins with Human Resources Representative Veronica McNeill.

85. On Wednesday, September 4, 2024, at approximately 8:40 AM, Plaintiff transmitted a written status update to management confirming his compliance with the virtual intensive outpatient group therapy regimen running from 9:00 AM to 12:00 PM, Monday through Friday, and stated his intent to manage his health condition through ongoing clinical therapy.

33

86. On September 5, 2024, while out on protected medical leave, Plaintiff submitted a formal, written supplement to corporate compliance through both of his EthicsPoint filings—Report Key 973570938501 and Report Key 327000348401. This supplemental filing placed Defendant on explicit, written notice of ongoing financial retaliation, detailing that local management had frozen Plaintiff's scheduled 2-year anniversary pay raise (due August 8, 2024) and block-voted to deny his standard vacation cash-out requests immediately following his internal discrimination disclosures.

87. As confirmed by his daily clinical records spanning August 20 through September 11, 2024, Plaintiff engaged in daily psychiatric rehabilitation. Plaintiff completed the virtual MH-IOP program on September 12, 2024, as certified by Counselor Rita Clark, who cleared Plaintiff to return to work on September 23, 2024, without restrictions.

88. On September 10, 2024, at approximately 3:10 PM, Defendant submitted a post *"by Organization"* regarding the August 16, 2024, filing under EthicsPoint Report Key 973570938501 involving Mr. Fogleman. This post stated, *"Thank you for your recent submission to the John Deere Global Compliance Hotline. A copy of your report has been*

*forwarded to the appropriate party for follow-up. No further information will be available under this report key and password."*

89. On September 17, 2024, corporate compliance closed Plaintiff's August 17, 2024, filing under EthicsPoint Report Key 327000348401 involving Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley. In this closure, Defendant encouraged Plaintiff to contact his *"...HR representative or Hotline at any time you believe there to be a potential violation..."*

90. Prior to this September 17, 2024, closure, and up until the day Plaintiff was terminated, Human Resources Manager Brian Mosbaugh maintained ultimate administrative authority over Plaintiff's employment file, while operational HR Representative Veronica McNeill processed daily front-line personnel paperwork for the facility.

91. On or around September 27, 2024, Workforce Relations Compliance and Benefits Advocacy Manager Dan Webster contacted Plaintiff about his internal reporting and directed him to talk to Human Resources Brian Mosbaugh. Plaintiff informed Mr. Webster that he did not feel comfortable with Manager Mosbaugh.

35

92. Because Defendant corporate leadership explicitly designated and assigned Manager Brian Mosbaugh as Plaintiff's primary point of contact for the resolution of internal compliance disputes, Mosbaugh legally acted as Plaintiff's designated HR representative for all material face-to-face administrative directives.

93. Following the conclusion of his FMLA window on September 22, 2024, Plaintiff utilized standard facility operational protocols to take approved, voluntary time off without pay (LA1) stretching through October 2, 2024. While Defendant routinely permits secular production workers to utilize continuous LA1 allotments without freezing their facility access credentials, Defendant treated Plaintiff with strict disparity by proactively deactivating his electronic security badge during this standard voluntary leave period.

## II. The Retaliatory Badge Deactivation and Closed-Door Interception

94. Immediately following the conclusion of Plaintiff's approved medical leave and concurrent voluntary time off, Defendant systematically undermined Plaintiff's clinical recovery and return-to-work clearance. Rather than facilitating a standard operational re-entry, Defendant actively authorized the very local management personnel previously reported for discrimination to execute an immediate, coordinated facility lockout.

36

95. On October 3, 2024, upon Plaintiff's attempted return from approved FMLA medical leave, Defendant's local agents, specifically Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley, proactively deactivated Plaintiff's electronic security credentials and facility gate access badge. This access restriction was executed by the same management personnel that Plaintiff previously reported to corporate compliance, utilizing facility access restrictions to isolate Plaintiff and condition his return to work upon an unannounced administrative meeting.

96. On October 3, 2024, upon discovering that his facility gate credentials had been deactivated while on an approved leave window, Plaintiff suffered an acute, debilitating psychological crisis. This sudden, unannounced facility lockout actively ruptured Plaintiff's ongoing clinical treatment plan, inducing immediate physical symptoms of panic and severe emotional distress. Facing an immediate loss of employment stability, Plaintiff was forced to wait outside the secure facility boundary under extreme distress until an operational representative arrived to vouch for his physical entry.

97. On October 3, 2024, upon being required to bypass the badge access restriction, Plaintiff was intercepted and summoned to a

closed-door meeting room at approximately 7:00 AM. This meeting was coordinated by Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley, the two actors Plaintiff had reported to corporate compliance on August 17, 2024, alongside Supervisor William Bridges.

98. During this meeting, Plaintiff proposed a lateral job transfer to an open position on the logistics loading dock, a separate section within the facility comprising independent forklift work where manufacturing machinery entanglement concerns were absent. Plaintiff requested to work in this open loading dock position to resolve the apparel dispute. Human Resources Manager Brian Mosbaugh refused to discuss or consider the open loading dock position and instead reiterated the directive requiring Plaintiff to completely conceal his religious wrist apparel or face immediate termination. The requested logistics loading dock and kitting roles were routinely filled by cross-deployed personnel and entirely removed from mechanical machinery hazards.

99. By abruptly truncating the interactive process with an immediate "cover or fired" ultimatum, Defendant foreclosed any bilateral exploration of readily available, zero-risk operational alternatives within the Logistics infrastructure. Specifically, Defendant's local management

38

completely failed to evaluate or offer placement in the department's enclosed cab yard tractor position. This pre-existing workflow operates entirely within an isolated vehicle cab and outdoors, completely removed from manufacturing floor hazards, and is accessed strictly via non-PPE administrative walkways.

100. Operating this specific machinery (tractor) occurs entirely within an enclosed, protective vehicle cab and outdoors, completely isolated from the manufacturing production floor.

101. Because the vehicle is equipped with an automated hitch, all equipment connections are performed hands-free from inside the vehicle, entirely eliminating any requirement for the operator to exit the cab or come into contact with external mechanical entanglement hazards.

102. Plaintiff's daily entry and exit pathing to access this equipment (tractor) would be limited strictly to standard administrative transit pathways and walkways where heavy industrial personal protective equipment (PPE) is not required by facility guidelines.

103. By placing Plaintiff in this pre-existing, vacant, or routinely cross-deployed Logistics role, the workspace remained completely

39

separated from manufacturing hazards. Defendant's refusal to investigate or discuss this outdoor workflow left the physical placement unreviewed.

104. Even though this isolated role was structurally available within Plaintiff's assigned Logistics framework, Defendant refused to evaluate or consider alternative department workflows, preferring to force an immediate discriminatory concealment-or-termination order instead.

105. As admitted by Defendant on Page 3 of its certified 435-2024-01634 EEOC Position Statement, during this October 3, 2024 meeting, local management conditioned Plaintiff's right to perform work on the production floor upon the absolute concealment of his religious attire.

106. Faced with an immediate threat of termination issued by the facility's highest local Human Resources authority, Plaintiff unwillingly submitted to the cover directive under acute economic duress as a temporary condition of retaining his livelihood, while explicitly advising management that he maintained his fundamental religious objections to the forced concealment.

107. Immediately following this closed-door confrontation, Plaintiff was forced to exit the facility under severe economic duress to purchase external materials capable of concealing his sacred items. Contemporary

electronic time-clock tracking logs subsequent to the meeting reveal that corporate agents—operating under the direct supervision of Human Resources Manager Brian Mosbaugh—actively manipulated Plaintiff's operational logs, generating a manual time-card override that clocked Plaintiff out of work concurrently with the administrative meeting window to strip his compensation.

108. On Page 3 of Defendant's certified 435-2024-01634 EEOC Position Statement, Defendant stated textually: *"Because Mr. Mosbaugh and Ms. Rumley did not consider the religious accommodation issue to be resolved, they temporarily deactivated Mr. Moore's security badge..."* Defendant further admitted that this intentional credential deactivation was executed while *"Mr. Moore was out of work on a medical leave of absence, which JDK provided to him in accordance with the Family Medical Leave Act."*

109. On October 3, 2024, immediately following the credential deactivation and meeting executed by Human Resources Manager Brian Mosbaugh, Plaintiff filed a third formal report through Defendant's corporate compliance system under EthicsPoint Report Key 612346367501, reporting the sudden credential deactivation.

41

110. On October 3, 2024, Defendant's global corporate compliance system posted an automated update directing Plaintiff to contact Russell Nieman, Ethics & Compliance Program Manager, at 309-765-5332 or NiemanRussellR@JohnDeere.com if he had any additional information.

111. Concurrently, Plaintiff updated his active administrative file with the Equal Employment Opportunity Commission under Charge No. 435-2024-01634, documenting the credential deactivation and gate intercept as an adverse enforcement action (Attached hereto as Exhibit A-2).

112. On October 6, 2024, Plaintiff submitted a Follow-Up note to the EthicsPoint Report Key 612346367501 filing, stating that he was *"being forced to do things [cover religious apparel] that do not align with my religious values."*

113. On October 7, 2024, Plaintiff sent a formal written disclosure via email directly to Ethics & Compliance Program Manager Russell Nieman. This correspondence explicitly placed corporate leadership on notice that local management was abusing power in retaliation for Plaintiff's EEOC filings. It also affirmatively notified Defendant of Plaintiff's acute psychological injuries, stating textually: *"I keep waking up in the middle of*

42

*the night having panic attacks. I feel uncomfortable and scared when I think about walking past the office area at work."*

114. On Wednesday, October 9, 2024, at approximately 1:46 PM, exactly six (6) days after the initial database lockout and facility interception, Worldwide Security Investigator Dicky Mah transmitted an electronic directive to Plaintiff captioned *"Highly Confidential."* In this transmission, global corporate security personnel demanded an immediate closed-door compliance interrogation via Microsoft Teams.

115. Demonstrating an intentional pattern of isolation, Investigator Mah explicitly imposed a strict corporate order upon Plaintiff, mandating: *"Please do not forward this meeting notice to anyone else or tell anyone that you are meeting with compliance."* While simultaneously demanding total narrative secrecy and isolating Plaintiff from external peer support, Defendant ironically provided a digital link to its official "Policy Against Retaliation," utilizing corporate compliance channels to shield its own adversarial investigation from transparency.

116. On October 10, 2024, Plaintiff participated in an administrative video conference interview conducted by Defendant's Security Operations Manager and Investigator David Hamilton, and Worldwide Security

43

Investigator Dicky Mah. As admitted on Page 4 of Defendant's certified 435-2024-01634 EEOC Position Statement, the primary purpose of this interview was to review Plaintiff's claims that Human Resources Manager Brian Mosbaugh had been hostile and had retaliated against him. During this interview, the primary example of retaliation provided by Plaintiff was the deactivation of his security badge and the subsequent gate lockout.

117. During this video conference, in the presence of Worldwide Security Investigator Dicky Mah, Security Operations Manager David Hamilton asserted that Defendant possessed the authority to require an employee who wore a beard for religious purposes to shave as a mandatory condition of employment. Mr. Hamilton stated to Plaintiff: Knowing we can do that, are you going to willingly cover up your religious apparel? Mr. Hamilton further referenced Plaintiff's internal statutory reports regarding religious apparel covering enforcement and a request for accommodation stating that those disclosures were "*muddying the water.*"

118. On October 14, 2024, exactly eleven (11) days after local management executed the hostile badge deactivation lockout, Plaintiff began ongoing, intensive clinical therapy sessions to treat acute, debilitating psychological trauma—including documented clinical diagnoses of Panic

44

Attacks and Generalized Anxiety Disorder—induced directly by Defendant's escalating workplace hostility.

119.     On November 8, 2024, Plaintiff supplemented his active internal compliance record under EthicsPoint Report Key 612346367501 by transmitting photographic evidence through the EthicsPoint portal. This evidence captured production floor employees wearing wristwatches and fitness trackers while performing physical production duties and operating heavy logistics machinery, including forklifts.

120.     This operational comparison is documented in Defendant's certified 435-2024-01634 EEOC Position Statement. On Page 2 of that filing, corporate counsel stated that the facility's safety guideline *"allows for the wearing of a wristwatch, so long as the watch is snug to the wrist."* Plaintiff's religious chakra bracelets maintained a physical profile, width, and alignment to the wrist identical to a standard wristwatch.

121.     On Tuesday, November 19, 2024, at approximately 8:32 AM, Worldwide Security Investigator Dicky Mah transmitted an electronic mail notification to Plaintiff explicitly stating that corporate security had officially concluded its compliance inquiry and requested a brief 10-to-15-minute

45

Microsoft Teams conference to deliver the structural results of the investigation.

122. Following Plaintiff's response providing his open schedule blocks, Investigator Mah transmitted a separate electronic directive at approximately 11:14 AM that same morning. Despite having just declared the compliance investigation concluded, Defendant's global security personnel imposed a second, highly restrictive administrative order upon Plaintiff. Using identical language to the October directives, Defendant instructed Plaintiff via email to secure a private space where *"no one else will be able to overhear us,"* and stated: *"Please do not forward this meeting notice to anyone else or tell anyone that you are meeting with compliance."*

123. Despite this direct report, Defendant's corporate compliance office subsequently closed the internal inquiry regarding the October 3, 2024, gate lockout on November 21, 2024, without ordering any administrative oversight or remedial interventions at the local facility. Investigator David Hamilton explicitly labeled the badge deactivation led by Human Resources Manager Brian Mosbaugh as *"unsubstantiated."*

46

## III. Database Alterations, FMLA Interference, and ERISA

### (A)

124. Following Plaintiff's internal and administrative disclosures, administrative alterations were made to Plaintiff's corporate data, resulting in the submission of report tracks to the United States Securities and Exchange Commission (SEC) under SEC TCR Submission Numbers 17733-597-484-278 and 17785-863-012-536.

125. Public SEC Form 8-K filings confirm that the dissolution of the Hitachi joint venture and the acquisition of the Kernersville factory were legally and operationally finalized on February 28, 2022. Because the legal entity officially changed its corporate name to "John Deere Kernersville LLC" effective March 1, 2022, and because Plaintiff was hired in August 2022, more than five months after this merger was finalized, Plaintiff was an original, direct hire of the finalized corporate entity. Consequently, there was no legacy joint-venture data profile or historical employment transition required for Plaintiff's specific personnel file which would alter his hire date.

126. Between late 2024 and early 2025, Defendant executed an organization-wide administrative migration to overhaul its global benefits platform, transition insurance carriers, and reconfigure enterprise-wide

47

'RACF ID' network credentials. Following this migration, Plaintiff's historical seniority and original hire date records diverged from his original August 2022 hiring onboarding documentation.

127. While Plaintiff was out on medical leave, Plaintiff's recorded employment date baseline was adjusted to reflect an artificial corporate hire date of January 1, 2025. Following this alteration, Plaintiff's elected family benefits were removed from his active insurance coverage, and the chronological sequence of his August 2024 internal compliance disclosures was altered in the internal personnel history.

128. Defendant stated on Page 3 of its certified EEOC Position Statement for Charge No. 435-2024-01634 that local management, specifically Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley, deactivated Plaintiff's security badge access credentials while Plaintiff was out on approved medical leave.

129. Defendant asserted that this credential deactivation was executed to *"ensure they could meet with him upon his return,"* conditioning Plaintiff's physical reentry into the facility upon participation in an unannounced administrative meeting regarding his religious apparel.

48

130. Simultaneously, during this period of approved leave, Defendant did not issue Plaintiff's updated company 'RACF ID' network credentials, preventing him from accessing the internal corporate benefits enrollment portal. Internal corporate records indicate that the compliance sessions required to activate these internal network credentials were scheduled for September 12, 2024, falling within Plaintiff's approved FMLA medical leave window. Defendant provided no alternative method for Plaintiff to secure his electronic network credentials while on leave, effectively locking him out of the internal global benefits platform transition.

131. For the avoidance of doubt, while Defendant's internal network credential lockout successfully blocked Plaintiff from accessing his corporate employment benefits portal, it did not restrict his ability to submit internal ethics disclosures. Plaintiff's concurrent internal complaints were filed externally through EthicsPoint, an independent, third-party administrative platform hosted by NAVEX on an external public web architecture. Because EthicsPoint operates completely outside of Defendant's internal network firewalls and does not require a corporate RACF ID login, Plaintiff was able to utilize a public, non-company internet connection to submit secure reports while remaining entirely locked out of

49

Defendant's proprietary corporate software, directories, and benefits management applications.

132. Defendant modified personnel data during Plaintiff's FMLA absence to alter his corporate seniority and cancel his prior elected insurance coverage. This data modification altered personnel systems to reset Plaintiff's accrued corporate seniority metrics and eliminate active family benefit elections while he remained an active employee on approved medical leave.

133. Specifically, Defendant, acting through its authorized corporate agents on a date uniquely within Defendant's exclusive possession and control, manually updated the corporate employee registry, overriding Plaintiff's authentic employment timeline to change his corporate hire date to January 1, 2025.

134. This administrative data override altered Plaintiff's personnel history, separating his internal compliance disclosures from his original onboarding profile. As a direct consequence of this data alteration, Plaintiff's prior elected benefits were removed effective January 1, 2025, during his active employment footprint and following his internal compliance disclosures.

135. As documented on page one (1) of its initial EEOC Position Statement for Charge No. 435-2024-01634, Defendant explicitly admitted that Plaintiff first became an employee of John Deere Kernersville LLC ("JDK") in August 2022.

136. Conversely, in its subsequent EEOC Position Statement for Charge No. 435-2025-01587, Defendant submitted documentary evidence (Attached hereto as Exhibit D-2) reflecting a reset of Plaintiff's corporate hire date to January 1, 2025, while falsely asserting that Plaintiff "elected" to forfeit his prior elected benefits—benefits for which he had continuously paid until they transitioned to a zero-cost option.

137. While an employee may theoretically elect to alter or discontinue prior benefit selections after years of financial contribution, any such benefit modification cannot mechanically reset, alter, or override an employee's authentic corporate hire date within personnel records.

138. Defendant maintained an ongoing restriction on Plaintiff's electronic network access following his return from medical leave. On March 12, 2025, during a dentist appointment, Plaintiff discovered that his elected insurance coverage had been modified within the system without his consent.

51

139. Following this discovery, Plaintiff's network profile remained locked, preventing network access until a corporate override was executed. As preserved in text message logs, this network restriction remained active until Thursday, March 20, 2025, at 9:59 AM, when network administrator *"Donald from IT"* notified Plaintiff that his corporate profile access was unlocked.

**(B)**

140. On October 25, 2024, Defendant utilized variant entity entries, including *"KOHN DEERE KERNERSVILLE"* and *"1000 JOHN DEERE RS,"* within its database tracking systems to alter Plaintiff's statutory filing records (attached hereto as Exhibit W-2).

141. Prior to these modifications, on August 28, 2024, Plaintiff filed a North Carolina Industrial Commission Form 18 under Intake Number 202408-174115, designating the employer as "John Deere" at the facility address "1000 John Deere Rd*."* In the *"Describe how the injury or occupational disease occurred"* section of his Form 18 filing, Plaintiff wrote, *"I was forced to remove my religious apparel after stating it was for religious purposes. It has caused me to have extreme anxiety/panic attacks. I followed*

52

*up with HR & they continued the discrimination which created a hostile work environment."*

142. On September 10, 2024, the North Carolina Industrial Commission processed Plaintiff's intake data and formally opened the file under I.C. No. 24789611.

143. On October 25, 2024, Defendant utilized the corporate entity name designation *"KOHN DEERE KERNERSVILLE"* and modified the physical plant facility address from "1000 John Deere Rd" to "1000 John Deere RS", while compressing the city and state blocks into the single string "KERNERSVILLENC 27284" on official state administrative filings (Attached hereto as Exhibit W-2).

144. By utilizing the altered spelling *"KOHN DEERE KERNERSVILLE"* on its Form 19 state filing, Defendant's entries separated Plaintiff's workplace injury records from standard corporate compliance tracking. This data modification disconnected Plaintiff's workers' compensation documentation from internal tracking networks, establishing an administrative framework that designated Plaintiff as a new hire on January 1, 2025, preceding the removal of his elected insurance coverage.

53

145. Defendant's certified state regulatory submissions track the timeline of Plaintiff's medical leave. As documented in Box 12 of the Form 19 filed with the North Carolina Industrial Commission under IC File No. 24789611, Defendant noted that Plaintiff departed the facility and entered FMLA leave directly following the August 12-14, 2024 jewelry policy enforcement action (Box 3).

146. Human Resources Manager Brian Mosbaugh, Human Resources Representative Veronica McNeill, Manager Lindsey Cota, Supervisor William Bridges, and Supervisor Jessie White were among the members of management who knew of Plaintiff's FMLA filing in August 2024.

147. On this state-certified EDI Form 19, completed on October 25, 2024, Defendant documented a *"first knew of injury"* date of October 1, 2024, in Box 7. This administrative entry stands in direct, objective contrast to internal human resources and medical leave records showing that local management had processed and handled Plaintiff's written medical restrictions weeks prior, on August 22, 2024.

148. Concurrently, in Box 12 of the same state-certified EDI Form 19 document, Defendant documented that Plaintiff *"TOOK FMLA UNTIL 10/3/2024."* This entry indicates that Plaintiff was away on an approved

54

medical absence dating back to August 2024 (Box 3). However, in that same filing, Defendant asserted that October 1, 2024, was the *"first knew of injury"* date in Box 7.

149. These contradictory administrative data entries are documented on North Carolina Industrial Commission EDI Form 19 and Form 61 records under IC File No. 24789611 and IC File No. 24040642. Subsequent to his termination, upon uncovering the full structural scale of this data-masking scheme through administrative record discovery, Plaintiff formally reported these corporate tracking distortions to the United States Securities and Exchange Commission (SEC) in March 2026 as an unmitigated "Books and Records" internal controls violation under Section 13(b)(2)(A) of the Exchange Act (15 U.S.C. § 78m(b)(2)), placing federal regulators on direct notice of the company's falsified personnel streams.

150. These database entries are repeated on the face of the North Carolina Industrial Commission Form 61 *"Denial of Workers' Compensation Claim"* processed under IC File No. 24040642 (attached hereto as Exhibit W-3). Filed into the state record on November 6, 2024, this administrative document lists the employer as *"KOHN DEERE KERNERSVILLE"* located at the postal address string *"1000 JOHN DEERE RS."*

151. This Form 61 document indicates that Senior Resolution Manager Kris Daye executed a formal denial of compensability for Plaintiff's Workers' Compensation claim on November 5, 2024. The denial explicitly references and denies liability for the psychological injuries asserted by Plaintiff arising from the August 12-14, 2024, workplace interactions.

152. Further, Defendant asserted textually in the reason-for-denial block of said Form 61 that Plaintiff's psychological injuries did not arise from his employment, stating: *"Employee's position did not place him at an increased risk of developing a mental health disorder, nor is his mental health disorder causally related to his employment."* Defendant then used the administrative document to shield its ongoing data modifications, concluding: *"Employer and Carrier are continuing their investigation of this claim and reserve the right to raise other defenses should the need arise. Additional defenses may become available through additional discovery and defense counsel."*

153. Defendant's administrative filing metrics under these files resulted in direct regulatory intervention by the state administrative body. On September 18, 2025, the North Carolina Industrial Commission issued an

official Order Assessing Sanction against Defendant under I.C. File No. 24789611 (attached hereto as Exhibit W-4).

154. In said Order, the North Carolina Industrial Commission's Claims Administration Section determined that Defendant and its insurance carrier failed to comply with statutory mandates under N.C. Gen. Stat. § 97-18(j). Consequently, the Commission levied a financial sanction of $400.00 against Defendant and stated that continued non-compliance would result in automated enforcement docket referrals and contempt proceedings.

155. This state administrative order was finalized approximately thirteen (13) months following Plaintiff's initial Form 18 filing. Defendant's fraudulent database entry modifications documented in these state regulatory proceedings occurred concurrently with the tracking modifications executed within Defendant's enterprise personnel systems.

## IV. Continuous Corporate Knowledge of Local Management

156. Following the October 3, 2024, credential deactivation and initial EthicsPoint escalations filed under Report Key 612346367501, Plaintiff continued to utilize internal reporting channels over a multi-month period to contest the selective enforcement of safety policies and the modification of his personnel timeline.

157. On November 22, 2024, Plaintiff filed a fourth multi-page disclosure under EthicsPoint Report Key 200083297101. This filing provided corporate compliance leadership with direct written notice of coordinated retaliation and explicit evidence of selective safety policy enforcement. Specifically, Plaintiff embedded twelve (12) distinct photographic exhibits documenting extensive secular apparel policy exemptions routinely granted to other floor employees. These images captured multiple workers openly wearing non-religious wristwatches and secular jewelry during active production at the Kernersville facility.

158. On November 23, 2024, Plaintiff added a Follow-Up note to the EthicsPoint Report Key 200083297101 filing, requesting an administrative status update and inquiring why *"no one is doing anything to address this issue."*

159. On November 23, 2024, at approximately 9:02 AM, Plaintiff escalated the continuous facility behavior directly to global corporate leadership by transmitting a comprehensive, multi-page written disclosure to Ethics & Compliance Program Manager Russell Nieman. This correspondence explicitly detailed a pattern of data masking and administrative neglect, noting that Plaintiff had logged four distinct internal

compliance files, including EthicsPoint Report Keys 973570938501, 327000348401, 612346367501, and 200083297101, which Defendant's compliance teams ultimately rubber-stamped and closed despite being provided concrete photographic evidence of selective enforcement.

160. This corporate escalation to Ethics & Compliance Program Manager Russell Nieman further provided direct, contemporaneous notice to Defendant of the severe, mounting physical and financial injuries suffered by Plaintiff as a direct result of the workplace hostility, stating textually: *"Because of this ongoing issue I now have medical bills close to $2,000 and climbing. I have lost over $8,000 in income... I have suffered emotional and mental damage. My health has been affected."* Despite this explicit notice of severe distress and specific identification of conspiring local agents, Defendant's global leadership refused to intervene, explicitly ratifying the tortious conduct.

161. Defendant's systemic refusal to intervene or investigate these continuous escalations directly exacerbated Plaintiff's severe psychological injuries. This intentional corporate neglect converted the facility into an actively hostile work environment, causing Plaintiff to suffer chronic anxiety,

59

severe panic attacks, and debilitating stress that severely impaired his ability to perform his daily operational duties.

162. Following these repeated internal escalations, the U.S. Equal Employment Opportunity Commission (EEOC) Greensboro Local Office formally processed and acknowledged receipt of Plaintiff's administrative file on February 6, 2025.

163. The agency assigned formal EEOC Charge Number 435-2024-01634 to the matter, designated Investigator Nina Troxler to oversee the federal regulatory inquiry, and advised Plaintiff that a formal notice of the charge would be transmitted directly to the organization, placing Defendant on official notice of an active federal statutory investigation.

164. In February 2025, within seven (7) days of the February 6, 2025 EEOC notification window, Supervisor William Bridges, on behalf of Human Resources management, presented Plaintiff with a written employment contract requiring immediate execution.

165. Supervisor William Bridges denied Plaintiff's explicit request to have his private attorney review the five-page restrictive covenant, despite the contract's own internal language guaranteeing that right. Instead, Supervisor William Bridges offered HR Manager Brian Mosbaugh—an

60

individual whom Plaintiff had named in his active, pending EEOC filings—as the sole permitted entity to explain the contract's legal implications.

166. To record the conditions surrounding the execution of the document, on page 2 Plaintiff wrote the word *"Duress"* on the physical signature line and hand-wrote *"I don't understand everything"* on page 3 of the contract appendix.

167. Certified EEOC administrative logs reveal that following the formalization of Plaintiff's charge, Defendant failed to access the regulatory portal to view the filings. This administrative avoidance continued until February 20, 2025, at approximately 4:40 PM, when EEOC Investigator Nina Troxler explicitly documented that corporate managers Brian Mosbaugh, Tami McNeer (Comegys), and Steven Brewer had failed to log into the system, forcing the federal agency to execute emergency re-service of the Notice of Charge.

168. The electronic tracking logs establish that on February 21, 2025, at 9:54 AM—less than seventeen hours after federal re-service was triggered—Defendant's corporate agents scrambled online, changed portal security access passwords, and realized high-level local managers were the direct targets of a federal probe.

169. On March 4, 2025, Plaintiff filed a fifth formal compliance disclosure under EthicsPoint Report Key 870243460201, reporting that the covering mandate conflicted with his religious beliefs, stating that it was like *"a Muslim being forced to eat pork."* To document his career trajectory, Plaintiff also uploaded his corporate 2023 and 2024 performance review files directly into the compliance database, noting that he had maintained a record of high performance and had zero absences prior to the onset of the apparel dispute.

170. On March 5, 2025, at approximately 8:23 AM, Defendant's corporate compliance network acknowledged receipt of Report Key 870243460201. Corporate compliance leadership maintained this report in an unaddressed status for approximately three months until June 3, 2025, at approximately 3:00 PM, when the system generated a generic script announcing the administrative closure of the file without an independent resolution.

171. On March 25, 2025, Plaintiff filed a formal compliance disclosure under EthicsPoint Report Key 275263288201, stating that local management's enforcement actions had created a hostile work environment, induced ongoing panic attacks, and left him in a state of psychological

distress. This disclosure specifically notified global oversight that on or around October 4, 2024, Plaintiff informed General Manager Steven Brewer that management's gate intimidation tactics caused him to panic. It also noted that General Manager Brewer responded that Plaintiff needed to find a way to *"get over it"* and did not initiate an internal inquiry, safety assessment, or remedial measures regarding the encounter.

172. On March 26, 2025, at approximately 7:17 AM, Defendant's corporate compliance network generated an administrative response under Report Key 275263288201, confirming receipt and directing Plaintiff to coordinate further review with global Ethics & Compliance Program Manager Russell Nieman at corporate headquarters in Moline, Illinois.

## V. The Denial and Recategorization in the Position Statement

173. On April 8, 2025, the formal EEOC Position Statement Submission Deadline concluded for Charge No. 435-2024-01634. This hard administrative milestone legally compelled Defendant to submit its finalized defensive positions and evidence regarding the operational conduct.

174. On April 8, 2025, at approximately 3:31 PM, the Equal Employment Opportunity Commission (EEOC) formally notified Plaintiff that

a Position Statement had been requested from Defendant for Charge No. 435-2024-01634.

175. In its certified 435-2024-01634 EEOC Position Statement, Defendant asserted a complete falsehood to federal investigators, stating that as of April 8, 2025, Plaintiff *"has not provided John Deere or JDK with any reason why the accommodation [covering] it has provided for him conflicts with his religious beliefs."* However, corporate records prove that Defendant possessed actual knowledge that the mandatory concealment policy directly violated Plaintiff's theological practices, as evidenced by the following chronological disclosures:

a. **August 17, 2024:** Plaintiff submitted a detailed compliance report under Report Key 327000348401. Plaintiff placed corporate leadership on explicit notice, stating textually: *"The only options they gave me were to accommodate them by either removing the religious apparel or covering the religious apparel up."* Plaintiff further reported a severe, coercive hostile environment, documenting that he felt *"as if I were in a police interrogation room,"* that he was forced to participate in a group prayer during a mandatory meeting, and that Human Resources Manager Brian Mosbaugh dismissively *"referred to the issues as 'minor*

64

*issues.'"* Finally, Plaintiff explicitly stated his simple accommodation demand: *"Yes, just leave me alone. It was a simple request. Follow the law. Don't harass me. That's it."*

b. **On August 17, 2024:** Plaintiff provided formal written notice of the ongoing religious apparel dispute via an electronic mail transmission directed to Manager Tami McNeer (Comegys), stating: *"I can only describe it as a Muslim being forced to eat pork,"* and explicitly advised management that Defendant's covering directive seemed questionable, noting it was not an accommodation.

c. **October 6, 2024:** Plaintiff supplement his formal compliance report under Report Key 612346367501 comparing the ultimatum to the biblical story of Daniel in the lions' den, stating textually: *"I am being told to suppress my religious values or be fired. I am extremely distraught. I keep waking up having panic attacks."*

d. **November 22, 2024:** Plaintiff filed extensive follow-up notes under EthicsPoint Report Key 200083297101 placing corporate compliance on direct notice of systemic disparate treatment and an active local management cover-up, writing textually: *"I am the only one being told to remove my religious apparel or cover it up. No one else is being*

65

*targeted."* Plaintiff explicitly warned corporate investigators that local management was working together to hide their behavior, stating: *"They will conspire together and get their story straight... They will do things and deny it then tell each other to deny it with them."* Finally, Plaintiff documented the exact origin point of the dispute, declaring: *"The entire ordeal started when Mike Fogleman made me remove my religious apparel."*

e. **March 3, 2025:** Plaintiff filed a follow-up database supplement under EthicsPoint Report Key 200083297101 explicitly warning management that forced concealment was a theological violation, stating: *"I have repeatedly stated that being forced to remove my religious apparel or cover it up is like forcing a Muslim to eat bacon. It is sinful for me. Every day that the company has forced me to do this has been an act of discrimination."*

f. **March 4, 2025:** Plaintiff filed a comprehensive report explicitly naming Brian Mosbaugh, Maria Rumley, and Steven Brewer, reiterating: *"I have continuously stated to people at John Deere in Kernersville and the John Deere compliance team that removing or covering up my*

66

*religious apparel is sinful for me. I have compared it to a Muslim being forced to eat pork."*

g. **March 25, 2025:** Plaintiff submitted a comprehensive, formal administrative disclosure directly into Defendant's global internal compliance database under Report Key 275263288201. This internal filing placed the corporate headquarters on explicit notice of an unmitigated multi-month history of religious hostility and local management misconduct, with Plaintiff documenting the severe theological violation textually: *"had previously told him [HR Manager] and several others that being forced to remove or cover up my religious apparel was like forcing a Muslim to eat pork. It is sinful for me."* Plaintiff further reported a severe, retaliatory chilling effect engineered by local supervisors, writing: *"When I see most of management... I go the other way... I feel anxious. I have panic attacks. I feel targeted."*

176. Plaintiff's Form 5: Charge of Discrimination complaint under Charge No. 435-2024-01634 (Attached hereto as Exhibit A-6) lists the HR Manager [Brian Mosbaugh] as the main aggressor. It lists the Development and Recruiting Coordinator [Mike Fogleman] as the person who treated Plaintiff with disdain and made him remove his religious apparel. It lists the

67

Safety Coordinator [Maria Rumly] as a participant in the meetings with the HR Manager. It lists the Supply Chain Manager [Lindsey Cota] once as *"the person who sent me"* to the Human Resources Department.

177. Human Resources Manager Brian Mosbaugh subsequently participated in the preparation and certification of Defendant's formal administrative response, which contested Plaintiff's internal allegations and characterized his workplace interactions with management as disruptive. This administrative verification process occurred concurrently with local management's evaluation of Plaintiff's ongoing employment status.

178. In his original 435-2024-01634 EEOC filing, Plaintiff listed the Supply Chain Manager [Lindsey Cota] purely as a potential baseline witness who originally sent him to HR (Exhibit A-6, page 1, ¶ 2).

179. In its official 435-2024-01634 Position Statement, Defendant recategorized Manager Cota's role from a neutral witness into an active target of tracking, stating textually:

*"...commenting that it appeared to him that Mr. Moore's wearing of the bracelets may not be in compliance with the policy... JDK denies that at any point did Mr. Fogleman instruct Mr. Moore that he was required to remove the bracelets or that either Mr. Fogleman or Ms. Cota*

*treated Mr. Moore with disdain or in a manner designed to make him feel uncomfortable. At the time, they considered the matter to remain unresolved."*

180. In its certified 435-2024-01634 EEOC Position Statement, Defendant further sought to minimize its retaliatory conduct by openly admitting that Security Operations Manager David Hamilton investigated Plaintiff's internal alerts but summarily dismissed them as unsubstantive. Specifically, Defendant textually admitted to federal investigators that during his compliance interview, Plaintiff explicitly reported that *"Mr. Mosbaugh exhibited a lack of empathy, was disrespectful and raised his voice,"* yet Mr. Hamilton determined that Plaintiff *"did not provide any information that Mr. Hamilton considered substantive in nature."*

181. Defendant further stated that the only retaliation Plaintiff reported was *"the temporary deactivation of Mr. Moore's security badge."* By dismissively labeling an absolute physical gate lockout as a mere "temporary" issue and treating a manager's open hostility as "unsubstantive," Defendant's global leadership actively insulated local management from accountability, establishing direct corporate ratification of the ongoing retaliatory campaign.

69

182. On April 16, 2025, at approximately 10:43 AM, eight (8) days after the EEOC's final April 8, 2025 Position Statement deadline for Charge No. 435-2024-01634, and roughly three (3) weeks after the March 25, 2025, filing under Report Key 275263288201 was opened, corporate compliance leadership updated the system to announce the administrative closure of the file, stating that the matter had been reviewed and that no further information would be provided.

183. At approximately 4:16 PM that same day, Plaintiff logged a final entry into the filing under Report Key 275263288201 documenting: *"No action was taken to fix the situation."*

184. On April 16, 2025, Plaintiff filed a formal compliance disclosure under EthicsPoint Report Key 212735518701. This report provided corporate compliance leadership with a written notice of ongoing workplace disputes at the Kernersville facility, detailing his prior UNUM-approved medical leave, the October 3, 2024, security credential deactivation, his verbal notifications to General Manager Steven Brewer, his ongoing anxiety and panic attacks, and the presence of secular items routinely worn by other employees on the production floor. Plaintiff also wrote, *"I feel unsafe around certain people…"* and *"The HR manager, Brian*

70

*Mosbough, still stares at me like he wants to fight sometimes.*" Plaintiff further noted, *"The hostile work environment has affected my performance at work. I take off every chance I get."*

185. On April 17, 2025, at 7:08 AM, Defendant's corporate compliance network generated an administrative response under Report Key 212735518701, directing Plaintiff to coordinate further inquiry with global Ethics & Compliance Program Manager Russell Nieman at corporate headquarters.

## VI. The Interrogation Room and False Imprisonment

186. On April 24, 2025, sixteen (16) days after the EEOC's final April 8, 2025 Position Statement deadline for Charge No. 435-2024-01634, and eight (8) days after the April 16, 2025 EthicsPoint filing, under the instructions of Human Resources Manager Brian Mosbaugh, Paint Department Supervisor Amy Shelton—a first-shift supervisor from outside Plaintiff's operational department—instructed Plaintiff to accompany her to an unannounced administrative meeting. After Supervisor Shelton stated to Plaintiff that he *"had no choice"* in the matter, Plaintiff accompanied her to the designated room while verbally stating that he felt unsafe and uncomfortable.

71

187. On the specific date of April 24, 2025, Paint Department Supervisor Amy Shelton was assigned outside of Plaintiff's active shift operations and possessed no concurrent operational oversight, direct managerial control, or real-time scheduling authority over Plaintiff's daily logistics duties, production metrics, or immediate workplace assignments.

188. This meeting occurred within an enclosed office space measuring approximately 10 feet by 10 feet (or at most 12 feet by 12 feet), featuring a single exit door and a large central desk occupying the midsection of the room. Upon entering, Plaintiff remained standing on the far side of the desk facing the door to maintain a direct path to the exit, while Human Resources Manager Brian Mosbaugh sat behind the central desk, Safety Lead Maria Rumley sat toward the side of the desk, and Supervisor Amy Shelton stood near the exit door.

189. Upon entering the office space and encountering Human Resources Manager Brian Mosbaugh, whom Plaintiff had previously reported being uncomfortable around, Plaintiff attempted to leave the room, stating on the record: *I don't feel comfortable around these people.*

190. As Plaintiff moved toward the exit, Supervisor Amy Shelton shifted her physical position and placed her body directly in front of the exit

72

door handle, obscuring physical access to the door hardware and blocking his path out of the office space.

191. While Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley remained seated at the central desk, Supervisor Shelton maintained her physical position in front of the door frame and refused to clear his path, preventing Plaintiff from exiting the room.

192. Defendant's published corporate business standards and operating guidelines explicitly adopt "Lean management" operations as the facility's structural blueprint, stating textually that operations are structured to eliminate administrative waste, including dual-reporting structures to different supervisors.

193. Concurrently, Defendant's operational frameworks do not utilize a formalized "Matrix Organizational Structure"—defined as an integrated multi-dimensional grid where personnel are assigned to a "Two-Boss Matrix" carrying dual or multiple managerial accountability across separate functional line units.

194. Defendant's adopted lean management operations acknowledge that having too many bosses for a small crew creates a specific

73

type of waste called *"Muda,"* while also violating core lean rules about smooth workflow and clear communication.

195. Having two 'immediate supervisors' and a lead technician over a crew of only 15 to 20 floor employees stands as an operational departure from Defendant's published structural guidelines.

196. Defendant's localized organizational charts and department operational metrics for the Logistics department document that Plaintiff's direct, exclusive reporting structure consisted of one Lead Technician, Logistics Supervisor William Bridges, and Manager Lindsey Cota.

197. In direct contradiction to these published lean operating standards, department organizational structures, and exclusive reporting metrics, Defendant asserted to administrative bodies that Paint Supervisor Amy Shelton was present in the closed office space because she was *"one of Mr. Moore's immediate supervisors."*

198. This meeting concluded at or around 2:00 PM on Thursday, April 24, 2025. Following his departure from the office space, Plaintiff experienced immediate symptoms of acute emotional distress and panic attacks. Although approximately one hour remained before his scheduled shift concluded at 3:00 PM, Plaintiff remained on-site to complete the

74

workday under the economic compulsion of preventing a retaliatory 'unexcused absence' or 'job abandonment' designation.

199. Across the ensuing weekend of April 26–27, 2025, and into Monday, April 28, 2025, Plaintiff continued his medical treatment while his active EEOC claims remained pending. This operational sequence culminated on Tuesday, April 29, 2025, when management executed Plaintiff's termination.

200. At all times relevant, Supervisor Amy Shelton, Safety Specialist Maria Rumley, and Lead Technician Kevin Tilley maintained close personal and professional relationships with Plaintiff's direct department supervisors, William Bridges and Lindsey Cota.

201. Specifically, Lead Technician Kevin Tilley operated within the same direct local chain of command under Manager Lindsey Cota. Lead Technician Tilley openly interacted with Manager Cota's personal social media profiles using 'Love' heart reactions without receiving disciplinary action or corporate interference. Plaintiff offers this specific interaction as direct legal evidence of disparate treatment and selective enforcement. Defendant routinely tolerated these plant-wide social media interactions among other workforce members, while later selectively citing an unvetted

75

social media notification as an operational basis to discipline Plaintiff. By tolerating secular social media engagement from other employees while uniquely punishing the Plaintiff, Defendant utilized its corporate compliance guidelines as a weaponized, discriminatory pretext to execute an unlawful firing.

## VII. The April 29, 2025, Termination Meeting

202. In its second administrative EEOC filing under Charge No. 435-2025-01587, Defendant references a multi-month timeframe between the filing of Plaintiff's initial internal reports and his subsequent termination. While Plaintiff's initial administrative charge was filed two months prior to the termination, the EEOC issued an evidentiary demand targeting Defendant's Human Resources Manager, Brian Mosbaugh, with a deadline of April 8, 2025.

203. In its second certified administrative EEOC filing under Charge No. 435-2025-01587, Defendant asserted a complete chronological fabrication to federal investigators, falsely claiming that Manager Lindsey Cota *"sought and obtained a Temporary No Contact Order"* on April 24, 2025, which mandated Human Resources Manager Brian Mosbaugh to initiate a disciplinary meeting *"that very day."*

204. On April 29, 2025, exactly twenty-one (21) days after the EEOC Position Statement deadline for Defendant's first filing under Charge No. 435-2024-01634, and five (5) days after the April 24, 2025, meeting, where Plaintiff was detained against his express will, Human Resources Manager Brian Mosbaugh executed the termination of Plaintiff's employment.

205. Defendant allowed the same manager, specifically Human Resources Manager Brian Mosbaugh, whom Plaintiff reported to corporate compliance and to the EEOC, to terminate Plaintiff's employment based on a single, unvetted allegation.

206. Defendant's agents, Human Resources Manager Brian Mosbaugh, Supervisor William Bridges, and an unidentified third corporate representative, were present during the unannounced meeting to terminate Plaintiff's employment.

207. As captured on the real-time audio recording of the termination meeting, Human Resources Manager Brian Mosbaugh stated to Plaintiff: *"I'm bringing you in here today because on April 24th, 2025, at 1:57 pm in my office... you were told to no longer have any communication... with Lindsay Cota... and even after that conversation, at 10:55pm on 4/25/25, you*

77

*attempted to unwanted contact [sic] with Ms. Cota via Instagram... the plan of action in this case is termination of your employment..."*

208. At all relevant times, Defendant possessed documented notice that Plaintiff was undergoing clinical psychiatric treatment for severe anxiety and panic attacks.

209. During the April 29, 2025 termination meeting, Plaintiff asked the unidentified third person in the room, *"Are you a lawyer or something, or who are you?"* Immediately following this inquiry, and before any directive to depart the premises was issued, Defendant's agent Brian Mosbaugh stated, *"Because not only are you lost employment [sic], you don't want to get arrested also, so."* The third party refused to identify themselves. Human Resources Manager Brian Mosbaugh immediately requested Plaintiff's security badge, and Plaintiff left the building.

210. Defendant alleges that Plaintiff transmitted an Instagram request on Friday, April 25, 2025, at 10:55 PM and then executed Plaintiff's termination based entirely upon a visual screenshot of this digital notification.

211. Defendant alleges that a single unvetted Instagram notification posed a safety threat, yet waited four (4) days to execute Plaintiff's termination.

78

212. Prior to executing the discharge, Defendant did not question Plaintiff, ask Plaintiff if he initiated the transmission, or provide Plaintiff an opportunity to review the image.

213. Furthermore, Defendant conducted no verification of electronic forensic metadata, account ownership logs, transmission source IP addresses, or network footprints prior to the termination.

214. Prior to the discharge, Plaintiff maintained an unblemished employment record with zero historic disciplinary actions or write-ups.

215. In its second formal EEOC submission under Charge No. 435-2025-01587, Defendant falsely asserted that Manager Lindsey Cota *"sought and obtained"* a Temporary No Contact Order on April 24, 2025, and that the subsequent termination was executed solely due to an April 25, 2025, Instagram notification.

216. Certified state court filing records demonstrate that no petition or temporary order was filed, stamped, or in legal existence on April 24, April 25, April 26, April 27, or April 28, 2025.

217. Plaintiff's real-time audio metadata captures the exact moment that Human Resources Manager Brian Mosbaugh finalized and

concluded Plaintiff's termination meeting at 12:44 PM on April 29, 2025, twenty (20) minutes prior to the legal filing of the state court documentation.

218. The official state court petition was formally executed and time-stamped twenty (20) minutes after the termination on April 29, 2025, at 1:04 PM, and later granted at 3:15 PM based on the termination as preserved on page 4, Box #5 of the filing.

219. Before, during, and after Manager Lindsey Cota's transfer to Iowa and Plaintiff's termination window, continuing through the present, contemporaneous social media platform records verify that Manager Lindsey Cota maintained direct personal connections and digital interactions on her personal Facebook account with numerous management, human resources, and administrative personnel across multiple Deere & Company facilities. These individual connections were initiated either prior to, during, or following her operational transfer to Iowa.

220. Specifically, contemporaneous social media platform metrics verify that personnel operating under the same local chain as Plaintiff were maintained as active personal connections on or actively interacted with Manager Lindsey Cota's personal profile.

80

221. At all times relevant, while Plaintiff was terminated on April 29, 2025, for an alleged, unvetted, single digital notification involving Manager Lindsey Cota, Lead Technician Kevin Tilley, who operated under the same local chain of command, maintained an active personal social media connection with Lindsey Cota and openly interacted with her profile using reactions without facing disciplinary action or termination.

222. Furthermore, at all times relevant, "Tony" Ford, a Logistics Technician in Plaintiff's exact same department and job title, engaged in multiple unprofessional verbal altercations and snapped at employees, including Supervisor Cory Willis, but faced no severe disciplinary action and was allowed to remain employed.

223. Additionally, at all times relevant, Human Resources Manager Brian Mosbaugh committed multiple serious violations of company policies, including an FMLA badge lockout and forcing Plaintiff into an unannounced and coercive physical confinement. These actions took place after Plaintiff reported being uncomfortable around Mr. Mosbaugh. Despite these actions, Defendant took no disciplinary action against Manager Mosbaugh, allowed him to retain his employment, and permitted him to engage and terminate Plaintiff over a single, unvetted social media notification.

81

## VIII. State Court Chronology and Administrative Records

224. In its certified administrative submissions, Defendant relies upon the state court's subsequent Chapter 50C filing to assert that Plaintiff's termination was mandated. State court records establish on page 2, box 3, that the termination decision was finalized prior to any state court judicial review, documenting: *"He is being fired today which could escalate things."*

225. Defendant finalized the termination at 12:44 PM and subsequently utilized the fact of that termination during the 1:04 PM state court proceeding. The state court's eventual Chapter 50C Finding #5 explicitly noted that Plaintiff *"has since been fired and banned from the property today"*. The judicial determination was therefore based upon the pre-existing fact of the termination itself.

226. Prior to termination, Manager Lindsey Cota had given Plaintiff a handwritten thank-you note that stated: *"Thank you so much for the generous gifts. Each one of them made me smile! You put a lot of thought into these gifts and they are all perfect. "Chaos coordinator" couldn't be a better description of my job! Thanks for being on our team and all you do!"* (attached hereto as Exhibit Z).

82

227.	The corporate origin of Plaintiff's initial interaction with Ms. Cota is documented by an official email communication from Operations Manager Steven Brewer dated April 12, 2024. In response to an administrative inquiry regarding internal career paths, Mr. Brewer stated: *"I spoke with Lindsey Cota regarding job shadowing. She is happy to support and may have already reached out. I hope the experience is positive."*

228.	Manager Lindsey Cota asserted under oath on page 1, box 5, in the state court petition that Plaintiff engaged in an unwelcome pattern of seeking her out immediately after the final June 2024 job shadow session had concluded.

229.	However, an email from July 8, 2024, shows that it was Manager Lindsey Cota who initiated the continuing contact with Plaintiff after the conclusion of the 'job shadowing,' stating that she had *"looked for you a couple times,"* proactively invited him to an individual *"1:1"* meeting, and encouraged him to apply for open positions on her immediate team.

230.	On page 4, box 4a.i, of her handwritten state court petition, Manager Lindsey Cota asserted under oath that Plaintiff was *"professing his love for her... on Facebook on 4/19."*

83

231. However, electronic communication logs show that the transmission sent via Facebook Messenger on Saturday, April 19, 2025, at approximately 6:49 PM, contained an inquiry regarding a technical platform error, accompanied by a screenshot of a Facebook 'Can't Send Request' system notification.

232. Defendant has a well-documented commitment to continuous improvement (Kaizen) and emphasizes that front-line workers are in the best position to identify waste and suggest improvements.

233. On May 21, 2024, Manager Lindsey Cota sent Plaintiff an email, informing him that "...open door policy is true. You are never a bother."

234. On July 8, 2024, Manager Lindsey Cota sent Plaintiff a direct email proactively inviting him to communicate workplace feedback, explicitly stating: "I encourage everyone to share if they have ideas."

235. Conversely, in her subsequent sworn state court Chapter 50C petition on page 1, box 5, Manager Cota claimed under oath that Plaintiff's "various complaints and suggestions for improvements" actually constituted unlawful harassment.

84

236. In the temporary 50C order on page 4, box 4a.i, Manager Lindsey Cota asserted that an unvetted, off-duty Instagram notification, which contained no added wording or text, constituted a profession of love.

237. In her sworn, handwritten state court Chapter 50C petition on page 3, Box 5 (Cont.), Manager Lindsey Cota explicitly admitted that on Friday, April 11, 2025—exactly three (3) days after the EEOC Position Statement submission deadline—she personally informed Plaintiff of her upcoming operational relocation. Manager Cota documented textually that during this office discussion, Plaintiff simply expressed standard professional sadness regarding her departure.

238. Manager Lindsey Cota did not appear at the initial state court hearing to support the emergency petition. As a result of this non-appearance, the temporary ex parte order expired by operation of law.

239. At the second scheduled hearing, Manager Lindsey Cota appeared, accompanied by W. Mark Peck, Defendant Deere & Company's retained local defense counsel.

240. Mr. Peck entered a formal appearance on the record, physically presenting himself before the presiding judge alongside Ms. Cota. Mr. Peck stated explicitly on the judicial record that he was participating in

the private action because he represented Deere & Company, the complainant was a concurrent corporate employee, and Plaintiff was a former employee.

241. At all times relevant, Mr. Peck operated as the central, authorized legal representative tasked with managing, structuring, and authoring the corporate defense response to the U.S. Equal Employment Opportunity Commission (EEOC) under Charge No. 435-2024-01634. Concurrently, Mr. Peck utilized his firm's corporate legal infrastructure to personally intercede in direct discovery for and manage a third-party state court Chapter 50C civil proceeding involving the same Plaintiff.

242. During the second state court hearing for the Chapter 50C civil proceeding, when Plaintiff's counsel formally requested discovery parameters during the state court proceeding, Mr. Peck interceded on behalf of the corporate entity, directed that all discovery demands be served directly upon his office, and then secured a continuance.

243. Following this courtroom intervention, Mr. Peck utilized his firm's corporate email architecture (mpeck@robinsonlawing.com) to manage the transmission of state court discovery and negotiate the resolution of the 50C filing.

244. Mr. Peck subsequently exchanged formal legal correspondence with Plaintiff's counsel, Attorney Edward "Eddie" Shifflette III, from June 23 through July 8, 2025, reviewing legal discovery requests, conveying settlement demands, and serving the final dismissal paperwork.

245. On June 23, 2025, at approximately 10:42 AM, Mr. Peck sent Mr. Shifflette an email asking if "... *Mr. Moore would be interested in putting all of this behind but agreeing to a mutual no-contact agreement.*"

246. On June 25, 2025, at approximately 2:39 PM, Mr. Shifflette sent Mr. Peck an email informing him that Plaintiff declined the mutual no-contact agreement, stating that, *"At this point, my client would like to see responses to discovery and go from there."*

247. On Friday, June 27, 2025, at approximately 3:14 PM, roughly forty-eight (48) hours after the press for discovery, corporate defense counsel W. Mark Peck confirmed the nature of the state court filing in an email sent directly to Mr. Shifflette. In said communication, Mr. Peck wrote, *"I spoke with Ms. Cota this morning. She feels the message has been sufficiently sent to Mr. Moore that he is not to have contact with her and, therefore, will be moving to dismiss the 50C."*

248. Following this coordinated corporate appearance and subsequent email exchanges, the state court action concluded without a judicial adjudication on the merits. On July 8, 2025, at 2:05 PM, a formal Notice of Voluntary Dismissal pursuant to G.S. 1A-1, Rule 41 was filed with the Forsyth County Clerk of Superior Court under File No. 25 CVD 2735. The complaining witness signed the dismissal document on July 7, 2025, canceling the scheduled July 14, 2025, hearing. This voluntary dismissal concluded the matter without any judicial finding of harassment or misconduct against Plaintiff.

249. As a direct and proximate result of this post-termination abuse of process, Plaintiff suffered severe, continuous, and debilitating psychological and physical trauma. This calculated corporate campaign caused Plaintiff to experience chronic sleep deprivation, profound social withdrawal, and clinical isolation, severely exacerbating and prolonging his need for ongoing clinical therapy sessions to manage the acute emotional distress and panic attacks induced directly by Defendant's actions.

## IX. Corporate Compliance Post-Termination

250. Following the April 24, 2025, physical office confinement incident, Plaintiff formally transmitted the details of his confinement to

corporate headquarters on May 18, 2025, under EthicsPoint Report Key 674480162101.

251. On June 3, 2025, at 3:01 PM, corporate compliance leadership updated the database to announce the administrative closure of the EthicsPoint report that was filed on April 16, 2025, under Report Key 212735518701.

252. On June 4, 2025, at 10:54 AM, Plaintiff logged an administrative follow-up entry into the compliance database to object to the 212735518701-file closure. Plaintiff stated on the record that the internal compliance process resulted in an abuse of power, manipulation, and retaliation, and explicitly directed corporate oversight to preserve the specific names identified in his filings because management's conduct would continue.

253. On Thursday, June 12, 2025, Investigator Shai Cruciani contacted Plaintiff via email regarding the May 18, 2025, EthicsPoint filing under Report Key 674480162101 and issued a direct, written administrative directive. This corporate correspondence commanded Plaintiff: *"Do not communicate any information regarding this meeting and/or the investigation*

89

*to any others. This investigation is being conducted under the direction of in-house counsel and is attorney-client privileged."*

254. Defendant enforced this communication restriction as a mandatory requirement for Plaintiff's participation in the internal compliance review upon post-termination confidentiality.

255. In a companion email sent that same day, June 12, 2025, Investigator Shai Cruciani informed Plaintiff, *"Thank you for your request regarding the presence of your personal attorney at your upcoming compliance interview... personal attorneys are not permitted."*

256. On August 29, 2025, following his termination, Plaintiff submitted a comprehensive disclosure into Defendant's global compliance system under EthicsPoint Report Key 527577452501. This filing notified corporate headquarters of specific actions executed during his employment, including the removal of Plaintiff's dental coverage and the removal of his elected family benefits.

257. On December 15, 2025, the North Carolina Department of Labor Retaliatory Employment Discrimination Bureau (REDB) officially issued a formal Notice of Administrative Action in the matter of *Stephen*

90

*Moore v. John Deere Construction & Forestry Company*, designated under File No. 214742.

258. On February 6, 2026, Plaintiff uploaded an exhaustive, multi-page document directly into Defendant's global corporate compliance system under EthicsPoint Report Key 292777538101. This submission notified corporate headquarters of multiple violations.

259. This compliance disclosure named local management group members, specifically General Manager Steven Brewer and Human Resources Manager Brian Mosbaugh. The submitted disclosure stated that local management had submitted conflicting stories to administrative agencies, which Plaintiff first discovered in November 2025. Plaintiff also offered multiple exhibits for evidence regarding different incidents.

260. On Monday, February 9, 2026, at approximately 8:19 AM, Defendant's corporate compliance network generated an automated NAVEX system alert acknowledging that Plaintiff's comprehensive proffer of evidence was under active review by global oversight.

261. In under seven (7) hours, at approximately 2:26 PM that same day, February 9, 2026, Defendant's global corporate compliance team closed the active file without conducting an independent operational audit, witness

91

isolation protocol, or third-party investigation, transmitting a generic automated response stating that the matter *"has already been received and reviewed."*

262. By closing the active global compliance file within seven (7) hours of the submission acknowledgement, corporate compliance leadership concluded the internal tracking procedure without altering the operational actions executed by local managerial agents.

263. On March 11, 2026, the United States Department of Labor Office of Federal Contract Compliance Programs (OFCCP) Southwest and Rocky Mountain Regional Office formally issued an official administrative notification package under Complaint Reference Number I00319595, directed straight to Defendant's global Chairman and Chief Executive Officer, John C. May. This official notice detailed explicit allegations that Defendant utilized Plaintiff's confidential corporate "Record of Impairment" to facilitate a physical ambush, craft a defamatory legal defense to bypass standard safety metrics, and deliberately evade providing him with a necessary reasonable accommodation.

264. The notice further documents that Defendant actively engaged in corporate schemes to prevent Plaintiff from securing further

92

employment within the enterprise despite his documented academic excellence, listing the precise chronological violation dates of August 12, 2024, and February 9, 2026.

265. This federal notice placed Defendant on direct administrative notice of its strict record retention, non-spoliation, and anti-retaliation requirements under federal law while the agency's dual-filed investigation proceeds concurrently.

## CORPORATE NOTICE AND RATIFICATION OF WRONGFUL CONDUCT

266. On May 19, 2026, Plaintiff sent a comprehensive, written formal notice directly to Defendant's corporate headquarters in Moline, Illinois. This package was addressed directly to the Office of General Counsel and John C. May (Chief Executive Officer).

267. This transmission provided Defendant's highest corporate officers with actual, explicit notice of the ongoing religious discrimination, the local 'cover up or get fired' ultimatums, and the severe medical trauma and retaliation that followed.

93

268. On June 3, 2026, Defendant's outside legal counsel, W. Mark Peck, sent a written response explicitly acknowledging that Deere & Company corporate leadership received Plaintiff's May 19, 2026 formal notice.

269. In that June 3, 2026 response, Defendant flatly refused to engage in any corrective discussions regarding the local operational behavior.

270. In that June 3, 2026 response, Defendant further directed Plaintiff to cease all communications with corporate headquarters, and threatened Plaintiff with legal sanctions and attorney's fees if Plaintiff proceeded to seek judicial relief.

271. By refusing to investigate or remedy these documented violations after receiving direct, top-down notice, Defendant's corporate leadership ratified the unlawful actions of its local management team, demonstrating willful and reckless indifference to Plaintiff's federally protected civil rights.

## COUNT I: FIRST CLAIM FOR RELIEF

## (Title VII - Religious Discrimination & Failure to Accommodate)

### (Against All Defendants)

272. Plaintiff hereby realleges and incorporates by reference the factual allegations contained in the previous paragraphs of this Civil Complaint as if fully set forth herein.

273. Pursuant to 42 U.S.C. § 2000e-2, it is unlawful for a covered employer to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's religion.

274. Pursuant to 42 U.S.C. § 2000e(j), religion includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's religious observance or practice without undue hardship.

275. Pursuant to 29 C.F.R. § 1605.1, protected religious practices include moral or ethical beliefs as to what is right and wrong, which are sincerely held with the strength of traditional religious views.

95

276. At all times relevant hereto, Defendant is a covered employer and employs 15 or more employees.

277. At all times relevant hereto, Plaintiff maintains a sincerely held religious belief as an adherent of the Chakra and Nazar spiritual traditions, which strictly mandates that Plaintiff continuously wear uncovered, low-profile, snug-fitting religious bracelets consisting of Evil Eye, Tiger-Eye, and Jade spiritual beads on both wrists.

278. Defendant maintains an apparel policy, designated as Doc. No. JDKP-335, which restricts jewelry items in high-hazard machinery zones. This workplace policy directly and completely conflicts with Plaintiff's religious practice, which legally requires the sacred beads to remain completely uncovered to function.

279. Plaintiff explicitly and repeatedly informed Defendant's corporate and local management of this sincere religious belief and the resultant operational conflict.

280. Specifically, on August 13, 2024, Plaintiff transmitted a formal email memorandum titled *"The Burden of Belief"* to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer (Comegys). On the

96

same date, Plaintiff transmitted a formal email titled *"The Hypothetical Dilemma"* to General Manager Steven Brewer.

281. Between August 16–17, 2024, Plaintiff logged formal internal compliance reports through Defendant's internal EthicsPoint hotline under Report Keys 973570938501 and 327000348401.

282. In these internal disclosures, Plaintiff explicitly stated that the forced covering mandate worsened workplace safety and did not constitute a reasonable accommodation under applicable federal law.

283. Plaintiff reported that the discriminatory actions initiated by local management on August 12, 2024, created an immediate, severe, and legally actionable hostile work environment.

284. Plaintiff further reported that the subsequent meeting with HR Manager Brian Mosbaugh and Safety Lead Maria Rumley exacerbated the hostile environment by limiting Plaintiff's option to completely cover his sacred apparel.

285. As a direct consequence of this discrimination and the acute stress caused by the meeting, Plaintiff was completely incapacitated and

97

missed his subsequent scheduled shifts from August 14 through August 16, 2024.

286. On August 19, 2024, Plaintiff sought immediate professional medical care, where he was diagnosed with panic attacks and generalized anxiety disorder stemming directly from Defendant's hostile workplace actions.

287. Plaintiff was subsequently placed on protected Family and Medical Leave Act (FMLA) leave, which was directly related to Defendant's refusal to accommodate his religious tenets.

288. Defendant routinely permits secular employees to wear wristwatches, smartwatches, and fitness trackers bare-wristed and unhindered in the facility's highest-hazard industrial zones, as documented in Exhibit F-1 (Images 1 through 12).

289. Defendant selectively and disparately enforced its apparel guidelines to penalize Plaintiff's compact religious bracelets while explicitly exempting secular items that carry identical or greater mechanical hazard profiles.

98

290. Defendant failed to offer a reasonable accommodation to resolve the religious conflict. Defendant instead demanded that Plaintiff completely conceal his sacred items and offered oversized, thick, loose-fitting green welding sleeves (Attached hereto as Exhibit F-3).

291. Defendant's proposed alternative required the total physical obstruction of the sacred items, which directly neutralized their spiritual utility and forced Plaintiff to violate his religious tenets.

292. Defendant's proposed alternative also created an increased mechanical snag risk, trapped excessive body heat, and caused acute tactile impairment, forcing Plaintiff to choose between working under highly hazardous warehouse conditions or violating his faith.

293. Because Plaintiff could not comply with the concealment directive, Defendant took multiple adverse employment actions against him.

294. Specifically, on October 3, 2024, immediately upon Plaintiff's attempted return from approved FMLA medical leave, the same managers Plaintiff previously reported, Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley, deactivated Plaintiff's electronic security credentials and denied him entry to the facility to force compliance with the concealment directive.

99

295. To preserve his livelihood, Plaintiff temporarily submitted to the concealment directive under acute economic duress, while explicitly maintaining his fundamental religious objections to the forced concealment.

296. Over a multi-month period, Plaintiff continuously utilized internal reporting channels to contest the forced concealment and the lack of a reasonable accommodation. Plaintiff logged formal disclosures through the corporate EthicsPoint compliance system on October 3, 2024, November 22, 2024, March 4, 2025, March 25, 2025, and April 16, 2025.

297. During this time, Defendant reset Plaintiff's hire date and removed his prior elected family benefits without his consent.

298. On April 8, 2025, Defendant corporate agents officially accessed the federal regulatory system to finalize and upload their administrative Notice of Position Statement Response regarding Plaintiff's active discrimination and retaliation claims under Charge No. 435-2024-01634. This submission finalized the enterprise's formal defensive positions targeting the operational conduct of Human Resources Manager Brian Mosbaugh.

299. On April 29, 2025, exactly twenty-one (21) days after the EEOC's final April 8, 2025 Position Statement Submission Deadline

concluded—a federal administrative timeline naming Human Resources Manager Brian Mosbaugh—Defendant took a severe adverse employment action by terminating Plaintiff's employment.

300. The same manager named as the primary subject of Plaintiff's discrimination complaints, specifically Human Resources Manager Brian Mosbaugh, terminated Plaintiff's employment.

301. Defendant executed this termination as a direct consequence of Plaintiff's protected religious practices, his ongoing requests for a religious accommodation, and his continuous internal compliance disclosures.

302. Furthermore, in Defendant's certified 435-2024-01634 EEOC Position Statement, Defendant asserted: "*JDK denies that at any point did Mr. Fogleman instruct Mr. Moore that he was required to remove the bracelets.*"

303. However, on October 25, 2024, Defendant's authorized agent submitted an official state insurance EDI Form 19 regulatory filing documenting the "Cause and Nature of Injury" as follows: "*WAS ASKED TO REMOVE THEN COVER UP BRACELETS DUE TO JEWELRY POLICY. EMPLOYEE LEFT AND TOOK FMLA UNTIL 10/3/2024*" (Attached hereto as Exhibit W-2, Box #12).

101

304. As a direct and proximate result of Defendant's willful violations of Title VII, Plaintiff has suffered loss of income, loss of employment benefits, medical liabilities, and severe emotional distress, thereby entitling Plaintiff to an award of compensatory and punitive damages in an amount to be determined by a jury.

## COUNT II: SECOND CLAIM FOR RELIEF

### (Title VII – Retaliation & Retaliatory Discharge)

*(Against All Defendants)*

305. Plaintiff hereby realleges and incorporates by reference each of the preceding paragraphs of this Civil Complaint as if fully set forth herein.

306. Pursuant to 42 U.S.C. § 2000e-3, it is unlawful for an employer to discriminate against any individual because he has opposed any practice made an unlawful employment practice by Title VII.

307. Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964 by lodging formal internal religious discrimination and harassment complaints through Defendant's corporate EthicsPoint hotline,

102

and by submitting formal administrative charges to the United States Equal Employment Opportunity Commission (EEOC).

308. Defendant maintained direct corporate knowledge of these protected activities via August 13, 2024, internal email memorandums, internal EthicsPoint filings, formal EEOC notifications transmitted to headquarters on February 6, 2025, and a mandatory administrative Request for a Position Statement deadline of April 8, 2025.

309. Immediately following Plaintiff's protected disclosures, Defendant, through its managers and agents, engaged in a continuous, bridging pattern of workplace antagonism, hostile treatment, and heightened scrutiny designed to cause economic distress.

310. Specifically, Defendant executed a series of adverse actions by deactivating Plaintiff's security credentials on October 3, 2024, resetting his corporate hire date to January 1, 2025, stripping away his prior elected health benefits, and subjecting him to an unannounced, coercive physical workplace confinement on April 24, 2025.

311. On April 29, 2025, exactly twenty-one (21) days after the expiration of the EEOC's final Position Statement response deadline—a federal administrative timeline explicitly naming Human Resources Manager

103

Brian Mosbaugh as a subject—Defendant took a severe adverse employment action by terminating Plaintiff's employment.

312. The terminating official was Human Resources Manager Brian Mosbaugh, the exact same corporate decision-maker whose discriminatory and hostile actions formed the direct core of Plaintiff's active administrative complaints.

313. Defendant relies upon circular, contradictory logic and a fabricated paper trail to mask its true retaliatory intent and justify Plaintiff's termination.

314. Defendant falsely claimed that a state court temporary protective order—which was not granted until 3:15 PM on April 29, 2025, and was secured by utilizing Plaintiff's termination as its primary baseline justification—retroactively served as the sole operational basis for an internal disciplinary meeting held five (5) days prior on April 24, 2025.

315. Defendant further claimed that management immediately acted upon this state court order *"that very day"* and issued Plaintiff a verbal no-contact directive during an April 24, 2025, meeting led by Human Resources Manager Brian Mosbaugh and Supervisor Amy Shelton.

104

316. Defendant subsequently cited an unvetted, off-duty social media notification from April 25, 2025, as a willful violation of that alleged workplace order.

317. Defendant labeled this unvetted, off-duty, private social media notification as an immediate safety threat, yet deliberately waited four (4) days to carry out the April 29, 2025, termination.

318. Defendant utilized the termination itself to secure the temporary order at 3:15 PM on April 29, 2025, utilizing the discharge as retroactive justification for the state court filing.

319. Real-time audio recording metadata captures the exact conclusion of the termination meeting at 12:44 PM on April 29, 2025.

320. At no point during this termination meeting did management permit Plaintiff to view the allegations, present a statement, or provide his version of the events. Instead, Human Resources Manager Brian Mosbaugh stated textually: *"Not only are you lost employment, you don't want to get arrested also, so."*

321. Defendant's stated reasons for termination are completely fabricated, post-hoc pretext constructed exclusively to hide illegal retaliation.

105

Defendant failed to perform standard due diligence, never questioned Plaintiff regarding the social media request, and never verified account ownership or electronic forensic metadata prior to executing the discharge.

322. Furthermore, official state court records show that the Chapter 50C petition was not signed, time-stamped, or filed into legal existence until 1:04 PM on April 29, 2025, a full twenty (20) minutes after the firing concluded. It is a chronological impossibility for the court order granted at 3:15 PM on April 29, 2025, contingent upon the termination itself, to form the basis of a termination decision made before the document existed or a mandatory meeting five (5) days prior.

323. Following the termination, Defendant actively engaged in actionable, post-employment retaliation by weaponizing its corporate treasury and deploying corporate infrastructure, direct financial funding, and its retained corporate defense counsel, W. Mark Peck, and the law firm Robinson & Lawing, LLP.

324. Defendant utilized these corporate legal resources to completely finance, underwrite, subsidize, block discovery tracking, condition a private dismissal, and actively intervene in Plaintiff's private, non-

106

employment domestic state court civil proceeding to maintain an ongoing litigation posture designed to suppress Plaintiff's federal regulatory claims.

325. As a direct and proximate result of Defendant's unlawful retaliatory acts and severe adverse employment actions, Plaintiff has suffered and continues to suffer significant harms, including substantial loss of income, loss of employment benefits, medical liabilities, and severe emotional distress, thereby entitling Plaintiff to an award of compensatory and punitive damages in an amount to be determined by a jury.

## COUNT III: THIRD CLAIM FOR RELIEF

## (FMLA - Interference & Retaliation, 29 U.S.C. § 2611, § 2615(a)(1), and 29 U.S.C. § 2615(a)(2))

*(Against All Defendants)*

326. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint.

327. At all times relevant to this action, Plaintiff was an eligible employee and Defendant was a covered employer subject to the provisions

107

and protections of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2611, § 2615(a)(1), and 29 U.S.C. § 2615(a)(2).

## A. FMLA Interference

328. Plaintiff was entitled to FMLA leave due to a serious health condition, specifically acute anxiety and panic attacks brought on by the workplace events of August 12-14, 2024.

329. Defendant interfered with Plaintiff's FMLA rights by forcing him to deplete his accrued company leave balances, and specifically registering his medical absences under "LA1" leave and "sick" leave during the week following August 12-14, 2024, confrontations.

330. Defendant further interfered with Plaintiff's FMLA rights upon his return to work on October 3, 2024. On that date, immediately upon Plaintiff's attempted return from approved medical leave, Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley deactivated Plaintiff's electronic security credentials and denied him entry to the facility.

331. By executing this electronic badge lockout, Defendant failed to restore Plaintiff to his previous position or an equivalent position upon his return from protected medical leave.

108

332. Defendant further interfered with Plaintiff's FMLA rights by altering his corporate data and resetting his official company hire date to January 1, 2025. As detailed in ¶ 326, this was accomplished through a manual database modification by local human resources personnel to purposefully execute an automated purge of Plaintiff's benefit selections.

333. By retroactively altering Plaintiff's hire date, Defendant effectively eliminated Plaintiff's accrued service history and removed his FMLA lookback period, artificially destroying his ongoing eligibility for protected leave.

## B. FMLA Retaliation

334. Plaintiff engaged in protected activity under the FMLA by taking approved medical leave for his serious health condition beginning in August 2024 and returning on October 3, 2024.

335. Defendant maintained corporate knowledge of this protected activity through its authorized agents and its own state insurance EDI Form 19 regulatory filings.

336. Following Plaintiff's FMLA badge lockout while on protected medical leave, conducted by the same members of management Plaintiff

109

previously reported, Defendant engaged in a continuous pattern of workplace antagonism and heightened scrutiny.

337. Defendant systematically altered Plaintiff's corporate data within its personnel databases to strip away his accrued tenure, unilaterally resetting his official company hire date to January 1, 2025, and intentionally executed an automated purge to remove Plaintiff's dependent children from his elected company-sponsored health insurance benefits.

338. Following this continuous pattern of hostility and data manipulation, Defendant ultimately took a final, severe adverse employment action by terminating Plaintiff's employment on April 29, 2025.

339. Defendant executed this termination as a direct, retaliatory consequence of Plaintiff exercising his statutorily protected rights to take medical leave under the FMLA to treat a serious health condition.

340. As a direct and proximate result of Defendant's willful, reckless, and unlawful violations of the FMLA, Plaintiff has suffered and continues to suffer significant financial and personal harms, including a substantial loss of income, loss of employment benefits, mounting medical liabilities, and severe emotional distress, thereby entitling Plaintiff to an

award of compensatory damages, liquidated damages, and interest in an amount to be determined by a jury.

## COUNT IV: FOURTH CLAIM FOR RELIEF

## (ERISA Section 510 Retaliation & Interference — 29 U.S.C. § 1140)

### *(Against All Defendants)*

341. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

342. At all times relevant, Plaintiff and his dependents were participants and/or beneficiaries in Defendant's group insurance plans, which are employee benefit plans regulated under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002(1).

343. Under Section 510 of ERISA, 29 U.S.C. § 1140, it is unlawful for an employer to discharge, fine, suspend, expel, discipline, or discriminate against a participant for exercising any right to which he is entitled under the provisions of an employee benefit plan, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

111

344. Defendant, acting through its human resources infrastructure and managerial agents, intentionally utilized its benefits enrollment networks to execute a non-consensual administrative downgrade of Plaintiff's established plan status.

345. Specifically, Defendant utilized a calculated "technical lockout" by withholding Plaintiff's necessary network credentials (RACF ID) during his approved medical absence, effectively denying him the electronic access required to preserve or audit his family benefit profile during a global platform transition. Internal corporate correspondence explicitly documents that the mandatory compliance sessions required to receive said RACF credentials were scheduled for September 12, 2024, falling directly within Plaintiff's approved, continuous FMLA medical leave window. Defendant intentionally weaponized this technical lockout as a direct operational mechanism of FMLA interference and ERISA discrimination, utilizing the timing of Plaintiff's protected medical leave to purposefully strip away his electronic network access.

346. To facilitate, execute, and cover up this technical exclusion and to accomplish the unlawful reduction of employee benefits under ERISA Section 510, local human resources personnel manually manipulated the

112

corporate employee databases, overriding Plaintiff's authentic August 2022 hire date to reset his continuous tenure to a 'Day 1 New Hire' status effective January 1, 2025. This manual database modification completely erased over two years of accumulated continuous corporate seniority, providing the artificial automated baseline required to automatically trigger a dependent purge of his benefit elections. The intentional misidentification of the corporate entity as *"KOHN DEERE KERNERSVILLE"* and the corrupted address string on Form 61 Denial (Exhibit W-3) further demonstrates a coordinated, bad-faith effort to distort employment records, interfere with plan participant identity verification tracks, and manufacture a fraudulent record trail to obscure Defendant's retaliatory motives.

347. As a direct result of this fraudulent "New Hire" system override, Defendant's database automatically purged Plaintiff's long-held "Family" coverage elections down to an "Employee Only" status, stripping his prior elected family coverage.

348. Defendant's subsequent defense that Plaintiff voluntarily "elected" to drop his dependents from a zero-premium plan is a bad-faith, post-hoc pretext; no rational actor would voluntarily select the total removal of dependent coverage from a plan carrying a $0.00 employee cost baseline.

113

349. Defendant executed this administrative sabotage with the specific, malicious intent to retaliate against Plaintiff for filing internal ethics complaints and seeking federal statutory intervention from the EEOC, and to inflict severe economic coercion by weaponizing the health security of his elected family benefits.

350. As a direct and proximate result of Defendant's willful violations of ERISA Section 510, Plaintiff's elected benefits were stripped from his coverage, resulting in an unlawful exclusion of benefits and the accumulation of medical liabilities.

351. Pursuant to ERISA Section 502(a)(3), Plaintiff is entitled to appropriate equitable and remedial relief, including equitable restitution in the form of a surcharge requiring Defendant to restore the platform to its uncorrupted status, make whole the benefits plan, retroactively reinstate his authentic August 2022 seniority metrics, and disgorge the value of all premiums and medical/dental plan benefits withheld during the system lockout window, and Plaintiff further prays for an award of reasonable attorney's fees, litigation costs, and pre-judgment interest pursuant to 29 U.S.C. § 1132(g)(1), with all underlying factual issues to be determined by a jury.

114

## COUNT V: FIFTH CLAIM FOR RELIEF

## (Common Law False Imprisonment)

### (Against All Defendants)

352.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

353.    At all times relevant, the common law of North Carolina protected Plaintiff from being intentionally and unlawfully detained against his will without legal justification.

354.    Defendant breached this duty on April 24, 2025, when Plaintiff was forced into a bounded room and physically prevented from his egress.

355.    On April 24, 2025, Defendant, acting through its authorized managerial agents Brian Mosbaugh and Amy Shelton within the scope of their employment, totally restrained Plaintiff's physical liberty without lawful authority or legal justification. Management utilized express threats of professional reprimand and severe employment consequences, telling Plaintiff he *"had no choice"* in order to force submission to their authority. Through this coercion, Plaintiff was ordered into a small, enclosed office

115

space measuring approximately 10 feet by 10 feet, where they refused his explicit requests to leave and physically blocked the single point of egress, thereby establishing a total, non-consensual physical confinement.

356. This physical confinement, forced detention, and severe emotional coercion executed against Plaintiff on April 24, 2025, by Human Resources Manager Brian Mosbaugh and Paint Supervisor Amy Shelton were entirely intentional, malicious, and calculated acts. These tortious actions carried zero legitimate operational or business purpose and completely diverged from any standard, expected, or accidental risk of a manufacturing or logistics workplace environment. The non-consensual physical trapping of an employee experiencing an active medical emergency carries no operational privilege and falls completely outside the scope, intent, and exclusivity coverage of the North Carolina Workers' Compensation Act.

357. The exact same people who held the October 3, 2024 coercive FMLA badge deactivation meeting regarding Plaintiff's religious apparel, specifically Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley, were in this room.

358. As the high-pressure escalation continued, Defendant's agent, Paint Supervisor Amy Shelton, who operated completely outside of

116

Plaintiff's Logistics department, used her physical presence to obstruct the only exit door. Supervisor Shelton deliberately stepped directly in front of the door handle and positioned her standing body directly over the hardware to create an impenetrable, forced physical barrier blocking any means of egress. Supervisor Shelton refused to move and willfully ignored Plaintiff's visible, acute medical distress, his clear verbal statement that *"I don't feel comfortable around these people,"* and his active physical attempts to leave the room, thereby overbearing Plaintiff's will, ignoring his complete lack of consent, and using physical force to compel Plaintiff to remain totally trapped inside the cornered space under severe duress.

359. The severe duress and confinement orchestrated by Manager Mosbaugh on April 24, 2025, represent an escalated continuation of prior targeted harassment. Specifically, seven to eight months prior, on October 3, 2024, the exact same manager, Brian Mosbaugh, had maliciously deactivated Plaintiff's security badge to restrict his workplace access. While Manager Shelton was not involved in that October 2024 badge incident, Manager Mosbaugh's history of intentional targeting establishes a clear, pre-existing malice and intent to violate Plaintiff's rights.

117

360. Plaintiff was fully conscious and aware of this unlawful physical restraint and confinement, which was executed by Defendant's corporate agents without any legal justification, warrant, privilege, or right, completely depriving Plaintiff of his freedom of movement by force, threat of force, and against his express will.

361. At all times relevant, Defendant's managerial agents executed this unlawful confinement while acting squarely within the line and scope of their employment, thereby rendering Defendant entity vicariously liable for Plaintiff's injuries under the North Carolina common law doctrine of *respondeat superior.*

362. As a direct and proximate result of Defendant's willful, malicious, and unlawful physical restraint and confinement of Plaintiff, Plaintiff has suffered a substantial loss of income, loss of employment benefits, severe public humiliation, mounting medical liabilities, and deep emotional distress, entitling Plaintiff to an award of compensatory damages, front pay, and punitive damages under North Carolina law in an amount to be determined by a jury.

## COUNT VI: SIXTH CLAIM FOR RELIEF

## (North Carolina Common Law Wrongful Discharge in Violation of Public Policy)

*(Against All Defendants)*

363. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

364. At all times relevant, Plaintiff was an employee and Defendant was an employer subject to the public policies of the State of North Carolina.

365. North Carolina common law holds that an employer has no right to terminate an at-will employee for an unlawful reason or a purpose that contravenes public policy.

366. Public policy is the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.

367. N.C. Gen. Stat. § 143-422.2 expresses the explicit public policy of North Carolina prohibiting workplace discrimination and retaliatory discharge based upon a worker's sincerely held religious beliefs, race, color,

119

national origin, age, sex, or handicap by employers that regularly employ 15 or more employees.

368. It is the public policy of the State of North Carolina, expressed in Section 1 of the North Carolina Constitution, that all persons are endowed with certain inalienable rights, including the enjoyment of the fruits of their own labor.

369. Defendant violated these express public policies when it targeted Plaintiff with selective safety enforcements, executed a retaliatory credentials lockout, reset his corporate hire date to January 1, 2025, removed his prior elected health benefits, subjected him to an unannounced physical office confinement, and ultimately executed a retaliatory discharge. Defendant carried out these adverse actions to punish Plaintiff for requesting a religious accommodation and for filing workplace injury reports, while explicitly protecting secular employees who wore identical wrist apparel unhindered on the high-hazard production floor.

370. The North Carolina Workers' Compensation Act and N.C. Gen. Stat. § 95-241 expresses the clear public policy of the state that prohibits employers from executing retaliatory terminations against

120

employees who file workplace injury tracking documentation, including North Carolina Industrial Commission Form 18 filings.

371. N.C. Gen. Stat. § 14-209 sets forth the state's public policy prohibiting perjury and the engineering of fraudulent administrative misrepresentations to state regulatory bodies.

372. North Carolina expresses an overriding public policy prohibiting physical intimidation, assault, and intentional physical confinement within the workplace.

373. Defendant directly violated this express state public policy by executing Plaintiff's termination as a direct consequence of, and a cover-up for, his physical resistance to the unlawful, non-consensual office confinement orchestrated by Defendant's agents on April 24, 2025

374. Defendant, acting through its operational managers and human resources staff, engaged in a coordinated course of unlawful employment practices in direct violation of North Carolina public policy. Specifically, Defendant discriminated against Plaintiff by selectively enforcing apparel bans to force a religious erasure, executing an unannounced office confinement to physically intimidate him, and manipulating corporate identifiers—such as utilizing *"KOHN DEERE*

121

KERNERSVILLE" name variations and altering address registries on official state insurance logs—to obscure his employment timeline from standard tracking systems.

375. These deceptive administrative methods were utilized as a direct corporate smokescreen to hide a malicious, post-hoc pretext for his termination and to cover up core religious hostility following Plaintiff's requests for spiritual accommodations and internal compliance reporting.

376. Defendant's bad-faith actions directly resulted in an official regulatory intervention by a state body, culminating in a September 18, 2025 Order Assessing Sanctions against Defendant under N.C. Gen. Stat. § 97-18(j). Defendant violated overriding state public policy by executing Plaintiff's summary termination as direct retaliation for opposing this pattern of discrimination, thereby denying him the protected opportunity to hold employment free from corporate hostility.

377. As a direct and proximate result of Defendant's willful, malicious, and unlawful termination of Plaintiff's employment in violation of the overriding public policies of the State of North Carolina, Plaintiff has suffered a substantial loss of income, loss of employment benefits, mounting medical liabilities, and severe emotional distress, entitling Plaintiff to an

122

award of compensatory damages, front pay for career disruption, and punitive damages in an amount to be determined by a jury.

## COUNT VII: SEVENTH CLAIM FOR RELIEF

## (Intentional Infliction of Emotional Distress)

### (Against All Defendants)

378.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

## A. Extreme and Outrageous Conduct Exceeding All Bounds of Decent Society

379.    Defendant, acting through its managing operational, security, and human resources agents, engaged in a continuous, coordinated campaign of psychological coercion explicitly designed to shatter Plaintiff's emotional stability, force a religious erasure, and condition his continued employment upon physical duress and threats of criminal arrest.

380.    Defendant's conduct crosses the objective boundary into extreme and outrageous conduct because it was executed with prior, specific

123

knowledge of a subordinate's special susceptibility and documented mental health vulnerabilities.

381. Defendant possessed actual, written notice dating back to August 2024 that local management's selective safety enforcement and refusal to accommodate Plaintiff directly aggravated his diagnosed medical condition, yet Defendant willfully authorized local management to continue enforcing these discriminatory ultimatums.

382. Specifically, global corporate compliance and local management possessed explicit, continuous written notice of Plaintiff's clinical medical diagnoses—including Generalized Panic Disorder, panic attacks, an acute hypertensive blood pressure spike from a baseline of 120/80 to 150/80, and admission to a 4-week Mental Health Intensive Outpatient Program (MH-IOP)—via multiple formal alerts spanning an eight-month period:

a) August 16, 2024: Initial EthicsPoint Compliance Report;

b) August 17, 2024: Escalation Report;

c) August 19, 2024: EthicsPoint Follow-Up Report detailing a medical diagnosis of Generalized Anxiety Disorder, a blood pressure spike from a baseline of 120/80 up to 150/80 induced

124

by discussing the workplace incidents, and the recommended treatment of counseling alongside three distinct prescribed medications (Amlodipine, Fluoxetine, and Hydroxyzine);

d) August 21, 2024: Direct delivery of doctor's note to HR Representative Veronica McNeill;

e) August 22, 2024, Supervisor Jessie White forwarded Plaintiff's medical note and FMLA filing notice to Human Resources Manager Brian Mosbaugh, Supervisor William Bridges, and Human Resources Representative Veronica McNeill;

f) October 3, 2024: EthicsPoint Report;

g) October 7, 2024, Formal written disclosure via email to Ethics & Compliance Program Manager Russell Nieman, stating textually: *"I keep waking up in the middle of the night having panic attacks. I feel uncomfortable and scared when I think about walking past the office area at work."*

h) November 22, 2024: EthicsPoint Report;

i) November 23, 2024: Email to Ethics & Compliance Program Manager Russell Nieman stating, *"I have suffered emotional and mental damage. My health has been affected."*

125

j) March 4, 2025: EthicsPoint Report;

k) March 25, 2025: EthicsPoint Report; and

l) April 16, 2025: EthicsPoint Report, stating, *"I feel unsafe around certain people..."* and *"The HR manager, Brian Mosbough, still stares at me like he wants to fight sometimes."*

383. Despite this comprehensive, actual notice of Plaintiff's fragile psychological state, Defendant intentionally ignored Plaintiff's cries for help and permitted local management to weaponize these known medical vulnerabilities through the following targeted, extreme, and outrageous acts:

384. The October 3, 2024 Security Badge Lockout: This act was willfully and intentionally executed immediately upon Plaintiff's return from approved medical leave by the exact same members of management, specifically HR Manager Brian Mosbaugh and Safety Representative Maria Rumley, to isolate and interrogate Plaintiff while in an acute medical state.

385. The April 24, 2025 Non-Consensual Confinement: Defendant willingly allowed a manager Plaintiff previously reported internally and to the EEOC, specifically Human Resources Brian Mosbaugh, to intentionally pull Paint Supervisor Amy Shelton across departmental lines to compel Plaintiff into a room where Supervisor Shelton utilized her physical body as an

126

impenetrable wall, blocking the door handle of a restrictive 10x10 foot office space, and completely denying Plaintiff access to exit while willfully ignoring his verbal plea: *"I don't feel comfortable around these people."*

386. The April 29, 2025 Coerced Termination and Criminal Arrest Threats: Defendant willfully and intentionally allowed the exact manager Plaintiff reported, specifically Human Resources Brian Mosbaugh, to carry out a retaliatory termination. Intentionally introducing bad-faith assertions of criminal arrest during a high-pressure termination meeting to force an involuntary administrative surrender of property and to silence Plaintiff under duress. When Plaintiff asked an unidentified third person to state their corporate identity, HR Manager Brian Mosbaugh immediately interjected to weaponize law enforcement, stating: *"Because not only are you lost employment [sic], you don't want to get arrested also, so. Can I please have your badge?"*

387. The Manufacturing of Fraudulent State Court Litigation: Funding, coordinating, and executing a post-termination campaign utilizing a state court Chapter 50C civil process built entirely upon fabricated testimony as noted in ¶¶ 221-262. Defendant abruptly filed a Notice of Voluntary Dismissal pursuant to G.S. 1A-1, Rule 41 on July 8, 2025, once

127

Plaintiff's counsel pushed for formal discovery, proving the unadjudicated action was a groundless tool used to retroactively validate a retaliatory discharge and inflict severe emotional distress.

388.    The Post-Termination Isolation and Gag Orders: Deploying Enterprise Security & Preparedness Investigators Shia Cruciani and James Poehlman on June 12, 2025, to issue an ongoing speech restriction commanding Plaintiff via email to *"Not communicate any information regarding this meeting and/or the investigation to any others,"* while simultaneously issuing a written refusal to allow Plaintiff's private legal counsel to be present during compliance questioning.

## B. Actual Malice, Intent, and Reckless Indifference

389.    Defendant acted with actual malice, specific intent, and reckless indifference to the devastating psychological impact its actions would cause. HR Manager Brian Mosbaugh's history of intentional targeting establishes a clear, pre-existing malice and intent to violate Plaintiff's rights. This continuous pattern of intentional, non-accidental misconduct constitutes a deliberate injury that completely transcends the administrative scope and exclusivity protections of the North Carolina Workers' Compensation Act.

128

390. Defendant's global corporate compliance and legal leadership actively and in a coordinated manner ratified this ongoing psychological harm by maintaining absolute administrative silence, willfully ignoring seven separate corporate compliance alerts, and executing expedited hotline closures and post-termination secrecy mandates to insulate its managing agents.

391. Defendant's global corporate compliance, legal leadership, and managing agents possessed explicit, multi-month written notice of Plaintiff's severe psychiatric conditions and still authorized and executed an unannounced physical confinement and issued bad-faith threats of criminal arrest, which constitutes intentional misconduct. Defendant knew this conduct was substantially certain to cause severe, permanent, and disabling psychological trauma, moving this intentional injury completely outside the administrative scope and exclusivity bar of the North Carolina Workers' Compensation Act.

392. Defendant's conduct crosses the objective boundary of civilized decency because it transitioned standard workplace management into physical intimidation. While an employer possesses an administrative privilege to discipline or terminate an employee, no such privilege extends to

129

physically trapping a vulnerable subordinate—who was in visible, acute medical distress—inside an enclosed room.

393. Defendant specifically exploited Plaintiff's known medical vulnerabilities by deploying an outside supervisor, Amy Shelton, to create an impenetrable human barrier over the exit hardware. Executing a physical confinement and threatening criminal arrest against an employee experiencing a documented panic attack constitutes a calculated campaign of psychological coercion exceeding all bounds of a decent society.

## C. Causation of Severe, Debilitating Emotional Distress

394. As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiff suffered, and continues to suffer, severe, debilitating, and unremitting emotional distress, acute mental anguish, profound public humiliation, and the accumulation of substantial medical debt.

395. The intensity and duration of the emotional distress inflicted are so severe that no reasonable person could be expected to endure it, necessitating an immediate escalation of clinical therapy sessions and specialized psychiatric care to manage severe psychological trauma.

130

396. Plaintiff's severe distress is backed by objective physical manifestations of extreme anxiety, including a clinically documented acute hypertensive spike where Plaintiff's blood pressure escalated from a normal baseline of 120/80 to an emergency level of 150/80 solely upon recounting the workplace hostility, resulting in the severe exacerbation of his clinically diagnosed psychiatric injuries.

397. This severe and disabling emotional and mental condition has led to an unbroken, multi-year chain of therapy, starting from August 2024 until the present filing of this complaint.

398. Because this common-law intentional tort was executed by Defendant's managing agents acting within the scope of their employment and subsequently ratified by corporate leadership, Defendant is directly and vicariously liable for all resulting harm.

399. As a direct and proximate result of Defendant's willful, malicious, and intentional conduct, Plaintiff suffered severe and debilitating emotional distress, mental anguish, and a profound disruption to his career, entitling Plaintiff to an award of compensatory damages, front pay, and punitive damages under North Carolina law in an amount to be determined by a jury.

## COUNT VIII: EIGHTH CLAIM FOR RELIEF

## (Common Law Abuse of Process)

### (Against All Defendants)

400. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

401. Defendant, acting through its corporate managers and hired defense counsel, W. Mark Peck, initiated and executed a state court Chapter 50C civil process against Plaintiff for an improper, collateral purpose. The true intent was not a legitimate pursuit of physical safety, as the complaining manager was already actively executing a permanent out-of-state relocation over 800 miles away to Iowa and required no local geographic protection. Rather, the process was used as a coordinated corporate campaign to manufacture a post-hoc, fraudulent timeline to retroactively justify an unlawful termination, insulate corporate agents from civil rights liability, and intimidate Plaintiff into abandoning his federal EEOC and whistleblowing disclosures.

402. At all times relevant, Defendant weaponized its corporate treasury by authorizing the direct expenditure of corporate funds and

132

commercial billing accounts to completely finance, underwrite, and subsidize the initiation and maintenance of the state court Chapter 50C civil proceeding. Defendant directly paid its corporate enterprise defense counsel, W. Mark Peck, and the law firm Robinson & Lawing, LLP, to absorb all legal fees for the complaining manager and deploy corporate legal infrastructure against the Plaintiff in a private, non-employment domestic action, thereby perverting corporate resources for the collateral purpose of inflicting severe economic duress upon the Plaintiff.

403. Defendant, by and through its corporate agents and hired counsel, advanced this state court process despite possessing actual, documented knowledge that the proceeding was entirely baseless and designed solely to harass. Because corporate leadership had formally approved the manager's out-of-state relocation a month prior, Defendant possessed actual knowledge that no local protective order was needed, using the state court purely as a tactical corporate bluff to coerce Plaintiff.

404. Defendant committed improper, willful acts in the regular use of that process by deploying corporate funds and enterprise counsel to manage a private employee civil matter, offering fabricated testimony regarding social media correspondence, and actively leveraging the threat

133

of the pending state proceeding to extract a restrictive, mutual "no-contact" waiver to silence Plaintiff.

405. Certified EEOC administrative logs reveal that on March 5, 2025, at approximately 10:21 AM, Defendant explicitly declined federal mediation, forcing the case into an active investigation. On March 6, 2025, at approximately 10:40 AM, the EEOC served an official notice locking in an absolute corporate Position Statement deadline of April 8, 2025, straight to Defendant's enterprise counsel, W. Mark Peck (mpeck@robinsonlawing.com).

406. Enterprise counsel Peck utilized this active, ticking federal regulatory window to step into state court to orchestrate the groundless Chapter 50C process, perverting the legal system for the collateral purpose of manufacturing a backward-facing timeline to satisfy that federal demand.

407. As a direct and proximate result of Defendant's willful abuse of the legal process, Plaintiff suffered profound public humiliation, severe emotional distress, disruption to his legal defense, and the accumulation of legal and medical liabilities, entitling Plaintiff to compensatory and punitive damages in an amount to be determined by a jury.

134

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Stephen Moore respectfully requests that this Court enter judgment against Defendant Deere & Company and grant the following relief:

1. **Compensatory Damages**: Award full compensation for lost back pay, and lost front pay mapped directly to Plaintiff's documented fast-track career trajectory toward specialized management and corporate procurement roles; lost retirement and pension contributions; and all out-of-pocket medical debts induced by Defendant's fraudulent cancellation of family health benefits.

2. **Title VII Statutory Damages:** Award the maximum federal statutory compensatory and punitive damages permitted under 42 U.S.C. § 1981a for intentional, malicious, and reckless violations of Title VII, to be evaluated completely independent of any common-law tort or equitable recovery.

3. **FMLA Liquidated Damages:** Award double liquidated damages for willful, bad-faith statutory violations under the Family and Medical Leave Act (FMLA) pursuant to 29 U.S.C. § 2617, which sit entirely outside Title VII caps.

4. **ERISA Equitable & Restitutionary Relief:** Order the full reinstatement of Plaintiff's authentic August 2022 corporate seniority metrics, retroactive restoration of all family healthcare and dental coverages, and complete restitution for all lost employee benefit values under ERISA Section 502(a)(3) [29 U.S.C. § 1132(a)(3)].

5. **Common-Law Tort Damages:** Award substantial, separate compensatory, punitive, and exemplary damages against Defendant Deere & Company for Common-Law False Imprisonment, Intentional Infliction of Emotional Distress (IIED), and Wrongful Discharge in Violation of North Carolina Public Policy executed through physical confinement, manufactured criminal threats, and data manipulation.

6. **Forensic Equitable Relief:** Issue a formal order directing an independent federal audit of the local facility's IT database logs, system hire-date override histories, personnel records, and internal compliance protocols to expose and correct widespread data masking.

7. **Fees and Costs:** Award reasonable attorney's fees, expert witness fees, forensic metadata analysis costs, and all general costs of this action.

8. **Declaratory Judgment:** Enter a Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202 establishing that Defendant's

manual IT network credential exclusions, localized account "Relock Loops," and subsequent non-consensual stripping of Plaintiff's dependents from active healthcare coverage during a period of approved medical leave constituted a willful, bad-faith interference with vested rights and a breach of corporate fiduciary duties under ERISA Section 510 (29 U.S.C. § 1140).

9. **Permanent Whistleblower Injunction:** Enter a Permanent Injunction strictly prohibiting Defendant, its corporate parent, subsidiaries, affiliates, and retained legal counsel from enforcing, utilizing, or threatening the execution of unvetted corporate compliance confidentiality directives or internal "Gag Orders" to impede, chill, restrict, or otherwise obstruct Plaintiff from communicating directly with, or presenting forensic evidence to, the U.S. Securities and Exchange Commission (SEC), the National Labor Relations Board (NLRB), or any other federal or state regulatory investigative agency under the protected baseline of SEC Rule 21F-17(a).

10. **Corporate Ratification Damages**: Award Plaintiff separate compensatory, general, and punitive damages against Defendant Deere & Company, in an amount to be determined at trial, for the continuous, multi-month campaign of post-termination administrative isolation, denial of legal representation, and coordinated psychological coercion intentionally executed by corporate compliance agents to induce a severe psychiatric

crisis while Plaintiff remained under active psychiatric care, which constituted

a direct corporate ratification of local manager misconduct.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff

Stephen Moore hereby demands a trial by jury on all issues and claims so

triable in this action.

138

**VERIFICATION**

I, Stephen Moore, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I am the Plaintiff in the above-captioned matter, that I have read the foregoing Civil Complaint and know the contents thereof, and that the factual allegations contained therein are true and correct to the best of my own personal knowledge, information, and belief.

Executed on this 25 day of June 2026.

Respectfully submitted,

By: _____

Stephen Moore, Plaintiff Pro Se

6136 Pepperidge Way

Climax, NC 27233 (Randolph County)

Phone: (336) 772-0044

Email: spmoore1@gtcc.edu