

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### (Greensboro Division)

|  |  |
|---|---|
| STEPHEN MOORE, | |
| Plaintiff, | Case No.: 1:26CV591 |
| vs. | |
| DEERE & COMPANY; and JOHN DEERE KERNERSVILLE LLC, | FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |
| Defendants. | |

NOW COMES PLAINTIFF Stephen Moore, pro se, complaining of the Defendant, and does hereby allege and aver as follows:

## PARTIES

1. Plaintiff Stephen Moore is a natural person and a citizen of the United States. He resides in Randolph County, North Carolina. At all times relevant, Plaintiff was an "employee" as defined by federal and state employment statutes.

2. Defendant Deere & Company is a multi-national corporation headquartered in Moline, Illinois. Defendant owns and operates a regional

1

manufacturing campus and wholly owned facility under the trade name John Deere Kernersville LLC, located at 1000 John Deere Road, Kernersville, NC 27284. At all relevant times, Defendant was an employer of Plaintiff and regularly employed more than 500 employees.

3. At all times relevant, Defendant Deere & Company and John Deere Kernersville LLC operated as a highly unified, single integrated employer under controlling federal standards.

4. For structural clarity and brevity throughout this Complaint, Defendants Deere & Company and John Deere Kernersville LLC are referred to collectively in the singular as "Defendant." Any reference to corporate policies, shared databases, or managerial actions executed by personnel at the local Kernersville facility constitutes the joint and several liability of both named corporate entities.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over the federal statutory claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3) (Title VII) and 29 U.S.C. § 2617 (Family and Medical Leave Act).

2

6. This Court has supplemental jurisdiction over the Plaintiff's North Carolina state statutory and common law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) and 42 U.S.C. § 2000e-5(f)(3), because a substantial part of the events giving rise to the claims occurred at the John Deere Kernersville LLC manufacturing facility located within this judicial district, and Defendant's corporate entity conducts substantial business operations within this district.

8. Jurisdiction and venue are proper before this Court.

## **Evidentiary and Exhibit Conventions**

9. For the avoidance of doubt, certain core documentary, administrative, and photographic assets referenced throughout this Complaint are explicitly annexed hereto as physical attachments and are uniformly labeled with the prefix "Attached hereto as Exhibit" followed by

3

the corresponding letter or number. All other external investigative files, digital metadata, clinical files, and evidentiary metrics referenced herein shall be formally produced and disclosed in their entirety during the subsequent civil discovery phase of this litigation pursuant to Federal Rule of Civil Procedure 26.

## ADMINISTRATIVE PREREQUISITES

10. The EEOC issued a Determination and Notice of Right to Sue for the initial Charge (No. 435-2024-01634) on April 27, 2026.

11. The EEOC issued a formal Determination and Notice of Right to Sue Letter for Charge No. 435-2025-01587 on July 7, 2026.

12. Plaintiff has brought these claims within ninety (90) days of receiving the respective Notices of Right to Sue for both Charge No. 435-2024-01634 and Charge No. 435-2025-01587.

4

## **EXHIBITS**

13.     Attached hereto and incorporated by reference are the following exhibits referenced herein:

a) **Exhibit A-1**: EEOC Notice of Right to Sue Letter issued on April 27, 2026, for Charge No. 435-2024-01634.

b) **Exhibit A-2**: Signed EEOC Form 5A Charge of Discrimination document under Charge No. 435-2024-01634.

c) **Exhibit A-3:** EEOC Notice of Right to Sue Letter issued on July 7, 2026, for Charge No. 435-2025-01587.

d) **Exhibit A-4**: Form 5: Charge of Discrimination for Charge No. 435-2024-01634.

e) **Exhibit D-1**: John Deere Corporate Jewelry Policy Manual, designated as Doc. No. JDKP-335.

f) **Exhibit D-2**: January 1, 2025 Hire Date Alteration Submitted to EEOC by Defendant as Evidence for Benefits Removal.

g) **Exhibit D-3**: Defendant's Global Policy against Discrimination and Harassment.

h) **Exhibit E-12**: Defendant's Feb 9, 2026 EthicsPoint 6 Hour Closure by corporate compliance.

5

i) **Exhibit F-1**: Contemporaneous Photographic Evidence of secular apparel worn on the production floor.

j) **Exhibit F-2**: Visual comparisons of Plaintiff's actual religious bracelets next to a standard wristwatch.

k) **Exhibit F-3**: Physical and visual evidence regarding the bulky green welding sleeves.

l) **Exhibit L-1:** Littler Learning Group Internal Investigation Manual

m) **Exhibit R-1**: Plaintiff's 2023 Non-Exempt Annual Review showing "Highly Successful."

n) **Exhibit W-2**: State insurance EDI Form 19 regulatory filing dated October 25, 2024, textually stating: *"WAS ASKED TO REMOVE"* & *"KOHN DEERE KERNERSVILLE"* [sic].

o) **Exhibit W-3**: North Carolina Industrial Commission Form 61 Denial document textually stating: *"KOHN DEERE KERNERSVILLE"* [sic].

p) **Exhibit W-4**: North Carolina Industrial Commission Order Assessing Sanction dated September 18, 2025.

q) **Exhibit Z**: Handwritten thank-you note from Manager Lindsey Cota showing appreciation.

6

## STATEMENT OF FACTS

14. Plaintiff incorporates by reference the foregoing Paragraphs 1 through 13 of this Complaint as if fully set forth herein.

15. Plaintiff Stephen Moore was employed by Defendant between August 2022 and April 29, 2025.

16. Plaintiff Stephen Moore received no disciplinary actions or written warnings and maintained an unblemished performance record until his sudden termination.

17. During the course of his employment, Plaintiff Stephen Moore performed his job duties as expected and in a satisfactory manner.

18. The last position Plaintiff Stephen Moore held during his employment with Defendant was a Warehouse Logistics Technician in the Warehouse Logistics department.

19. The main duties of a Warehouse Logistics Technician are operating a forklift and "kit building," which utilizes a push-button pendant station to operate an overhead crane to safely move parts.

20. To further his advancements within the company, Plaintiff began taking Supply Chain Management classes, which directly align with

7

Defendant's core operational structure as a large-scale manufacturing enterprise.

21. On November 2, 2023, Plaintiff's supervisor, William Bridges, executed Plaintiff's 2023 Non-Exempt Annual Review, awarding him an overall performance rating of "Highly Successful," noting that Plaintiff was a *"great teammate"* and that management *"look[ed] forward to working with him as we move into the new year."* (Attached hereto as Exhibit R-1).

22. Following this performance evaluation, Plaintiff's upward career trajectory continued into the 2024 calendar year.

23. On May 21, 2024, Manager Lindsey Cota validated Plaintiff's ongoing performance and alignment for upward mobility, stating in writing that his career outreach was *"never a bother,"* and confirming that General Manager Steven Brewer was actively tracking Plaintiff for advanced project assignments.

24. This corporate career track was formalized on June 10, 2024, when Manager Cota officially scheduled and authorized a final logistics "job shadow" session alongside PDP Buyer Kristian Eller.

8

25. Following the completion of the shadowing sessions, Manager Cota maintained manager-initiated professional outreach.

26. On July 8, 2024, Manager Cota sent an electronic transmission to Plaintiff stating she *"had looked for you a couple times,"* invited him to an individual "1:1" development meeting to discuss his college degree, and encouraged him to *"review"* and *"let me know if you have any questions"* regarding open corporate NTA positions on her immediate team.

27. Prior to August 12, 2024, Plaintiff maintained an excellent attendance record, making every effort to never miss a day of work and consistently arriving at least 30 minutes early to his scheduled shifts.

28. On August 12, 2024, in the office area of the John Deere Kernersville location, Manager Lindsey Cota stated to Plaintiff that she had noticed his bracelets before and questioned him regarding the meaning and spiritual functions of the religious bracelets he was wearing.

29. Upon Plaintiff explaining that the bracelets serve a necessary spiritual and religious function, Manager Cota stated she did not believe Plaintiff could wear them due to company policy.

9

30. Plaintiff immediately informed Manager Cota of Title VII's religious accommodation protections and the governing *Groff v. DeJoy* legal standard, even displaying the statutory language to her on Plaintiff's cellular phone.

31. Despite being informed of Title VII, Manager Cota repeatedly sought to circumvent Plaintiff's religious practice by asking Plaintiff to place the bracelets in his pockets or wear them hidden on his ankles.

32. After Plaintiff reiterated that the bracelets must be worn on his wrists to fulfill their religious purpose, Manager Cota refused the accommodation and directed Plaintiff to Human Resources, where Plaintiff again reiterated his formal Title VII religious accommodation request.

33. On August 12, 2024, after Plaintiff invoked Title VII and asserted his religious accommodation request, Defendant's managerial agent, Mike Fogleman, forced the complete removal of Plaintiff's religious apparel.

34. Defendant explicitly admits to this removal order in its official state insurance EDI Form 19 regulatory filing, stating textually: *"WAS ASKED TO REMOVE THEN COVER UP BRACELETS DUE TO JEWELRY POLICY"* (Attached hereto as Exhibit W-2, Box #12).

10

35. Subsequently, on Page 2 of Defendant's certified 435-2024-01634 EEOC Position Statement, Defendant asserted: "*JDK denies that at any point did Mr. Fogleman instruct Mr. Moore that he was required to remove the bracelets.*"

36. On August 12, 2024, immediately following this failure to engage in an interactive accommodation discussion, Plaintiff engaged in further protected activity by filing a formal inquiry with the EEOC.

37. On August 13, 2024, via email, Plaintiff formally notified Defendant's managerial agents, General Manager Steven Brewer, Human Resources Manager Brian Mosbaugh, and Manager Tami McNeer, n/k/a Tami Comegys, of the August 12, 2024 incident, his religious beliefs, his accommodation request, and his active EEOC inquiry, thereby establishing actual, contemporaneous managerial knowledge of his protected activities.

38. In the August 13, 2024 email to General Manager Steven Brewer, Plaintiff put Defendant on explicit notice of an acute emotional crisis, including "uncontrollable crying" and "insomnia," which he was undergoing because of the August 12, 2024 forced religious apparel removal, labeling it a "traumatic event." Due to the severe psychological trauma Plaintiff was experiencing, he utilized third-person narrative writing as a deliberate

11

protective barrier to document the painful, destabilizing event without re-experiencing the full emotional weight of the panic and vulnerability in real-time.

39. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"...the employee immediately endures what could be described as judgmental skepticism and feels that they are being looked upon as if their religious beliefs are frivolous and fictitious."*

40. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"...the employee becomes emotional to the point they feel they are being discriminated against."*

41. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"The person in HR then responds in a tone that the employee feels is disrespectful and says, 'I wish you would.'"*

42. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"The employee feels emotionally distraught and starts crying as they drive to the Equal Employment Opportunity Commission office in Greensboro."*

43. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"...the employee is also unable to sleep because they have suffered what could be described as a traumatic event. The employee stays awake all night feeling anxious, perplexed, and distressed."*

44. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"...the thought of going back to work makes them feel uncomfortable, anxious, angry, and hurt."*

45. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"The employee also dreads the thought of having to return to work the following week because of the situation."*

46. In this August 13, 2024 email to General Manager Brewer, Plaintiff stated textually: *"...they are not emotionally able to go to work the next day because of the discrimination."*

47. In the August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff put Defendant on explicit notice of the acute emotional crisis directly related to the August 12, 2024 incident.

13

48. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"I repeated that my bracelets were religious and told them they were chakra bracelets. I was met with judgmental skepticism and told I must remove them..."*

49. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"I felt myself becoming emotional and said "I would take them off" because I needed to get away from the situation."*

50. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"The person responded "I wish you would" in a tone I felt was disrespectful."*

51. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"After the incident, I was so emotionally distraught I immediately put in for LA1 and left work. I was emotionally overwhelmed and cried while driving to the Equal Employment Opportunity Commission in Greensboro."*

14

52. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"Because of this incident, I feel uncomfortable, anxious, hurt, and angry at the thought of returning to work."*

53. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"It has caused me to become extremely distraught to the point where I don't want to go back to work."*

54. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"I do not want to be harassed or judged based on my beliefs... I just want to be left alone."*

55. In this August 13, 2024 email to Human Resources Manager Brian Mosbaugh and Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff stated textually: *"I am uncertain if I will return to work this week solely based on the discrimination."*

56. Defendant's managerial agent, Human Resources Manager Brian Mosbaugh, summoned Plaintiff to attend a mandatory meeting held on August 14, 2024, which was Plaintiff's scheduled day off.

15

57. During this meeting, Manager Mosbaugh and Safety Lead Maria Rumley explicitly refused to engage in a good-faith interactive process. Instead, they unilaterally imposed a predetermined total concealment directive regarding Plaintiff's sacred religious apparel, directly denying his request for a reasonable religious accommodation.

58. As admitted in its certified EEOC Position Statement under Charge No. 435-2024-01634, Defendant further proposed that Plaintiff utilize bulky, oversized *"welding sleeves"*—standard personal protective equipment (PPE) that Defendant is legally and operationally required to purchase and provide universally to facility welders—to completely conceal his religious apparel (Attached hereto as Exhibit F-3).

59. Because these oversized welding sleeves presented a higher physical safety risk for his logistics warehouse role, and because completely covering the items directly violated his religious tenets, Plaintiff declined the proposal.

60. Faced with an immediate directive to suppress his religious practice while experiencing acute mental distress, Plaintiff suffered an immediate panic attack and was compelled by a medical emergency to exit the meeting space to manage his worsening psychiatric symptoms.

16

61.     Consequently, Plaintiff's departure from the room was a physical physiological response to the directive.

62.     During the week following the August 12–14, 2024, confrontations, Defendant instructed Plaintiff to deplete his accrued company leave balances and specifically registered his medical absences under "LA1" leave and "sick" leave.

63.     On August 16, 2024, Plaintiff officially placed corporate compliance on notice by logging a comprehensive internal discrimination report into Deere & Company's internal system under EthicsPoint Report Key 973570938501, advising corporate oversight that local management was forcing the removal of his religious attire.

64.     On August 17, 2024, Plaintiff formally reported Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley to Deere & Company's internal corporate compliance channels for policy enforcement and differential treatment under EthicsPoint Report Key 327000348401.

65.     On August 17, 2024, Plaintiff provided formal written notice of the ongoing religious apparel dispute via an electronic mail transmission directed to Manager Tami McNeer, n/k/a Tami Comegys.

17

66.     This August 17, 2024 email correspondence to Manager Tami McNeer, n/k/a Tami Comegys, provided Defendant with contemporary written notice of a separate Title VII violation at the facility. Specifically, Plaintiff documented that local management forced him to participate in a sectarian group prayer during a mandatory company standdown meeting earlier that year regarding an incident where a tractor-trailer backed into a man, pinning him between a loading dock and the back of the tractor-trailer.

67.     In this August 17, 2024 email to Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff reported that when he raised civil rights concerns regarding the forced prayer, Human Resources Manager Brian Mosbaugh dismissed both the forced prayer and the apparel removal as mere *"minor incidents."*

68.     In the same transmission to Manager Tami McNeer, n/k/a Tami Comegys, Plaintiff documented the immediate psychological impact of the local management group's enforcement actions, writing that he was *"too emotionally distraught to describe everything perfectly"* and had been *"pressured into removing"* his religious items.

69.     Plaintiff further put Defendant's Manager Tami McNeer, n/k/a Tami Comegys, on notice that management was actively spreading details of his

18

confidential accommodation meetings across the workplace, documenting: *"I could tell that several people in the office had been gossiping about the incident. People were staring and acting funny."*

70. On August 18, 2024, Plaintiff added an official Follow-Up disclosure under EthicsPoint Report Key 973570938501 explicitly rejecting Defendant's alternative covering directives, documenting that *"The meeting I had with the HR manager [Mosbaugh] only made the issue worse when I was given the options to remove my religious apparel or cover it up."*

71. On August 19, 2024, Manager Tami McNeer, n/k/a Tami Comegys, acknowledged the receipt of Plaintiff's August 17, 2024 email, and encouraged him *"to keep open dialog with your manager or Brian Mosbaugh on any new or additional concerns that you have on the topic."*

72. On August 19, 2024, Plaintiff transmitted a written follow-up note to Manager Tami McNeer, n/k/a Tami Comegys, informing her that *"I do not feel comfortable"* discussing the issue with Human Resources Manager Brian Mosbaugh.

73. On August 19, 2024, as an immediate and proximate result of the severe workplace hostility executed by Defendant's managerial agents,

Plaintiff suffered an acute medical crisis and underwent an emergency clinical evaluation at the Guilford County Behavioral Health Center.

74.     This emergency evaluation formally codified clinical diagnoses of an acute Panic Attack and Generalized Anxiety Disorder, which directly rendered Plaintiff unable to perform his job duties.

75.     On August 19, 2024, Plaintiff placed local management on written notice of his psychological and physiological responses to the apparel dispute via an email transmitted directly to Manager Lindsey Cota.

76.     In this August 19, 2024 email sent to Defendant's Manager Lindsey Cota, Plaintiff documented that during his clinical evaluation, his blood pressure rose from a baseline of 120/80 to an acute hypertensive state of 150/80 when asked by medical staff to recount the workplace events. Plaintiff further advised management that his medical providers prescribed targeted, clinical therapeutic medications to treat the acute anxiety resulting from the facility dispute.

77.     On August 19, 2024, Plaintiff updated his active internal compliance record under EthicsPoint Report Key 327000348401, placing Defendant's corporate compliance on formal notice that as a direct and proximate result of management's hostile enforcement actions, disparate treatment, and

20

failure to accommodate, Plaintiff suffered severe physical and psychological trauma. Specifically, when asked to recount the workplace incidents, Plaintiff experienced an immediate, severe hypertensive blood pressure spike.

78. In this August 19, 2024, updated record under EthicsPoint Report Key 327000348401, Plaintiff also informed Defendant's corporate compliance that a licensed healthcare provider formally diagnosed him with acute Panic Attacks and Generalized Anxiety Disorder—severe, disabling, and professionally recognized conditions caused directly by the workplace hostility—and prescribed targeted therapeutic medications to manage these debilitating symptoms.

79. On August 21, 2024, Plaintiff provided direct statutory notice of his serious medical condition to Defendant by emailing a formal medical note covering his emergency absences to HR Representative Veronica McNeill, as well as corporate agents Jessie White and Blake Bridges.

80. On August 21, 2024, Defendant's Human Resources Department acknowledged Plaintiff's statutory notice and verified his immediate entitlement to protected leave. Specifically, HR Representative Veronica McNeill emailed Plaintiff, textually stating: *"I received your doctor's note for Monday, 8/19 and Tuesday, 8/20. It looks like you may be eligible for FMLA,"*

21

and provided Plaintiff with the formal corporate FMLA procedures and instructions to initiate his claim through UNUM.

81.     On August 21, 2024, Plaintiff's serious health condition was formally codified by Dr. Julie Nguyen of Cone Health Outpatient Behavioral Health, who issued an official medical directive admitting Plaintiff into a virtual Mental Health Intensive Outpatient Program (MH-IOP). Dr. Nguyen explicitly mandated that Plaintiff be excused from all work duties for a continuous length of stay spanning four weeks, with a projected full-duty return-to-work date of September 23, 2024.

82.     On August 21, 2024, formal written medical directives from Dr. Julie Nguyen on Cone Health Outpatient Behavioral Health letterhead were transmitted via email to Human Resources Representative Veronica McNeill, which Ms. McNeill formally acknowledged as received on August 22, 2024.

83.     On August 21, 2024, Plaintiff sent a copy of the formal written medical directives and FMLA filing notice to Supervisor Jessie White via email.

84.     On August 22, 2024, Supervisor Jessie White forwarded Plaintiff's medical note and FMLA filing notice to Human Resources Manager Brian

22

Mosbaugh, Supervisor William Bridges, and Human Resources Representative Veronica McNeill.

85. Plaintiff submitted this medical directive to Defendant's designated third-party leave administrator, Unum Life Insurance Company of America. Under Claim No. NTN-465654-GDC-02 and Leave No. NTN-465654-ABS-01, Unum formally evaluated the medical documentation and confirmed Plaintiff's statutory rights under the Act.

86. While Plaintiff was out on protected medical leave, Defendant withheld Plaintiff's earned, scheduled 2-year anniversary pay increase. This adverse economic action is documented in Plaintiff's August 16, 2024, and August 17, 2024, EthicsPoint report filings under Report Key 973570938501 and Report Key 327000348401.

87. As documented in both of those filings, on September 5, 2024, Plaintiff added a Follow-Up Note, placing Defendant's corporate compliance on explicit, written notice textually stating: *"I feel I am being retaliated against… My 2-year mark was on 08/08/2024. The discrimination I faced at work first took place on 08/12/2024 and again on 08/14/2024. I was supposed to get a raise on 08/08/2024, but that day has come and gone.*

23

*Now, it has been a month past the time I should have gotten a raise, but nothing has happened and I haven't received an update."*

88.     On September 5, 2024, Unum issued a formal, written "Your Leave Decision" notice to both Plaintiff and Defendant's corporate agents. This official notice textually certified that Plaintiff was fully eligible under the statute and that his continuous medical leave was "Eligible and Approved" under Federal FMLA from August 21, 2024, through September 22, 2024, utilizing 4.6000 weeks of his statutory allocation.

89.     While Plaintiff remained on medical leave, Defendant withheld Plaintiff's updated "RACF ID" network credentials, effectively locking him out of the internal corporate benefits enrollment portal and blocking him from participating in the global benefits platform transition without providing an alternative access method.

90.     On or around September 27, 2024, Deere & Company's Workforce Relations Compliance and Benefits Advocacy Manager, Dan Webster, contacted Plaintiff about his internal reporting and directed him to talk to Human Resources Brian Mosbaugh about the accommodation. Plaintiff informed Mr. Webster that he did not feel comfortable with Manager Mosbaugh.

24

91. On October 3, 2024, immediately upon Plaintiff's attempted return from an approved FMLA medical leave, local managing agents Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley—the exact corporate agents named in Plaintiff's internal complaint filed on August 17, 2024—executed a complete facilities lockout by deactivating Plaintiff's security badge.

92. Defendant explicitly admitted this adverse action in its certified EEOC Position Statement for Charge No. 435-2024-01634, stating textually: *"Because Mr. Mosbaugh and Ms. Rumley did not consider the religious accommodation issue to be resolved, they temporarily deactivated Mr. Moore's security badge..."*

93. Defendant further admitted that this intentional credential deactivation was executed while *"Mr. Moore was out of work on a medical leave of absence, which JDK provided to him in accordance with the Family Medical Leave Act."*

94. On October 3, 2024, immediately after learning that Plaintiff arrived at work and was let in the building, Human Resources Manager Brian Mosbaugh summoned Plaintiff to a conference room.

25

95. This meeting was coordinated by Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley, the two actors Plaintiff had reported to corporate compliance on August 17, 2024, alongside Supervisor William Bridges.

96. During this meeting, Human Resources Manager Brian Mosbaugh summarily shut down all dialogue after Plaintiff requested a lateral transfer to the dock—a sub-section within the Warehouse Logistics Department—as an accommodation.

97. Defendant conditioned Plaintiff's employment on forced compliance with the concealment directive or immediate termination.

98. Defendant failed its statutory duty to evaluate or offer open positions within the department that would resolve the conflict.

99. Specifically, the logistics department maintained a pre-existing enclosed cab yard tractor position that could have served as a reasonable accommodation. This position operates entirely within an isolated vehicle cab and outdoors, completely removed from manufacturing floor or mechanical machinery hazards.

26

100. Faced with an immediate threat of termination issued by the facility's highest local Human Resources authority, Plaintiff unwillingly submitted to the cover directive under acute economic duress as a temporary condition of retaining his livelihood, while explicitly advising management that he maintained his fundamental religious objections to the forced concealment.

101. Immediately following this closed-door confrontation, Plaintiff was required to exit the facility under severe economic duress to purchase external materials capable of concealing his sacred items.

102. Contemporary electronic time-clock tracking logs subsequent to the meeting reveal that corporate agents—operating under the direct supervision of Human Resources Manager Brian Mosbaugh—affirmatively altered Plaintiff's operational logs, generating a manual time-card override that clocked Plaintiff out of work concurrently with the administrative meeting window, removing his compensation for that duration.

103. As admitted in its 435-2024-01634 EEOC Position Statement, Defendant subsequently cited its Doc. No. JDKP-335 Policy (Attached hereto as Exhibit D-1) to justify the total concealment of Plaintiff's religious apparel (Attached hereto as Exhibit F-2).

27

104. Defendant's Doc. No. JDKP-335 Policy allows "suppliers and outside contractors" who come to the facility to wear "loose jewelry."

105. Defendant's Doc. No. JDKP-335 Policy allows "people" to walk freely throughout the facility, including high-hazard zones, while wearing "loose jewelry" such as "wallet chains, bracelets, dangling earrings (below the earlobe), hoop earrings, body piercing and necklaces outside of the shirt" as long as they do not "engage in physical work."

106. While using its Doc. No. JDKP-335 Policy to justify the complete concealment order regarding Plaintiff's religious apparel, Defendant completely ignored secular apparel and personal adornments worn by similarly situated employees outside of Plaintiff's protected class (Attached hereto as Exhibit F-1).

107. This differential enforcement of corporate policy Doc. No. JDKP-335 is documented by contemporaneous photographic evidence. Specifically, Exhibit F-1 documents an active heavy equipment operator inside a machinery cab wearing a watch on his wrist and a ring on his left hand (Image 11) while performing physical operational tasks.

108. Additionally, Exhibit F-1 documents an active floor employee who was cross deployed into Plaintiff's exact same department wearing a watch

28

on his wrist and a ring on his left hand (Image 9) while standing adjacent to operational machinery during active shift hours.

109. Defendant continuously permitted secular employees to wear large, metallic rings while actively operating heavy machinery and climbing onto logistics equipment, in direct violation of JDKP-335's explicit mandate that employees performing physical work *"shall not perform work assignments while wearing rings."*

110. On October 3, 2024, immediately following the credential deactivation and meeting executed by Human Resources Manager Brian Mosbaugh, Plaintiff filed a third formal report through Defendant's corporate compliance system under EthicsPoint Report Key 612346367501, reporting the sudden credential deactivation.

111. On October 3, 2024, Deere & Company's global corporate compliance system posted an automated update directing Plaintiff to contact Russell Nieman, Ethics & Compliance Program Manager, at 309-765-5332 or NiemanRussellR@JohnDeere.com if he had any additional information.

112. Concurrently, Plaintiff updated his active administrative file with the Equal Employment Opportunity Commission under Charge No. 435-2024-

29

01634, documenting the credential deactivation and gate intercept as an adverse enforcement action (Attached hereto as Exhibit A-2).

113. On October 4, 2024, Plaintiff supplemented his EthicsPoint filing under Report Key 612346367501, stating textually: *"Other people are openly allowed to walk around wearing turbans and other religious apparel. I feel the only reason it is an issue with me is because I filed a complaint with the EEOC and they are trying to protect themselves legally."*

114. On October 6, 2024, Plaintiff supplemented his EthicsPoint filing under Report Key 612346367501, stating textually: *"The same people claiming that it's a "safety issue" will go out on the floor wearing their fancy watches and other apparel that has nothing to do with religion... All I want is to be treated with the same respect other people with different religious beliefs are given."*

115. On October 7, 2024, Plaintiff sent a formal written disclosure via email directly to Deere & Company's Ethics & Compliance Program Manager Russell Nieman. This correspondence explicitly placed corporate leadership on notice that local management was acting in direct retaliation for Plaintiff's EEOC filings. It also affirmatively notified Defendant of Plaintiff's acute psychological injuries, stating textually: *"I keep waking up in the middle of*

*the night having panic attacks. I feel uncomfortable and scared when I think about walking past the office area at work".*

116.    On Wednesday, October 9, 2024, exactly six (6) calendar days after the initial database lockout and facility interception, Worldwide Security Investigator Dicky Mah transmitted an electronic directive to Plaintiff captioned "Highly Confidential." In this transmission, global corporate security personnel issued notice for an immediate meeting, subjecting Plaintiff to an isolated, closed-door compliance interrogation via Microsoft Teams.

117.    In communicating this directive, Investigator Mah explicitly imposed a strict corporate order upon Plaintiff, mandating textually: *"Please do not forward this meeting notice to anyone else or tell anyone that you are meeting with compliance."* While demanding absolute narrative secrecy regarding the investigation, Defendant concurrently provided a digital link to its official "Policy Against Retaliation."

118.    On October 10, 2024, Plaintiff participated in an administrative video conference interview conducted by Deere & Company's Security Operations Manager and Investigator David Hamilton, and Worldwide Security Investigator Dicky Mah.

31

119.     As admitted on Page 4 of Defendant's certified 435-2024-01634 EEOC Position Statement, the primary purpose of this interview was to review Plaintiff's claims that Human Resources Manager Brian Mosbaugh had engaged in hostile and retaliatory conduct against him.

120.     During this interview, the primary example of retaliation provided by Plaintiff was the deactivation of his security badge and the subsequent facility gate lockout.

121.     On October 14, 2024, exactly eleven (11) calendar days after local management executed the unannounced badge deactivation and facility lockout, Plaintiff began ongoing, monthly intensive clinical therapy sessions to treat acute, debilitating psychological trauma—including documented clinical diagnoses of Panic Attacks and Generalized Anxiety Disorder—induced by Defendant's escalating workplace enforcement actions.

122.     On October 25, 2024, Defendant utilized variant entity entries in its North Carolina Industrial Commission submission under IC File No. 24789611, including "KOHN DEERE KERNERSVILLE" and "1000 JOHN DEERE RS" (Attached hereto as Exhibit W-2).

32

123. On this state-certified EDI Form 19, completed on October 25, 2024, Defendant documented a *"first knew of injury"* date of October 1, 2024, in Box 7.

124. This administrative entry stands in direct, objective contrast to internal human resources and medical leave records showing that local management had processed and handled Plaintiff's written medical restrictions weeks prior, on August 22, 2024.

125. Concurrently, in Box 12 of the same state-certified EDI Form 19 document, Defendant documented that Plaintiff *"TOOK FMLA UNTIL 10/3/2024."* This entry indicates that Plaintiff was away on an approved medical absence dating back to August 2024 (Box 3).

126. On November 5, 2024, the same variant entity entries, "KOHN DEERE KERNERSVILLE" and "1000 JOHN DEERE RS," were utilized in Defendant's Form 61 submission to deny liability for Plaintiff's injury claim arising from the August 12-14, 2024, workplace incidents (Attached hereto as Exhibit W-3).

127. In said Form 61 submission, Defendant asserted that Plaintiff's psychological conditions did not arise out of or in the course of employment.

33

128. Further, Defendant asserted textually in the reason-for-denial block of said Form 61: *"Employee's position did not place him at an increased risk of developing a mental health disorder, nor is his mental health disorder causally related to his employment."*

129. In the same document, Defendant concluded: *"Employer and Carrier are continuing their investigation of this claim and reserve the right to raise other defenses should the need arise. Additional defenses may become available through additional discovery and defense counsel."*

130. Subsequently, on September 18, 2025, the North Carolina Industrial Commission issued an official Order Assessing Sanction against Defendant under I.C. File No. 24789611 (attached hereto as Exhibit W-4).

131. On November 8, 2024, Plaintiff supplemented his EthicsPoint filing under Report Key 612346367501, stating textually: *"I am uploading 4 image files... Each file contains pictures of people walking around openly wearing a watch/apparel while at work during production at John Deere in Kernersville."*

132. On November 21, 2024, Defendant's corporate compliance office closed the internal inquiry regarding the October 3, 2024, gate lockout incident.

34

133.    Investigator David Hamilton labeled the allegation regarding the badge deactivation executed by Human Resources Manager Brian Mosbaugh as *"unsubstantiated."*

134.    In its certified EEOC Position Statement under Charge No. 435-2024-01634, Defendant stated that corporate compliance reviewed the compliance hotline report regarding the October 3, 2024, incident, writing textually: *"Regarding, the "hostile" allegation, Mr. Moore noted that Mr. Mosbaugh exhibited a lack of empathy, was disrespectful and raised his voice, but was not yelling."* and *"...with respect to the allegation of "retaliation" the only example Mr. Moore provided was the temporary deactivation of Mr. Moore's security badge."*

135.    In the same certified Position Statement, Defendant defended the badge deactivation, explicitly asserting that Defendant *"took no form of adverse employment action against the employee."*

136.    Immediately following the November 21, 2024, closure of the gate lockout inquiry, Plaintiff submitted a subsequent EthicsPoint disclosure on November 22, 2024 under Report Key 200083297101, to oppose the ongoing targeting and proffer secular comparative evidence, stating textually: *"I am attaching an image of my religious apparel so you will know*

35

*why I am sending pictures of people wearing watches. My apparel does not dangle and it is not loose-fitting jewelry. I have seen several people with watches and other apparel that are larger and stick out further on their arms. Still, I am the only one who has been constantly targeted."*

137. This November 22, 2024, EthicsPoint disclosure listed Human Resources Manager Brian Mosbaugh, Safety Lead Maria Rumley, General Manager Steven Brewer, and John Deere compliance as the *"person(s) involved."*

138. Defendant left this internal filing stagnant and uninvestigated for months, permitting the underlying failure to accommodate and disparate treatment to persist entirely unresolved.

139. On November 23, 2024, Plaintiff supplemented his EthicsPoint disclosure under Report Key 200083297101 and also notified Deere & Company's Ethics & Compliance Program Manager Russell Nieman, via email, of the ongoing, unchecked retaliatory hostility and disparate policy enforcement, explicitly stating textually: *"I have suffered emotional and mental damage. My health has been affected. This has also affected my sleeping and eating patterns."*

140. Following these internal disclosures, Defendant altered Plaintiff's operational metrics.

141. On a date fully within Defendant's internal tracking data, Defendant adjusted Plaintiff's corporate hire date in its internal systems to January 1, 2025, altering his accrued seniority and changing his prior elected health benefits.

142. As documented on page one (1) of its initial EEOC Position Statement for Charge No. 435-2024-01634, Defendant states that Plaintiff first became an employee of John Deere Kernersville LLC ("JDK") in August 2022.

143. In its EEOC Position Statement for Charge No. 435-2025-01587, Defendant included documentary evidence reflecting a January 1, 2025, corporate hire date for Plaintiff, while asserting that the modification of Plaintiff's elected health benefits was justified (Attached hereto as Exhibit D-2).

144. In this certified 435-2025-01587 Position Statement, Defendant asserted that Plaintiff voluntarily elected to forfeit his prior health benefits after they transitioned to an alternative corporate plan option.

37

145. Prior to his benefits removal, Plaintiff continuously paid for his elected option.

146. Plaintiff's elected benefits were removed once Defendant transitioned to a zero-cost option.

147. Because Defendant's failure to accommodate and systematic disparate treatment remained actively ongoing since August 2024, Plaintiff proceeded with his EEOC filing to seek an external resolution.

148. Plaintiff filed a Form 5: Charge of Discrimination complaint under Charge No. 435-2024-01634, which listed the HR Manager [Brian Mosbaugh] as the main aggressor.

149. On February 6, 2025, the U.S. Equal Employment Opportunity Commission (EEOC) processed and acknowledged receipt of Plaintiff's administrative file under EEOC Charge Number 435-2024-01634, placing Defendant on official notice of an active federal statutory investigation.

150. In February 2025, within seven (7) days of the February 6, 2025, EEOC notification window, Supervisor William Bridges presented Plaintiff with a written employment contract requiring immediate signature.

38

151. Supervisor William Bridges denied Plaintiff's request to have his private legal counsel review the five-page agreement prior to execution.

152. Supervisor William Bridges stated to Plaintiff that he was required to sign the agreement if he wanted to maintain his employment.

153. Supervisor William Bridges identified Human Resources Manager Brian Mosbaugh as the individual authorized to explain the legal terms of the agreement.

154. Prior to signing, Plaintiff wrote the word "Duress" on the physical signature line on page 2 of the document, and hand-wrote "I don't understand everything" on page 3 of the appendix

155. EEOC tracking data indicates that Defendant's managers, including Brian Mosbaugh, Tami McNeer, n/k/a Tami Comegys, and Steven Brewer, had not logged into the regulatory system to view the initial February 6, 2025, filings, resulting in a re-service of the Notice of Charge by EEOC Investigator Nina Troxler on February 20, 2025.

156. Electronic tracking logs show that on February 21, 2025—less than seventeen (17) hours after the EEOC re-service was completed—

Defendant's corporate agents accessed the online portal and updated the case status.

157. On March 5, 2025, Defendant explicitly declined federal mediation, forcing the case into an active investigation.

158. On March 6, 2025, the EEOC served Defendant with an official notice establishing a Position Statement deadline of April 8, 2025.

159. Following Plaintiff's return from medical leave, Defendant maintained an ongoing restriction on his electronic network access.

160. On March 12, 2025, Plaintiff discovered that his elected insurance coverage had been modified within Defendant's systems.

161. Following this discovery, Plaintiff's network profile remained locked until March 20, 2025, at 9:59 AM, when an authorized network administrator notified Plaintiff via text message that access was restored.

162. Following this restoration, Defendant subsequently restricted Plaintiff's network access.

163. On March 25, 2025, Plaintiff filed a formal disclosure to Defendant's corporate compliance under EthicsPoint Report Key 275263288201, reporting that local management's enforcement actions had created a hostile

40

work environment, stating textually: *"When I see most of management... I go the other way... I feel anxious. I have panic attacks. I feel targeted."*

164.     On April 8, 2025, the formal EEOC Position Statement Submission Deadline concluded for Charge No. 435-2024-01634.

165.     Human Resources Manager Brian Mosbaugh participated in the preparation and certification of Defendant's formal response to EEOC Charge No. 435-2024-01634, which contested Plaintiff's internal allegations and characterized his workplace interactions with management as disruptive.

166.     In its certified 435-2024-01634 EEOC Position Statement, Defendant asserted to federal investigators that as of April 8, 2025, Plaintiff *"has not provided John Deere or JDK with any reason why the accommodation [covering] it has provided for him conflicts with his religious beliefs."*

167.     Prior to this submission, Defendant possessed written notifications documenting that the mandatory concealment policy conflicted with Plaintiff's religious beliefs, as evidenced by the following chronological disclosures:

41

168. On August 17, 2024, Plaintiff submitted an internal report to Defendant's corporate compliance under Report Key 327000348401, stating textually: *"The only options they gave me were to accommodate them by either removing the religious apparel or covering the religious apparel up,"* noting they both seemed questionable, and were not an accommodation.

169. On August 17, 2024, Plaintiff provided formal written notice via email to Manager Tami McNeer, n/k/a Tami Comegys, stating textually: *"I can only describe it as a Muslim being forced to eat pork,"* and explicitly advised management that Defendant's covering directive seemed questionable, noting it was not an accommodation.

170. On October 6, 2024, Plaintiff supplemented his formal Deere & Company compliance report under Report Key 612346367501, comparing the covering ultimatum to the biblical story of Daniel in the lions' den, stating textually: *"I am being told to suppress my religious values or be fired. I am extremely distraught. I keep waking up having panic attacks."*

171. On November 22, 2024, Plaintiff filed extensive follow-up notes under EthicsPoint Report Key 200083297101, placing Defendant's corporate compliance on direct notice of systemic disparate treatment and local management's operational concealment actions, writing textually: *"I am the*

42

only one being told to remove my religious apparel or cover it up. No one else is being targeted."

172. On March 3, 2025, Plaintiff filed a follow-up database supplement to Defendant's corporate compliance file under EthicsPoint Report Key 200083297101, textually stating: *"I have repeatedly stated that being forced to remove my religious apparel or cover it up is like forcing a Muslim to eat bacon. It is sinful for me. Every day that the company has forced me to do this has been an act of discrimination."*

173. On March 4, 2025, Plaintiff filed a report to Defendant's corporate compliance under EthicsPoint Report Key 870243460201, reiterating: *"I have continuously stated to people at John Deere in Kernersville and the John Deere compliance team that removing or covering up my religious apparel is sinful for me. I have compared it to a Muslim being forced to eat pork."*

174. On March 25, 2025, Plaintiff submitted a formal disclosure directly into Deere & Company's global internal compliance database under Report Key 275263288201, stating textually: *"had previously told him [HR Manager] and several others that being forced to remove or cover up my religious apparel was like forcing a Muslim to eat pork. It is sinful for me."*

43

175. Plaintiff's Form 5: Charge of Discrimination complaint under Charge No. 435-2024-01634 (Attached hereto as Exhibit A-4) lists the HR Manager [Brian Mosbaugh] as the main aggressor.

176. It lists the Development and Recruiting Coordinator [Mike Fogleman] as the person who treated Plaintiff with disdain and made him remove his religious apparel.

177. It lists the Safety Coordinator [Maria Rumly] as a participant in the meetings with the HR Manager.

178. It lists the Supply Chain Manager [Lindsey Cota] once as *"the person who sent me"* to the Human Resources Department (Exhibit A-4, page 1, ¶ 2).

179. In its official Position Statement under Charge No. 435-2024-01634, Defendant denied the allegations regarding the August 12, 2024, instructions, stating textually: *"... JDK denies that at any point did Mr. Fogleman instruct Mr. Moore that he was required to remove the bracelets or that either Mr. Fogleman or Ms. Cota treated Mr. Moore with disdain or in a manner designed to make him feel uncomfortable."*

44

180. On April 16, 2025, Plaintiff filed a formal internal disclosure to Defendant's corporate compliance under EthicsPoint Report Key 212735518701, detailing his ongoing anxiety and panic attacks, textually stating: *"I feel unsafe around certain people..."* and *"The HR manager, Brian Mosbough, still stares at me like he wants to fight sometimes."* Plaintiff further noted, *"The hostile work environment has affected my performance at work. I take off every chance I get."*

181. On April 24, 2025, Paint Department Supervisor Amy Shelton was assigned outside of Plaintiff's active shift operations and possessed no concurrent operational oversight, direct managerial control, or real-time scheduling authority over Plaintiff's daily logistics duties, production metrics, or immediate workplace assignments.

182. On April 24, 2025, under the instructions of Human Resources Manager Brian Mosbaugh, Paint Department Supervisor Amy Shelton instructed Plaintiff to accompany her to an unannounced administrative meeting.

183. After Supervisor Shelton stated to Plaintiff that he had "no choice" in the matter, Plaintiff accompanied her to the designated room under physical and administrative duress, while verbally protesting the

45

unauthorized directive and explicitly stating that he felt uncomfortable with the arrangement.

184. This meeting occurred within an enclosed office space measuring approximately 10 feet by 10 feet (or at most 12 feet by 12 feet), featuring a single exit door and a large central desk occupying the midsection of the room.

185. Upon entering, Plaintiff remained standing on the far side of the desk facing the door to maintain a direct path to the exit, while Human Resources Manager Brian Mosbaugh sat behind the central desk, Safety Lead Maria Rumley sat toward the side of the desk, and Supervisor Amy Shelton stood near the exit door.

186. While in the small, confined office space, Plaintiff experienced an immediate panic attack and was compelled by a medical emergency to exit the meeting space to manage his worsening psychiatric symptoms.

187. Plaintiff stated on the record: *"I don't feel comfortable around these people."*

188. As Plaintiff moved toward the exit, Supervisor Amy Shelton shifted her physical position and placed her body directly in front of the exit door

46

handle, obscuring physical access to the door hardware and blocking Plaintiff's path out of the office space.

189. Supervisor Amy Shelton maintained her physical position in front of the door frame and refused to clear a path, preventing Plaintiff from exiting the room and detaining him against his will under physical duress.

190. Defendant asserted within its certified 435-2025-01587 EEOC Position Statement that Paint Supervisor Amy Shelton was present in the closed office space on April 24, 2025, because she was *"one of Mr. Moore's immediate supervisors."*

191. On April 29, 2025, twenty (21) calendar days after the EEOC response deadline for Defendant's initial filing under Charge No. 435-2024-01634—and five (5) calendar days after the April 24, 2025, meeting—Human Resources Manager Brian Mosbaugh executed the termination of Plaintiff's employment.

192. Human Resources Manager Brian Mosbaugh executed the termination after Plaintiff reported him internally to Defendant's corporate compliance and to the EEOC.

47

193. Human Resources Manager Brian Mosbaugh had full knowledge of Plaintiff's 435-2024-01634 EEOC filing.

194. Defendant's agents, including Human Resources Manager Brian Mosbaugh, Supervisor William Bridges, and an unidentified corporate representative, were present during the termination meeting.

195. In its certified EEOC Position Statement under Charge No. 435-2025-01587, Defendant asserted that Manager Lindsey Cota *"sought and obtained a Temporary No Contact Order through a local court,"* on April 24, 2025, and that Mr. Mosbaugh then held a disciplinary meeting with Plaintiff *"that very day."*

196. Defendant waited four (4) calendar days after the alleged social media notification occurred to execute Plaintiff's termination.

197. During the termination meeting, Human Resources Manager Brian Mosbaugh stated to Plaintiff: *"I'm bringing you in here today because on April 24th, 2025, at 1:57 pm in my office... you were told to no longer have any communication... with Lindsay Cota... and even after that conversation, at 10:55pm on 4/25/25, you attempted to unwanted contact [sic] with Ms. Cota via Instagram... the plan of action in this case is termination of your employment..."*

48

198. Following this statement, an audio recording captures Manager Mosbaugh stating verbatim to Plaintiff: *"In addition, at this time, Ms. Cota is getting a restraining order against you."*

199. During the termination meeting, Plaintiff asked the unidentified third representative, *"Are you a lawyer or something, or who are you?"* Human Resources Manager Brian Mosbaugh immediately responded, *"It's not only a loss of employment, you don't want to get arrested also, so."* Mr. Mosbaugh then requested Plaintiff's security badge.

200. In its certified EEOC filing under Charge No. 435-2025-01587, Defendant asserts that Plaintiff's termination was mandated because the alleged Instagram notification was a violation of a work order given on April 24, 2025, after Manager Cota *"sought and obtained a Temporary No Contact Order."*

201. State court records, captioned as Lindsey Cota v. Moore, File No. 25 CVD 2735, in the District Court Division of Forsyth County, North Carolina, establish on page 2, box 3, reveal that the termination decision was finalized *prior* to any state court judicial review, documenting textually: *"He is being fired today which could escalate things."*

49

202.     Audio recording data shows that Defendant finalized Plaintiff's termination on April 29, 2025, at approximately 12:44 PM.

203.     Defendant finalized the termination at approximately 12:44 PM and subsequently utilized the fact of that termination during the 1:04 PM state court filing.

204.     The state court's eventual Chapter 50C Finding #5 explicitly noted that Plaintiff *"has since been fired and banned from the property today"*.

205.     The judicial determination was based upon the pre-existing fact of the completed termination itself.

206.     As captured on an authentic audio recording of the termination meeting, Human Resources Manager Brian Mosbaugh asserted that Plaintiff's termination was mandated under Defendant's "Global Policy Against Discrimination and Harassment" based on an alleged policy violation.

207.     Defendant's "Global Policy Against Discrimination and Harassment" mandates that upon receiving a report of an alleged violation, the company will conduct an investigation tailored to the circumstances, and upon confirmation of a policy violation, will implement disciplinary action up to and

50

including termination of employment (Attached hereto as Exhibit D-3, p. 4, "Investigation and Discipline," ¶¶ 1-2).

208. In its second certified administrative EEOC filing under Charge No. 435-2025-01587, specifically within Footnote 1, Defendant admitted that *"Formal discovery has not been conducted nor has a complete formal investigation."*

209. Defendant characterized a single, off-duty, unvetted social media notification containing no added textual content as an operational violation of its Global Policy.

210. That corporate policy requires that any actionable conduct be *"based on a protected characteristic"* (Exhibit D-3, p. 2, line 1-2) and of such a nature that *"a reasonable person would find offensive and unwelcome"* (Exhibit D-3, p. 1, bottom line – p. 2 line 1).

211. At all relevant times, Defendant corporate headquarters, internal legal analysts, and human resources executives managed workplace compliance profiles using industry-standard labor, benefits, and compliance materials widely developed by major national employment law firms, including Littler Mendelson.

51

212. These industry-standard guidelines, as published within widely utilized human resource reference curricula such as Littler Learning Group's *Conducting Internal Investigations*, textually state: *"Give the employee under investigation [sic] given all reasonable opportunities to be heard. This factor is critical in litigation. You must give the accused a full chance to tell his or her side of the story"* (Attached hereto as Exhibit L-1, p. 3 ¶ 2).

213. Prior to executing the discharge, Defendant failed to interview Plaintiff, bypassed any factual inquiry into whether he initiated the social media transmission, and withheld the underlying image from his view.

214. Prior to discharge, Defendant conducted no verification of electronic forensic metadata, account ownership logs, transmission source IP addresses, or network footprints.

215. Prior to discharge, Defendant did not allow Plaintiff to respond to the allegations, choosing instead to issue immediate commands for his security credentials alongside assertions of potential criminal arrest.

216. Prior to discharge, Defendant denied Plaintiff any administrative or formal forum to challenge, rebut, or inspect the specific digital notifications that Defendant relies upon as the basis for his termination.

217.     Prior to Plaintiff's discharge, Defendant had already approved a permanent corporate transfer for Manager Lindsey Cota to a facility in Iowa, located more than 800 miles away from Plaintiff's workplace.

218.     Prior to the discharge, Plaintiff maintained an unblemished employment record with zero historical disciplinary actions or write-ups.

219.     Before, during, and after Manager Lindsey Cota's operational transfer to Iowa and Plaintiff's termination window, continuing through the present, contemporaneous social media platform records verify that Manager Lindsey Cota maintained direct personal connections and digital interactions on her personal Facebook account with numerous management, human resources, and administrative personnel across multiple Deere & Company facilities.

220.     Contemporaneous social media platform metrics verify that personnel operating under the same local chain as Plaintiff were maintained as active personal connections on or actively interacted with Manager Lindsey Cota's personal profile.

221.     Specifically, Lead Technician Kevin Tilley, who operated under the same local chain of command as Plaintiff, maintained an active personal

social media connection with Lindsey Cota and openly interacted with her profile without facing disciplinary action or termination.

222. Furthermore, "Tony" Ford, a Logistics Technician in Plaintiff's same department and job title, engaged in multiple verbal disruptions on the production floor and directed aggressive language toward other workforce members, including Supervisor Cory Willis, but faced no severe disciplinary action and was permitted to remain employed.

223. Additionally, Human Resources Manager Brian Mosbaugh engaged in multiple departures from company policies, executing an unannounced security credential deactivation and facility lockout during Plaintiff's FMLA absence, and conducting an unannounced closed-door confinement of a vulnerable subordinate.

224. These actions took place after Plaintiff informed Defendant's corporate compliance that he was uncomfortable around Mr. Mosbaugh.

225. Despite these documented compliance alerts, Defendant took no corrective action against Manager Mosbaugh regarding Plaintiff.

226. Defendant allowed Manager Mosbaugh to retain his corporate authority and permitted him to finalize and execute Plaintiff's termination.

54

227.    Prior to termination, Manager Lindsey Cota had given Plaintiff a handwritten thank-you note that stated textually: *"Thank you so much for the generous gifts. Each one of them made me smile! You put a lot of thought into these gifts and they are all perfect. "Chaos coordinator" couldn't be a better description of my job! Thanks for being on our team and all you do!"* (Attached hereto as Exhibit Z).

228.    The corporate origin of Plaintiff's initial interaction with Manager Cota is documented by an official email communication from General Manager Steven Brewer dated April 12, 2024. In response to an administrative inquiry regarding internal career paths, Mr. Brewer stated: *"I spoke with Lindsey Cota regarding job shadowing. She is happy to support and may have already reached out. I hope the experience is positive."*

229.    Manager Lindsey Cota asserted under oath on page 1, box 5, in the state court petition that Plaintiff engaged in an unwelcome pattern of seeking her out immediately after the final June 2024 job shadow session had concluded.

230.    However, an email from July 8, 2024, shows that it was Manager Lindsey Cota who initiated the continuing in-person contact with Plaintiff after the conclusion of the 'job shadowing,' stating that she had *"looked for you a*

55

*couple times,"* proactively invited him to an individual *"1:1"* meeting, and encouraged him to apply for open positions on her immediate team.

231. On page 4, box 4a.i, of her handwritten state court petition, Manager Lindsey Cota asserted under oath that Plaintiff was *"professing his love for her... on Facebook on 4/19."*

232. However, electronic communication logs show that the transmission sent via Facebook Messenger on Saturday, April 19, 2025, at approximately 6:49 PM, contained an inquiry regarding a technical platform error, accompanied by a screenshot of a Facebook 'Can't Send Request' system notification.

233. Defendant has a well-documented commitment to continuous improvement (Kaizen) and emphasizes that front-line workers are in the best position to identify waste and suggest improvements.

234. On May 21, 2024, Manager Lindsey Cota sent Plaintiff an email, informing him that *"...open door policy is true. You are never a bother."*

235. On July 8, 2024, Manager Lindsey Cota sent Plaintiff a direct email proactively inviting him to communicate workplace feedback, explicitly stating: *"I encourage everyone to share if they have ideas."*

56

236.     Conversely, in her subsequent sworn state court Chapter 50C petition on page 1, box 5, Manager Cota claimed under oath that Plaintiff's *"various complaints and suggestions for improvements"* constituted unlawful harassment.

237.     In the temporary 50C order on page 4, box 4a.i, Manager Lindsey Cota asserted that an unvetted, off-duty Instagram notification, which contained no added wording or text, constituted a profession of love.

238.     In her sworn, handwritten state court Chapter 50C petition on page 3, Box 5 (Cont.), Manager Lindsey Cota explicitly admitted that on Friday, April 11, 2025—exactly three (3) calendar days after the EEOC Position Statement submission deadline—she personally informed Plaintiff of her upcoming operational relocation.

239.     Manager Cota documented textually that during this office discussion, Plaintiff simply expressed standard professional sadness regarding her departure.

240.     Manager Lindsey Cota did not appear at the initial state court hearing to support the emergency petition. As a result of this non-appearance, the temporary ex parte order expired by operation of law.

241.     At the second scheduled hearing, Manager Lindsey Cota appeared, accompanied by W. Mark Peck, Defendant Deere & Company's retained local defense counsel.

242.     Mr. Peck entered a general appearance on the record, physically presenting himself before the presiding judge alongside Ms. Cota.

243.     Mr. Peck stated explicitly on the judicial record that he was participating in the action because he represented Deere & Company, the complainant was a concurrent corporate employee, and Plaintiff was a former employee.

244.     At all times relevant, Mr. Peck operated as the central, authorized legal representative tasked with managing, structuring, and authoring the corporate defense response to the U.S. Equal Employment Opportunity Commission (EEOC) under Charge No. 435-2024-01634.

245.     Concurrently, Mr. Peck utilized his firm's corporate legal infrastructure to participate on behalf of the corporate entity in the third-party state court Chapter 50C civil proceeding involving the same Plaintiff.

246.     During the second state court hearing for the Chapter 50C civil proceeding, when Plaintiff's counsel formally requested discovery

parameters during the state court proceeding, Mr. Peck participated on behalf of the corporate entity, directing that all discovery demands be served directly upon his office, and then secured a continuance.

247. Following this courtroom intervention, Mr. Peck utilized his firm's corporate email architecture (mpeck@robinsonlawing.com) to manage the transmission of state court discovery and coordinate the procedural path of the 50C filing.

248. Mr. Peck subsequently exchanged formal legal correspondence with Plaintiff's counsel, Attorney Edward "Eddie" Shifflette III, from June 23 through July 8, 2025, reviewing legal discovery requests, conveying litigation demands, and serving the final dismissal paperwork.

249. On June 23, 2025, at approximately 10:42 AM, Mr. Peck sent Mr. Shifflette an email inquiring whether Plaintiff would agree to a mutual no-contact arrangement as a condition of dropping the state court matter, asking textually if *"... Mr. Moore would be interested in putting all of this behind but agreeing to a mutual no-contact agreement."*

250. On June 25, 2025, at approximately 2:39 PM, Mr. Shifflette sent Mr. Peck an email informing him that Plaintiff declined the mutual arrangement and conditioned any further resolution on the receipt of formal

59

discovery answers, stating textually: *"At this point, my client would like to see responses to discovery and go from there."*

251. On Friday, June 27, 2025, at approximately 3:14 PM, roughly forty-eight (48) hours after Plaintiff's formal demand for discovery responses was communicated, corporate defense counsel W. Mark Peck confirmed the extrajudicial nature of the state court filing in an email sent directly to Mr. Shifflette. In said communication, Mr. Peck wrote textually: *"I spoke with Ms. Cota this morning. She feels the message has been sufficiently sent to Mr. Moore that he is not to have contact with her and, therefore, will be moving to dismiss the 50C."*

252. This communication demonstrates that Defendant maintained the state court Chapter 50C action to leverage a mutual "no-contact" agreement, and that Defendant voluntarily dismissed the state litigation immediately following Plaintiff's formal discovery demands.

253. Following this coordinated corporate appearance and subsequent email exchanges, the state court action concluded without a judicial adjudication on the merits. On July 8, 2025, at 2:05 PM, a formal Notice of Voluntary Dismissal Without Prejudice pursuant to G.S. 1A-1, Rule 41 was filed with the Forsyth County Clerk of Superior Court under File No. 25

60

CVD 2735. The state court petitioner, Manager Lindsey Cota, signed the dismissal document on July 7, 2025, canceling the scheduled July 14, 2025, hearing. This voluntary dismissal concluded the matter without any judicial finding of harassment or misconduct against Plaintiff.

254. As a direct and proximate result of Defendant's filing and maintenance of the state court protective order action, Plaintiff suffered severe, continuous, and debilitating psychological and physical trauma. These actions caused Plaintiff to experience chronic sleep deprivation, profound social withdrawal, and clinical isolation, severely exacerbating and prolonging his need for ongoing clinical therapy sessions to manage the acute emotional distress and panic attacks induced directly by Defendant's conduct.

255. On May 18, 2025, Plaintiff filed a formal report to Defendant's corporate compliance regarding the details of his April 24, 2025, workplace confinement under EthicsPoint Report Key 674480162101.

256. On Thursday, June 12, 2025, Investigator Shai Cruciani contacted Plaintiff via email regarding the May 18, 2025, EthicsPoint filing under Report Key 674480162101 and issued a direct, written administrative directive. This corporate correspondence commanded Plaintiff textually: *"Do not*

*communicate any information regarding this meeting and/or the investigation to any others. This investigation is being conducted under the direction of in-house counsel and is attorney-client privileged."*

257. Defendant enforced this communication restriction as a mandatory requirement for Plaintiff's participation in the internal compliance review upon post-termination confidentiality tracks.

258. In a companion email sent that same day, June 12, 2025, Investigator Shai Cruciani informed Plaintiff textually: *"Thank you for your request regarding the presence of your personal attorney at your upcoming compliance interview... personal attorneys are not permitted."*

259. On August 29, 2025, following his termination, Plaintiff submitted a comprehensive disclosure into Deere & Company's global compliance system under EthicsPoint Report Key 527577452501. This filing notified corporate headquarters of specific actions executed during Plaintiff's employment, which included the removal of his prior elected family benefits.

260. On December 15, 2025, the North Carolina Department of Labor Retaliatory Employment Discrimination Bureau (REDB) officially issued a formal Notice of Administrative Action in the matter of *Stephen Moore v. John Deere Construction & Forestry Company*, designated under File No. 214742.

261. On February 6, 2026, Plaintiff uploaded a multi-page document directly into Deere & Company's global corporate compliance system under EthicsPoint Report Key 292777538101. This submission notified corporate headquarters of multiple violations (attached hereto as Exhibit E-12).

262. On Monday, February 9, 2026, at approximately 8:19 AM, Defendant's corporate compliance network generated an automated NAVEX system alert acknowledging that Plaintiff's comprehensive proffer of evidence was under active review by global oversight (Exhibit E-12, p. 3 Follow-Up Questions/Comments ¶ 1).

263. Roughly (6) hours later, at approximately 3:26 PM that same day, February 9, 2026, Defendant's global corporate compliance team closed the active file without conducting an independent operational audit, witness isolation protocol, or third-party investigation, transmitting a generic automated response stating that the matter *"has already been received and reviewed"* (Exhibit E-12, p. 3 Follow-Up Questions/Comments ¶ 2).

264. On March 11, 2026, the United States Department of Labor Office of Federal Contract Compliance Programs (OFCCP) Southwest and Rocky Mountain Regional Office formally issued an official administrative notice

under Complaint Reference Number 100319595, directed straight to Defendant's global Chairman and Chief Executive Officer, John C. May.

265. This official notice detailed explicit allegations that Defendant utilized Plaintiff's confidential corporate "Record of Impairment" to facilitate an unannounced physical confinement, craft an adversarial legal defense to bypass standard safety metrics, and deliberately evade providing him with a necessary reasonable accommodation.

266. The notice further documents that Defendant actively engaged in corporate practices to prevent Plaintiff from securing further employment within the enterprise despite his documented academic excellence, listing the precise chronological violation dates of August 12, 2024, and February 9, 2026.

267. This federal notice placed Defendant on direct administrative notice of its strict record retention, non-spoliation, and anti-retaliation requirements under federal law while the agency's dual-filed investigation proceeds concurrently.

64

## CORPORATE NOTICE AND RATIFICATION OF WRONGFUL CONDUCT

268. On or around May 19, 2026, Plaintiff delivered a comprehensive, written formal notice directly to Defendant's corporate headquarters in Moline, Illinois, addressed to the Office of General Counsel and Chief Executive Officer John C. May.

269. This transmission provided Defendant's highest corporate officers with actual, explicit notice of the religious discrimination, localized management retaliation, and an ongoing internal cover-up occurring at the John Deere Kernersville facility.

270. On June 3, 2026, Defendant's outside legal counsel, W. Mark Peck of Robinson & Lawing, LLP, sent a written response explicitly acknowledging that Deere & Company corporate leadership received Plaintiff's May 19, 2026 formal notice.

271. In the June 3, 2026 response, Defendant flatly declined to initiate corrective action or engage in remedial discussions regarding the reported operational misconduct of its local managing agents, stating textually: *"Deere & Company does not wish to engage in any settlement discussions with you regarding your claims."*

65

272. In the same transmission, Defendant's legal counsel actively insulated corporate leadership from further exposure by directing Plaintiff to cease direct communications with corporate headquarters, instructing that *"all future communications be directed to my firm... with copy to Alex P. Boettcher, Senior Corporate Counsel, Deere & Company."*

273. Defendant further utilized this communication to threaten Plaintiff with financial and legal sanctions if Plaintiff pursued judicial enforcement of his civil rights, stating that *"Deere & Company will avail itself of all available legal remedies, including enforceable sanctions and attorney fees should you proceed with any further legal actions."*

274. Pursuant to North Carolina Rule of Evidence 408, Plaintiff offers the communications detailed in Paragraphs 268 through 273 not to prove the validity or amount of the underlying claims, but for the independent and permissible purposes of establishing: (a) the exact date Defendant's corporate leadership was directly confronted with the unlawful conduct; and (b) Defendant's subsequent affirmative ratification and top-down adoption of its local management's retaliatory actions.

275. As of the date of this Complaint, Plaintiff continues to undergo monthly clinical therapy sessions to manage the acute emotional distress and panic attacks proximately caused by Defendant's unlawful actions.

## COUNT I: FIRST CLAIM FOR RELIEF

### (Title VII - Religious Discrimination: Failure to Accommodate)

*(Against Defendant, jointly and severally)*

276. Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 275 of this Complaint as if fully set forth herein.

277. Pursuant to 42 U.S.C. § 2000e-2, it is unlawful for a covered employer to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's religion.

278. Pursuant to 42 U.S.C. § 2000e(j), religion includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's religious observance or practice without undue hardship.

67

279. Pursuant to 29 C.F.R. § 1605.1, protected religious practices include moral or ethical beliefs as to what is right and wrong, which are sincerely held with the strength of traditional religious views.

280. At all times relevant hereto, Defendant operated as a single, integrated employer and joint enterprise that collectively employed over five hundred (500) employees, and are covered employers within the meaning of Title VII.

281. At all times relevant hereto, Plaintiff maintains a sincerely held religious belief as an adherent of the Chakra and Nazar spiritual traditions, which mandates that Plaintiff continuously wear uncovered, low-profile, snug-fitting religious bracelets on both wrists.

282. Defendant maintains an apparel policy, designated as Doc. No. JDKP-335 and titled "Jewelry Policy," which dictates that employees engaged in any type of "physical work" shall not perform work assignments while wearing rings or "loose jewelry," as set forth in Paragraphs 103 through 105.

283. On August 12, 2024 Defendant forced the complete removal of Plaintiff's religious bracelets while he was in the office area of John Deere

Kernersville as set forth in Paragraphs 28 through 36. Plaintiff subsequently filed an inquiry with the EEOC.

284. On August 13, 2024, Plaintiff engaged in protected activity by formally placing Defendant on actual notice of his sincerely held religious beliefs, his active EEOC inquiry, and his formal request for a reasonable religious accommodation, as set forth in Paragraph 37.

285. On August 14, 2024, Defendant refused to engage in a good-faith interactive process and imposed a predetermined total concealment directive regarding Plaintiff's sacred religious apparel, directly denying his request for a reasonable religious accommodation, as set forth in Paragraphs 56 through 61.

286. Because Plaintiff's sincere religious convictions prevented him from complying with the total concealment directive, Defendant systematically executed a series of severe adverse employment actions against him.

287. On October 3, 2024, Defendant deactivated Plaintiff's electronic security credentials and physically denied him entry to the facility, refused to offer or discuss reasonable accommodations, and conditioned his employment on forced compliance with the concealment directive or immediate termination, as set forth in Paragraphs 91 through 102.

69

288. Over the subsequent multi-month period, between October 2024 and April 2025, Plaintiff continuously engaged in protected activity by utilizing Defendant's internal corporate compliance reporting channels to submit multiple EthicsPoint Reports contesting the unlawful concealment mandate and the ongoing denial of a reasonable accommodation, explicitly placing Defendant on notice that his religious apparel does not dangle and is not loose-fitting as set forth in Paragraph 136, and that Defendant's mandate conflicted with his sincerely held beliefs, as set forth in Paragraphs 168 through 174.

289. Rather than conducting meaningful remedial investigations or offering administrative assistance, Defendant's corporate compliance leadership systematically abandoned Plaintiff's internal disclosures.

290. During this time of corporate ratification, Defendant escalated its adverse actions by retroactively resetting Plaintiff's corporate hire date, canceling his prior elected family health benefits without his consent, as set forth in Paragraphs 140 through 146, and ultimately terminating his employment, as set forth in Paragraph 191.

291. Defendant executed these severe adverse and retaliatory acts with discriminatory intent, establishing a direct causal nexus between the

70

punishments imposed and Plaintiff's protected religious practices, his repeated requests for a reasonable religious accommodation, his EEOC inquiry, and his continuous internal corporate compliance disclosures.

292.    As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered loss of income, loss of employment benefits, medical liabilities, and severe emotional distress. Accordingly, Plaintiff is entitled to an award of back pay, front pay, and employment benefits, as well as compensatory damages against Defendant, jointly and severally, in an amount to be determined by a jury.

## COUNT II: SECOND CLAIM FOR RELIEF

### (Title VII - Religious Discrimination: Disparate Treatment)

*(Against Defendant, jointly and severally)*

293.    Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 275 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

71

294. Pursuant to 42 U.S.C. § 2000e-2(a)(1), it is an unlawful employment practice for an employer to fail or refuse to hire, to discharge, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's religion.

295. Pursuant to 29 C.F.R. § 1605.1, protected religious practices include moral or ethical beliefs as to what is right and wrong, which are sincerely held with the strength of traditional religious views.

296. At all times relevant hereto, Defendant operated as a single, integrated employer and joint enterprise that collectively employed over five hundred (500) employees and are covered employers within the meaning of Title VII.

297. At all times relevant hereto, Plaintiff maintained a sincerely held religious belief as an adherent of the Chakra and Nazar spiritual traditions, which mandates that Plaintiff continuously wear uncovered, low-profile, snug-fitting religious bracelets on both wrists.

298. Prior to the forced removal of Plaintiff's religious apparel on August 12, 2024, he was qualified for his position and met Defendant's legitimate work expectations; as set forth in Paragraphs 2 through 36.

72

299. As admitted in its certified Position Statement, Defendant deactivated Plaintiff's security badge under the guise of holding a discussion, whereas similarly situated, secular employees are not subjected to a facility lockout or have their security credentials deactivated simply to attend a meeting; as set forth in Paragraphs 91 through 94.

300. Defendant subsequently used Policy Doc. No. JDKP-335 to selectively enforce the total concealment of Plaintiff's snug-fitting religious apparel, while simultaneously permitting secular individuals to bypass these exact restrictions. Specifically, photographic evidence shows an employee who was cross deployed to work in Plaintiff's exact same department wearing a watch and a ring; as set forth in Paragraphs 103 through 109.

301. Defendant advanced its disparate treatment by utilizing variant entities to process and deny Plaintiff's Workers' Compensation filings, whereas similarly situated, secular employees are not subjected to alterations or bad-faith processing of their state-certified employment and injury records; as set forth in Paragraphs 122 through 130.

302. Defendant further subjected Plaintiff to a series of adverse employment actions affecting the structural terms, conditions, and

privileges of his employment. This course of conduct included the removal of his prior selected benefits and an alteration of his official hire date, whereas similarly situated, secular employees are not subjected to such actions; as set forth in Paragraphs 140 through 146.

303.     Defendant further demonstrated an unequal, discriminatory application of workplace conduct standards by selectively enforcing personal interaction and boundary guidelines against Plaintiff, while giving preferential treatment to similarly situated secular employees; as set forth in Paragraphs 220 through 222.

304.     Specifically, while Defendant referenced an unvetted social media notification during Plaintiff's termination, Lead Technician Kevin Tilley, who operated under Defendant's same local chain of command, maintained an active, open personal social media connection and interacted freely with Manager Lindsey Cota's personal profile without facing any invasive interrogation, corporate database metric deactivation, or termination; as set forth in Paragraphs 220 and 221.

305.     Additionally, "Tony" Ford, a Logistics Technician sharing Plaintiff's exact department and job title, engaged in multiple verbal disruptions on the production floor and directed aggressive language toward Supervisor

Cory Willis, but was exempted from Defendant's severe disciplinary metrics and was permitted to remain actively employed; as set forth in Paragraph 222.

306. The stark contrast between the immediate, severe administrative punishments inflicted upon Plaintiff and the complete absence of disciplinary action taken against Kevin Tilley and "Tony" Ford demonstrates that Defendant's stated operational and safety justifications are a shifting pretext for intentional religious discrimination.

307. As a direct and proximate result of Defendant's intentional, unremedied violations of Title VII, Plaintiff has suffered loss of income, loss of active employment benefits, out-of-pocket medical expenses, and severe emotional distress. Accordingly, Plaintiff is entitled to an award of back pay, front pay, general compensatory damages, and punitive damages against Defendant, jointly and severally, for their malicious and reckless indifference to Plaintiff's federally protected civil rights, in an amount to be determined by a jury.

## COUNT III: THIRD CLAIM FOR RELIEF

## (Title VII – Retaliation)

*(Against Defendant, jointly and severally)*

308. Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 307 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

309. At all relevant times, Plaintiff was an "employee" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f).

310. At all relevant times, Defendant was Plaintiff's "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

311. Title VII prohibits an employer from retaliating against an employee for opposing discriminatory practices, including the filing of or participation in an investigation or hearing under Title VII. See 42 U.S.C. § 2000e-3(a).

312. Defendant departed from its statutory mandates under 42 U.S.C. § 2000e-3(a) by executing a series of retaliatory actions against Plaintiff for his protected opposition to ongoing religious discrimination.

313. On August 12, 2024, Plaintiff engaged in protected activity under Title VII by filing an EEOC inquiry or by otherwise participating in an investigation initiated by EEOC alleging religious discrimination; as set forth in Paragraph 36.

314. On August 13, 2024, Plaintiff notified Defendant of his religious beliefs, his accommodation request, and his active EEOC inquiry, as set forth in Paragraph 37.

315. On August 16 and 17, 2024, Plaintiff filed internal discrimination and harassment disclosures to Defendant's corporate compliance.

316. Following these disclosures, Defendant withheld Plaintiff's earned, scheduled 2-year anniversary pay increase, which was due in August, by manually blocking the scheduled pay-raise solely within Defendant's internal payroll logs; as set forth in Paragraphs 86 and 87.

317. On October 3, 2024, Defendant executed a complete facilities lockout by deactivating Plaintiff's security badge and retroactively ceased his compensable time as recorded within internal time-clock system logs; as set forth in Paragraphs 91 through 102.

318. On a date fully within Defendant's internal tracking data, Defendant reset Plaintiff's hire date by manually altering employee tenure data within internal human resource logs; as set forth in Paragraphs 140 through 143.

319. Defendant altered Plaintiff's prior elected health benefits without his consent by executing an unapproved modification within internal benefits system records; as set forth in Paragraphs 144 through 146.

320. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, as well as significant compensatory damages for emotional distress, humiliation, inconvenience, and other non-economic losses.

321. Defendant's actions were willful and in reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against Defendant, jointly and severally, in an amount to be determined by a jury under 42 U.S.C. § 1981a.

## <u>COUNT IV: FOURTH CLAIM FOR RELIEF</u>

### (Title VII – Retaliatory Discharge)

*(Against Defendant, jointly and severally)*

322.     Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 321 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

323.     Plaintiff further specifically realleges and incorporates by reference the physical room confinement milestones and post-hoc state court chronological contradictions detailed in Paragraphs 181 through 240 of this Complaint.

324.     Defendant possessed actual, continuous notice of Plaintiff's protected activities through multiple internal EthicsPoint disclosures spanning August 2024 through April 2025, alongside formal administrative EEOC charge; as set forth in Paragraphs 147 through 149, 163 through 174, and Paragraph 180.

325.     Defendant departed from its statutory mandates under 42 U.S.C. § 2000e-3(a) by executing Plaintiff's summary termination in direct retaliation

for his protected opposition to ongoing religious discrimination, disparate policy enforcement, and local workplace hostility, as set forth in Paragraphs 191 through 218.

326.     On April 8, 2025, Defendant submitted its official Position Statement for EEOC Charge No. 435-2024-01634, which was signed by Human Resources Manager Brian Mosbaugh and addressed allegations regarding his conduct; as set forth in Paragraphs 164 and 165.

327.     On April 16, 2025, Plaintiff submitted an internal disclosure to Defendant's corporate Compliance department regarding an ongoing hostile work environment, explicitly naming Human Resources Manager Brian Mosbaugh; as set forth in Paragraph 180.

328.     On April 29, 2025, Human Resources Manager Brian Mosbaugh terminated Plaintiff's employment; as set forth in Paragraphs 191 and 192.

329.     As set forth in Paragraphs 195 through 205, Defendant's stated rationale for termination is a post-hoc fabrication. Defendant utilized Plaintiff's termination to obtain a temporary *ex parte* order, then asserted that this order mandated a meeting five (5) calendar days before the termination. Defendant then claimed that an April 25 social media notification violated a workplace directive that arose from that meeting.

80

330.    The chronological sequence establishes that Defendant finalized the termination before seeking the state court order, proving that the judicial process was utilized to retroactively sanitize a pre-determined corporate action rather than to address an active workplace violation.

331.    The direct causal nexus between Plaintiff's protected activity and his termination is established by the intense temporal proximity between the expiration of the EEOC Position Statement deadline on April 8, 2025, Plaintiff's internal compliance disclosure on April 16, 2025, and his sudden termination on April 29, 2025, executed by the primary subject of those complaints, Human Resources Manager Brian Mosbaugh.

332.    As a direct and proximate result of Defendant's intentional and malicious retaliatory discharge of Plaintiff, Plaintiff has suffered and continues to suffer substantial economic loss, loss of employment benefits, mounting medical liabilities, and acute emotional distress, entitling Plaintiff to an award of back pay, front pay, compensatory damages, and punitive damages against Defendant, jointly and severally, under 42 U.S.C. § 1981a, in an amount to be determined by a jury.

81

## COUNT V: FIFTH CLAIM FOR RELIEF

### (FMLA - Interference, 29 U.S.C. § 2615(a)(1))

*(Against Defendant, jointly and severally)*

333. Plaintiff realleges and incorporates by reference each and every factual allegation contained in Paragraphs 1 through 332 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

334. Plaintiff specifically realleges and incorporates by reference the emergency behavioral health evaluations, Cone Health medical directives, and third-party Unum Life Insurance Company approval certifications detailed in Paragraphs 73 through 85 and Paragraph 88 of this Complaint, establishing his absolute statutory entitlement to protected medical leave.

335. Plaintiff further specifically realleges and incorporates by reference the internal network credential ("RACF ID") portal lockouts detailed in Paragraph 89, and the corporate benefits platform exclusions and manual insurance modifications detailed in Paragraphs 141 and 160 of this Complaint.

82

336.    Pursuant to 29 U.S.C. § 2615(a)(1), it is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the Family and Medical Leave Act (FMLA).

337.    At all times relevant to this action, Plaintiff was an eligible employee and Defendant operated as a covered employer subject to the provisions, mandates, and protections of the FMLA pursuant to 29 U.S.C. § 2611, as set forth in Paragraphs 84 through 88.

338.    Plaintiff was fully entitled to protected FMLA leave due to a serious health condition under 29 U.S.C. § 2611(11), as set forth in Paragraphs 73 through 82.

339.    Defendant violated 29 U.S.C. § 2615(a)(1) by executing a complete operational lockout and deactivating Plaintiff's electronic facility access credentials on October 3, 2024, immediately upon his attempted return from an approved clinical leave of absence, as set forth in Paragraphs 91 through 93.

340.    By executing this security credential deactivation and conditioning Plaintiff's statutory right to reinstatement upon participation in an administrative meeting, Defendant failed to immediately reinstate Plaintiff to his prior position, with equivalent pay, benefits, and working conditions,

83

upon the expiration of his approved medical leave, directly violating 29 U.S.C. § 2614(a)(1) and 29 C.F.R. § 825.214.

341. Despite the explicit provisions of 29 U.S.C. § 2614(c)(1) and Defendant's own corporate policy commitments, Defendant willfully breached this mandate by executing a database modification that resulted in the unauthorized termination of Plaintiff's active insurance benefit selections, as set forth in Paragraphs 144 through 146.

342. Defendant further interfered with Plaintiff's FMLA rights by altering his corporate data and resetting his official company hire date to January 1, 2025. This manual database modification by Defendant's managerial agents was utilized to execute an automated purge of Plaintiff's active benefit selections, directly violating Department of Labor standards regarding look-back period integrity; as set forth in Paragraphs 140 through 143.

343. By retroactively altering Plaintiff's hire date, Defendant eliminated Plaintiff's accrued service history and removed his FMLA look-back period, artificially destroying his ongoing eligibility for protected leave and creating an unlawful barrier to his statutory rights.

84

344. Pursuant to 29 C.F.R. § 825.220(b), the Department of Labor explicitly mandates that FMLA interference includes "not only refusing to authorize FMLA leave, but also manipulation by a covered employer to avoid responsibilities under FMLA". By altering Plaintiff's official company hire date in its corporate database, Defendant engaged in a prohibited manipulation of employment records, thereby constituting independent and actionable FMLA interference.

345. Defendant's statutory obligation to preserve and maintain the integrity of Plaintiff's accrued service metrics and FMLA look-back period is absolute and non-delegable. Whether Defendant's database modifications were primary mechanisms to facilitate or obscure alternative discriminatory metrics or internal administrative tracking or corporate system adjustments structurally resulted in the retroactive erasure of Plaintiff's employment timeline, such operational practices fail as a matter of law to absolve Defendant of liability for the resulting deprivation, restraint, and interference with Plaintiff's rights under 29 U.S.C. § 2615(a)(1).

346. Because the structural effect of Defendant's actions directly defeated Plaintiff's protected right to leave, Defendant is liable for FMLA interference as a matter of law. No internal corporate reorganization,

85

system migration, database reclassification, or administrative process can legally operate to dilute, reset, or extinguish an eligible employee's accrued federal statutory protection.

347. As a direct and proximate result of Defendant's willful, reckless, and unlawful interference with Plaintiff's rights under the FMLA, Plaintiff has suffered and continues to suffer significant economic damages, including a substantial loss of income, loss of employment benefits, and other direct financial losses. Consequently, Plaintiff is entitled to an award of lost back pay, front pay, the monetary value of all lost employment benefits, statutory prejudgment interest, and liquidated damages against Defendant, jointly and severally, pursuant to 29 U.S.C. § 2617(a).

## COUNT VI: SIXTH CLAIM FOR RELIEF

### (FMLA - Retaliation, 29 U.S.C. § 2615(a)(2))

*(Against Defendant, jointly and severally)*

348. Plaintiff realleges and incorporates by reference each and every factual allegation contained in Paragraphs 1 through 347 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

86

349. Pursuant to 29 U.S.C. § 2615(a)(2), it is unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by the Family and Medical Leave Act, which includes retaliating against an employee for exercising their statutory right to take protected medical leave.

350. At all times relevant to this action, Plaintiff was an "eligible employee" and Defendant operated as a "covered employer" subject to the provisions, mandates, and protections of the FMLA pursuant to 29 U.S.C. § 2611.

351. Plaintiff engaged in legally protected activity under the FMLA by requesting and taking approved, continuous medical leave for a serious health condition beginning on or around August 19, 2024, and continuing through his attempted return to work on October 3, 2024, as set forth in Paragraphs 73 through 93.

352. Defendant possessed actual, continuous, and contemporaneous knowledge of Plaintiff's protected FMLA status and medical leave timeline via direct written notices sent to Human Resources and local supervisors on August 21–22, 2024, and formal approvals issued by third-party leave

87

administrator Unum Life Insurance Company on September 5, 2024, as set forth in Paragraph 88.

353. Immediately following Plaintiff's exercise of his protected FMLA rights, Defendant initiated a continuous, escalating pattern of adverse employment actions, hostile antagonism, and heightened administrative scrutiny targeted directly at undermining Plaintiff's employment status; as set forth in Paragraphs 316 through 318 and.181 through 218.

354. Defendant also withheld Plaintiff's updated "RACF ID" network credentials while he was out on medical leave; as set forth in Paragraphs 86 through 89.

355. Defendant escalated its adverse actions by utilizing variant entity entries to disrupt Plaintiff's Workers' Comp filing records and subsequently using those same variant entity entries to deny liability for Plaintiff's psychological injuries, as set forth in Paragraphs 126 through 130.

356. Defendant further demanded an immediate signature under threat of termination and denied his request for counsel review, as set forth in Paragraphs 150 through 154.

357. In taking the adverse employment actions detailed above, Defendant was motivated at least in part by Plaintiff's request for, use of, and return from protected medical leave. Pursuant to 29 C.F.R. § 825.220(c), an employer is strictly prohibited from using the exercise of FMLA rights as a "negative factor" in any employment decision. Plaintiff's FMLA-protected activities did not need to be the sole reason for Defendant's hostile conduct; rather, Plaintiff's leave constituted a negative factor in Defendant's decision-making process.

358. The proximity in time between Plaintiff's protected FMLA leave, the withholding of his anniversary pay increase and his updated "RACF ID" credentials, the deactivation of his security badge, the administrative database manipulation of his service dates, the physical office intercept, and his final termination establishes a direct causal connection between Plaintiff's protected activity and Defendant's adverse actions.

359. Defendant's asserted reasons for its cascading adverse actions and ultimate termination of Plaintiff are entirely pretextual, unverified, and constructed in bad faith to mask a systemic corporate campaign designed to punish Plaintiff for exercising his rights under the FMLA.

360. As a direct and proximate result of Defendant's willful, reckless, and unlawful violations of the FMLA, Plaintiff has suffered and continues to suffer significant economic damages, including a substantial loss of income, loss of employment benefits, and other direct financial losses. Consequently, Plaintiff is entitled to an award of lost back pay, front pay, the monetary value of all lost employment benefits, statutory prejudgment interest, and liquidated damages against Defendant, jointly and severally, pursuant to 29 U.S.C. § 2617(a).

## COUNT VII: SEVENTH CLAIM FOR RELIEF

## (North Carolina Common Law Wrongful Discharge in Violation of Public Policy)

*(Against Defendant, jointly and severally)*

361. Plaintiff realleges and incorporates by reference each and every factual allegation contained in Paragraphs 1 through 360 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

90

362. Plaintiff specifically realleges and incorporates by reference the severe temporal proximity and documented post-hoc chronological paper trail contradictions detailed in Paragraphs 181 through 218, establishing that the operational basis proffered for his termination violates North Carolina public policy.

363. Plaintiff specifically realleges and incorporates by reference the detailed evidentiary timelines, EthicsPoint tracking keys, federal agency notices, and specific corporate decision-maker disclosures set forth in Paragraphs 132 through 165 and Paragraph 180 through 205 of this Complaint.

364. At all times relevant, Plaintiff was an employee, and Defendant was an employer subject to the public policies of the State of North Carolina.

365. North Carolina common law holds that an employer has no right to terminate an at-will employee for an unlawful reason or a purpose that contravenes established public policy (*Coman v. Thomas Mfg. Co.*).

366. Plaintiff's timely opposition to religious discrimination and his subsequent discharge violate the express public policy of the State of North Carolina as codified in the North Carolina Equal Employment Practices Act

(NCEEPA), N.C. Gen. Stat. § 143-422.2, which explicitly prohibits workplace discrimination, hostility, and retaliatory discharge based upon a worker's sincerely held religious beliefs.

367. It is the further public policy of the State of North Carolina, expressed in Article I, Section 1 of the North Carolina Constitution, that all persons are endowed with certain inalienable rights, including the enjoyment of the fruits of their own labor.

368. Defendant departed from these established public policies by executing Plaintiff's summary termination on April 29, 2025, in direct retaliation for his protected opposition to ongoing religious discrimination and workplace hostility; as set forth in Paragraphs 191 through 218.

369. Defendant possessed actual, continuous notice of Plaintiff's protected activities through multiple internal EthicsPoint disclosures spanning August 2024 through April 2025, alongside formal administrative charges processed under EEOC Charge No. 43-2024-01634; as set forth in Paragraphs 147 through 149, 163 through 174, and 180.

370. The moving force behind Plaintiff's discharge was his opposition to these unlawful employment practices. The direct causal nexus between Plaintiff's protected activity and his termination is established by the intense

92

temporal proximity between the expiration of the EEOC Position Statement deadline on April 8, 2025, Plaintiff's internal compliance disclosure on April 16, 2025, and his sudden termination on April 29, 2025, executed by the primary subject of those complaints, Human Resources Manager Brian Mosbaugh.

371. Defendant's shifting, post-hoc justifications—including conflicting assertions made within EEOC positions under Charge No. 43-2025-01587 and contradictory contemporaneous audio evidence—demonstrate that the operational basis proffered for Plaintiff's termination is a pretext to mask retaliatory intent, in violation of North Carolina public policy.

372. Under controlling North Carolina precedent, an alternative federal statutory remedy only precludes a state common law public policy claim if that remedy is completely adequate to vindicate the specific rights violated. The North Carolina Supreme Court explicitly rejected automatic preemption in *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166 (1992), holding that common law public policy claims stemming from the foundational exceptions in *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 381 S.E.2d 445 (1989) can run concurrently alongside federal counts.

93

373. Because North Carolina courts adopt the Title VII burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to evaluate wrongful discharge claims, Plaintiff may simultaneously pursue both state and federal frameworks. Under controlling district precedent, federal standards govern the evaluation of common law claims anchored to state policies, meaning that a showing of severe temporal proximity and shifting employer pretext is sufficient to sustain the claim at the pleading stage (*see Howard v. Am. Inst. of Certified Pub. Accountants*, M.D.N.C. 2008).

374. Title VII remedies are bound by rigid federal statutory recovery limits under 42 U.S.C. § 1981a(b)(3), capping combined compensatory and punitive damages at a maximum of $300,000. In sharp contrast, a North Carolina common law tort claim for wrongful discharge carries no compensatory damage caps. Because Defendant engaged in a coordinated course of targeted administrative subversion, benefits erasure, and retaliatory termination, a capped statutory framework is structurally inadequate to fully displace a common law tort remedy under North Carolina law.

94

375. As a direct and proximate result of Defendant's unlawful termination of Plaintiff's employment in violation of the express public policy of the State of North Carolina codified in N.C. Gen. Stat. § 143-422.2, Plaintiff has suffered a substantial loss of income, loss of employment benefits, and severe emotional distress. Furthermore, pursuant to N.C. Gen. Stat. § 1D-15, Plaintiff is entitled to an award of punitive damages because Defendant's coordinated course of database manipulation, pretextual justifications, and retaliatory discharge was accompanied by fraud, actual malice, and willful and wanton conduct, entitling Plaintiff to compensatory damages, front pay, and punitive damages against Defendant, jointly and severally, in an amount to be determined by a jury.

## COUNT VIII: EIGHTH CLAIM FOR RELIEF

### (Common Law False Imprisonment)

*(Against Defendant, jointly and severally)*

376. Plaintiff realleges and incorporates by reference each and every factual allegation contained in the Master Statement of Facts in Paragraphs 1 through 375 of this Complaint as if fully set forth herein, while explicitly

95

excluding the statutory legal conclusions of any preceding Claims for Relief.

377. At all times relevant, the common law of North Carolina protected Plaintiff from being intentionally and unlawfully detained against his will without legal justification, establishing a civil tort remedy against corporate entities for the acts of their agents under *West v. King's Department Store, Inc.*, 321 N.C. 698 (1988) and *Hales v. McCrory-McLellan Corp.*, 260 N.C. 568 (1963).

378. Defendant, acting through its authorized managerial agents, restrained Plaintiff's physical liberty without lawful authority or legal justification; as set forth in Paragraphs 181 through 190.

379. On April 24, 2025, Defendant's managerial agent, Human Resources Manager Brian Mosbaugh, directed Paint Department Supervisor Amy Shelton to contact Plaintiff and initiate an unannounced administrative meeting; as set forth in Paragraphs 181 and 182.

380. Supervisor Amy Shelton stated to Plaintiff that he *"had no choice"* in the matter, and subsequently escorted him to the designated office space; as set forth in Paragraph 183.

381. Upon entering the enclosed office space, Plaintiff encountered Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley; as set forth in Paragraphs 184 and 185.

382. Human Resources Manager Brian Mosbaugh and Safety Lead Maria Rumley were named as subjects in Plaintiff's EEOC filing prior to this meeting; as set forth in Paragraphs 175 and 177.

383. As the administrative interaction continued and Plaintiff moved toward the exit, Defendant's agent took an affirmative step forward and positioned her physical body directly over the door handle and exit hardware, actively moving into Plaintiff's path to create a total obstruction of his egress; as set forth in Paragraphs 186 through 189.

384. Defendant's assertion that this closed-door workplace confinement was a legally authorized disciplinary action is a documented post-hoc fabrication; as set forth in Paragraphs 195 through 205.

385. Because this non-consensual physical confinement of an employee experiencing an active medical emergency was an intentional act rather than an industrial accident—and because Defendant's authorized operational managers acted with the specific, deliberate intent to inflict severe emotional duress, restrain liberty, and disregard an apparent acute

97

medical emergency—this claim falls completely outside the exclusivity coverage of the North Carolina Workers' Compensation Act pursuant to Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 340 S.E.2d 116 (1986).

386.     Plaintiff was fully conscious and aware of this unlawful physical restraint and confinement, which was executed by Defendant's corporate agents without any legal justification, warrant, privilege, or right, completely depriving Plaintiff of his freedom of movement by force, threat of force, and against his express will.

387.     At all times relevant, Defendant's managerial agents executed this unlawful confinement while acting squarely within the line and scope of their employment, utilizing their corporate authority, company office space, and managerial positions to execute the detention. Consequently, Defendant's corporate entities are strictly and vicariously liable for the resulting injuries under the doctrine of *respondeat superior* pursuant to *Brown v. Burlington Industries, Inc.*, 93 N.C. App. 431, 378 S.E.2d 232 (1989).

388.     As a direct and proximate result of Defendant's physical restraint and confinement, Plaintiff suffered public humiliation, medical distress, and

98

deep emotional distress, thereby entitling Plaintiff to common-law compensatory damages against Defendant, jointly and severally.

389. Because the non-consensual confinement was accompanied by fraud, actual malice, and willful and wanton conduct, Plaintiff is entitled to an award of punitive damages against Defendant, jointly and severally, pursuant to N.C. Gen. Stat. § 1D-15.

## COUNT IX: NINTH CLAIM FOR RELIEF

### (Common Law Abuse of Process)

*(Against Defendant, jointly and severally)*

390. Plaintiff realleges and incorporates by reference each and every factual allegation contained in the Master Statement of Facts in Paragraphs 1 through 389 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

391. Plaintiff specifically realleges and incorporates by reference each and every factual allegation contained in the Master Statement of Facts in

Paragraphs 195 through 205, Paragraph 217, and Paragraphs 227 through 254 of this Complaint as if fully set forth herein.

392. To state a valid claim for common law abuse of process under North Carolina law, a plaintiff must establish the existence of an ulterior, collateral purpose and a willful act in the use of the process not proper in the regular prosecution of the proceeding pursuant to *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611 (1979) and *Hewes v. Johnston*, 61 N.C. App. 603, 301 S.E.2d 120 (1983).

393. Plaintiff was terminated on April 29, 2025, prior to the physical existence or filing of the state court Chapter 50C petition later that afternoon; as set forth in Paragraph 202.

394. Manager Lindsey Cota then utilized Plaintiff's 12:44 PM termination as the primary factual catalyst during the 1:04 PM state court filing, leveraging the freshly executed corporate discharge to manufacture a false, instantaneous "emergency" while asserting a deceptive and contradictory narrative that directly conflicted with her own historical emails and handwritten praise of Plaintiff; as set forth in Paragraphs 203 and 227 through 239.

100

395. At 3:15 PM, the 50C *ex parte* temporary no-contact order was subsequently granted under Finding #5 specifically based on the termination; as set forth in Paragraphs 204 and 205.

396. The temporary 50C order expired on or around May 6, 2025, when Manager Cota failed to appear on the first court date; as set forth in Paragraph 240.

397. Following this expiration, Defendant actively intervened to revive the expired process. Defendant deployed its retained corporate defense counsel, W. Mark Peck, to accompany the manager and enter a general appearance at the subsequent scheduled hearing; as set forth in Paragraphs 241 through 253.

398. Defendant's retained counsel stated on the judicial record that his participation was executed on behalf of Defendant Deere & Company based upon the employment statuses of the respective parties; as set forth in Paragraph 243.

399. Defendant, by and through its corporate agents and hired counsel, advanced this state court process despite possessing actual notice and internal records demonstrating that the complaining manager's permanent out-of-state relocation over 800 miles away to Iowa had already been

corporate-approved and was actively underway, meaning she required no long-term local geographic protection; as set forth in Paragraph 217.

400. Following corporate defense counsel's appearance in court and direction to serve discovery requests directly upon his firm, Defendant utilized the channels of the pending litigation to propose an out-of-court resolution, issuing a written proposal offering to dismiss the Chapter 50C action if Plaintiff would execute a *"mutual no-contact agreement"*; as set forth in Paragraph 249.

401. Upon Plaintiff's rejection of the unilateral compromise proposal and his subsequent service of formal state court discovery demands, Defendant entered a voluntary dismissal of the action without prejudice. Defendant's counsel documented the collateral and improper purpose of the litigation, stating textually within written correspondence that the dismissal was being entered solely because the complaining manager felt *"the message has been sufficiently sent"* to Plaintiff; as set forth in Paragraphs 251 through 253.

402. Defendant subsequently utilized this same Chapter 50C filing to justify Plaintiff's termination and has already actively attempted to use this

102

mechanism to shield themselves from liability and defeat Plaintiff's EEOC charge; as set forth in Paragraphs 195 through 205.

403. At all times relevant, Defendant's counsel, W. Mark Peck, was actively representing Defendant and handling Plaintiff's EEOC charge, meaning Defendant possessed continuous corporate and legal knowledge of the overlapping proceedings while misapplying the state court mechanism.

404. Defendant committed willful, improper acts in the regular use of the state court Chapter 50C process after its issuance to secure a collateral advantage, and in doing so, misapplied the process to achieving an ulterior purpose for which it was not legally intended, violating the standard set forth in Badame v. Lampke, 242 N.C. 755, 89 S.E.2d 466 (1955).

405. Because Defendant withdrew the action immediately upon facing discovery obligations and judicial scrutiny, the proceeding constitutes an actionable perversion of the legal system under Stanback v. Stanback, 297 N.C. 181, 254 S.E.2d 611 (1979) and Hewes v. Johnston, 61 N.C. App. 603, 301 S.E.2d 120 (1983).

406. As a direct and proximate result of Defendant's willful abuse of the legal process, Plaintiff suffered profound public humiliation, severe

103

emotional distress, disruption to his legal defense, and the accumulation of legal and medical liabilities, entitling Plaintiff to an award of compensatory damages, and punitive damages against Defendant, jointly and severally, pursuant to N.C. Gen. Stat. § 14-15 based upon Defendant's fraud, malice, and willful conduct, in an amount to be determined by a jury.

## <u>COUNT X: TENTH CLAIM FOR RELIEF</u>

### (Intentional Infliction of Emotional Distress)

*(Against Defendant, jointly and severally)*

407.   Plaintiff realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 406 of this Complaint as if fully set forth herein, while explicitly excluding the statutory legal conclusions of any preceding Claims for Relief.

408.   Plaintiff specifically realleges and incorporates by reference each and every allegation contained in Paragraphs 37 through 55 of this Complaint.

409.    Under North Carolina substantive law, the essential elements of an IIED claim are: (1) extreme and outrageous conduct; (2) intended to cause or recklessly causing; and (3) severe emotional distress.

410.    Under established state precedent, an employer's prior knowledge of a subordinate's severe, clinically documented susceptibility to emotional or physiological distress is an objective factor that transforms standard personnel actions into "extreme and outrageous" conduct [*Miller v. Brooks*, 123 N.C. App. 20, 472 S.E.2d 350 (1996); Restatement (Second) of Torts § 46 cmt. f].

411.    Defendant acted with reckless disregard and intentional malice by continuously refusing to accommodate Plaintiff's sincerely held religious beliefs. As detailed in Paragraphs 37 through 55 of this Complaint, Defendant possessed a documented understanding that its discriminatory enforcement actions were the primary root cause of Plaintiff's severe emotional trauma, yet it deliberately chose a course of continuous refusal, physical confinement, and retaliatory termination, knowing with substantial certainty that its actions would exploit Plaintiff's known medical susceptibilities

412. From August 2024 through April 2025, global corporate compliance and local management possessed explicit, continuous written notice of Plaintiff's ongoing clinical medical crises. While Defendant was fully apprised of Plaintiff's underlying objective clinical diagnoses—including Generalized Anxiety Disorder, panic attacks, an acute hypertensive blood pressure profile spanning up to 150/80, and a medically mandated admission to a 4-week Mental Health Intensive Outpatient Program (MH-IOP)—Plaintiff's continuous disclosures put Defendant on direct notice of the active symptoms, including panic attacks and the impact to his ability to work, sleep, and eat, directly induced by its enforcement actions, spanning at least twelve distinct internal disclosures across an eight-month period:

  a) August 16-17, 2024: Written notice to corporate compliance warning of a hostile work environment and separate email to Manager Tami McNeer, n/k/a Tami Comegys; as set forth in Paragraphs 63 through 68;

  b) August 19, 2024: Written supplement to corporate compliance and separate email notice to Manager Lindsey Cota; as set forth in Paragraphs 75 through 78.

c) August 21–22, 2024: Direct delivery of medical restrictions to HR Representative Veronica McNeill, HR Manager Brian Mosbaugh, and Supervisor Jessie White; as set forth in Paragraphs 81 through 84;

d) October 3, 6, and 7, 2024: Written notice to corporate compliance and a separate concurrent email to Program Manager Russell Nieman; as set forth in Paragraphs 110 through 115 and 170;

e) November 22–23, 2024: Notice to corporate compliance and separate email to Program Manager Russell Nieman; as set forth in Paragraphs 136 through 139;

f) March 25 and April 16, 2025: Internal reports submitted to corporate compliance; as set forth in Paragraphs 163 and 180.

413. Defendant maintained actual, multi-month notice that its continuous refusal to accommodate Plaintiff and its disparate policy enforcement were the sole root cause of Plaintiff's escalating psychiatric injuries, yet Defendant willfully, maliciously, and continuously refused to implement any corrective or remedial measures.

414. Despite possessing actual notice of Plaintiff's acute medical vulnerabilities, Defendant explicitly authorized, executed, and ratified a calculated campaign of psychological and physical coercion through targeted actions which were executed as a single, continuous, and unified course of extreme and outrageous behavior deliberately designed to extend beyond the formal date of termination to continuously exploit Plaintiff's known medical susceptibilities, including:

a) A security badge lockout as set forth in Paragraph 91;

b) A non-consensual confinement as set forth in Paragraphs 186 through 188;

c) An arrest threat during termination as set forth in Paragraph 199;

d) Manufactured state court litigation as set forth in Paragraphs 227 through 240;

e) Post-termination isolation and secrecy mandates as set forth in Paragraph 256 through 258; and

f) Threats of sanctions and attorney fees as set forth in Paragraph 273.

415. Under North Carolina law, while an employer generally possesses an administrative privilege to discipline subordinates, this privilege is stripped when management conducts a campaign of physical intimidation and intentional misconduct [*West v. King's Department Store, Inc.*, 321 N.C. 698, 365 S.E.2d 621 (1988)]. Because Defendant's managing agents acted with actual malice and knew their conduct was substantially certain to exploit a documented clinical disorder, these injuries completely transcend the administrative scope and exclusivity bar of the North Carolina Workers' Compensation Act.

416. It is a foundational principle of federal and state jurisprudence that Title VII and the Family and Medical Leave Act (FMLA) do not preempt, exclude, or absorb independent, common-law intentional tort claims simply because the underlying events occurred in a workplace setting [*Bratcher v. Pharm. Prod. Dev., Inc.*, 545 F. Supp. 2d 533, 545 (E.D.N.C. 2008)].

417. Defendant's global corporate compliance and legal leadership actively adopted and ratified this outrageous conduct by maintaining absolute administrative silence, executing expedited hotline closures within six (6) hours as set forth in Paragraphs 261 through 263, and issuing post-

109

termination secrecy mandates to insulate its managing agents from liability as set forth in Paragraphs 255 through 258.

418.    As a direct and proximate result of Defendant's extreme and outrageous actions, Plaintiff suffered, and continues to suffer severe, debilitating, and unremitting emotional distress and acute mental anguish amounting to a severe and diagnosable psychiatric impairment. This distress has chronically and adversely affected Plaintiff, resulting in an unbroken, multi-year chain of therapeutic medical care stretching from August 2024 to the present filing; as set forth in Paragraph 275.

419.    Because these intentional torts were committed by Defendant's managing agents acting within the scope of their employment and subsequently ratified by top-down corporate leadership, Defendant is directly and vicariously liable for all resulting harm, entitling Plaintiff to compensatory damages, special damages for medical and psychological treatment, and punitive damages against Defendant, jointly and severally, for intentional and reckless conduct, in an amount to be determined at trial.

110

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Stephen Moore respectfully requests that this Court enter judgment against Defendant, jointly and severally, granting the following relief:

1.  Compensatory and Economic Damages: Award full economic compensation for all past and future financial losses according to proof at trial, including:

    a) Lost back pay and lost front pay calculated in accordance with Plaintiff's documented career trajectory toward specialized management and corporate procurement roles;

    b) Lost annual and yearly bonuses;

    c) Lost retirement and 401(k) contributions; and

    d) All out-of-pocket medical debts and expenses incurred as a direct result of Defendant's cancellation of family health benefits.

2.  Title VII Statutory Remedies: Award the maximum statutory compensatory and punitive damages permitted under 42 U.S.C. § 1981a for intentional, malicious, and reckless violations of Title VII, to be evaluated independent of any common-law tort or equitable recovery.

111

3. FMLA Statutory Remedies: Award double liquidated damages for willful, bad-faith statutory violations under the Family and Medical Leave Act (FMLA) pursuant to 29 U.S.C. § 2617, sitting entirely outside of Title VII statutory caps.

4. Common-Law Tort and Punitive Damages: Award substantial, separate compensatory, punitive, and exemplary damages against Defendant according to proof at trial for Common-Law False Imprisonment, Intentional Infliction of Emotional Distress (IIED), Abuse of Process, and Wrongful Discharge in Violation of North Carolina Public Policy, based upon the conduct, intentional acts, and post-termination administrative actions ratified by corporate leadership.

5. Declaratory Judgment: Enter a Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202 establishing that Defendant's operational, IT, and benefits actions constituted a willful, bad-faith breach of statutory obligations and corporate fiduciary duties.

6. Injunctive Relief: Enter a Permanent Injunction prohibiting Defendant and their agents from enforcing or threatening to enforce any corporate compliance confidentiality directive or internal policy to impede, chill, or restrict Plaintiff from communicating directly with, or presenting

112

evidence to, the U.S. Securities and Exchange Commission (SEC) or any other regulatory investigative agency.

7.      Fees and Costs: Award reasonable attorney's fees, expert witness fees, forensic technical analysis costs, and all general costs of this action as permitted by applicable federal and state statutes.

8.      General Relief: Grant such other and further relief as this Court deems just, equitable, and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Stephen Moore hereby demands a trial by jury on all issues and claims so triable in this action.

Dated: _July 31, 2026_   Respectfully submitted,

By: _____

Stephen Moore, Plaintiff Pro Se
6136 Pepperidge Way
Climax, NC 27233 (Randolph County)
Phone: (336) 772-0044
Email: spmoore1@gtcc.edu

113

# VERIFICATION

I, Stephen Moore, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I am the Plaintiff in the above-captioned matter, that I have read the foregoing First Amended Complaint and know the contents thereof, and that the factual allegations contained therein are true and correct to the best of my own personal knowledge, information, and belief.

Executed on this 31 day of July 2026.

Respectfully submitted,

By: _____

Stephen Moore, Plaintiff Pro Se

6136 Pepperidge Way

Climax, NC 27233 (Randolph County)

Phone: (336) 772-0044

Email: spmoore1@gtcc.edu

114